# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The locations more fully described in Attachments A<br>and A1 through A48 | )<br>)<br>)<br>)<br>)    Case No.    MJ21-377<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
The locations more fully described in Attachments A and A1 through A48

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C | See Attachment C |

The application is based on these facts:

✓ See attached affidavit of FBI Special Agent Shawna McCann.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

_____
*Applicant's signature*

Shawna McCann, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____06/28/2021_____

City and state: Seattle, Washington

_____
*Judge's signature*

Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SHAWNA MCCANN

STATE OF WASHINGTON )
) ss
COUNTY OF KING )

I, Shawna McCann, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since September 2017. I am currently assigned to the Seattle Field Division where I am a member of the violent crime, gang, and Transnational Organized Crime – Western Hemisphere squad. In this capacity, I investigate, *inter alia*, violations of the Controlled Substance Act, Title 21, United States Code, Section 801 *et seq*., and related offenses. I have received specialized training in the enforcement and investigation of the Controlled Substances Act. I have received over 400 hours of classroom training including, but not limited to, drug identification, drug interdiction, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, manufacturing, and trafficking of controlled substances.

2.      In my role as a Special Agent for the FBI, I have participated in narcotics investigations (e.g., heroin, cocaine, marijuana, and methamphetamine) that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotics-related evidence and the forfeiture of narcotics-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I have encountered and have become familiar with various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to import, export, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations,

AFFIDAVIT OF SHAWNA MCCANN - 1
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and how they code their conversations to disguise their unlawful activities. I am also
2   familiar with the various methods of packaging, delivering, transferring, and laundering
3   drug proceeds. Additionally, through my training and experience, I can identify illegal
4   drugs by sight, odor, and texture.

5       3.      I have also worked on drug investigations involving the use of court-
6   authorized wiretaps under Title III. In that capacity, I have had the opportunity to
7   monitor, listen to, and review transcripts and line sheets (prepared by linguists)
8   documenting the content of hundreds of intercepted conversations involving the
9   trafficking of cocaine, methamphetamine, heroin, and other narcotics, by persons who
10  used some form of code to attempt to thwart law enforcement detection. I have also
11  interviewed defendants at the time of their arrest and have debriefed, spoken with, and/or
12  interviewed numerous drug dealers or confidential sources (informants) at proffer and
13  field interviews who were experienced in speaking in coded conversation over the
14  telephone. From these interviews, and also from discussions with other experienced
15  agents, I have gained knowledge regarding the various methods, techniques, codes,
16  and/or jargon used by drug traffickers in the course of their criminal activities, including
17  their use of firearms to protect their narcotics-related activities and of cellular telephones
18  and other electronic means to facilitate communications while avoiding law enforcement
19  scrutiny.

20      4.      I have written affidavits in support of court-authorized federal warrants and
21  orders in the Western District of Washington for GPS tracking of telephones, Pen
22  Register/Trap and Trace, and search warrants. Additionally, I have testified in grand jury
23  proceedings, written investigative reports, and conducted and participated in numerous
24  interviews of drug traffickers of various roles within drug organizations, which has
25  provided me with a greater understanding of the methods by which drug trafficking
26  organizations operate.

27      5.      I am an investigative law enforcement officer of the United States within
    the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations

AFFIDAVIT OF SHAWNA MCCANN - 2
USAO #2019R01083

1   of, and to make arrests for, violations of the Controlled Substances Act, Title 21, United

2   States Code, Section 801 *et seq.*, and related offenses.

3   ## PURPOSE OF THE AFFIDAVIT

4   6.   As described herein, there is probable cause to believe that the following

5   offenses have been committed, and are being committed, by Herbert Scott, Edward

6   Abercrombie, Sedric McNeair, Jason Hester, Sergio Reyes-Pina aka Gio, Samuel Duarte

7   Avila, Elyas Kerow aka E aka Elias, David Armer, Brett Radcliff, Cresencio Moreno

8   Aguirre, Craig Fellers, James Fellers, Gabriel Timmen aka Gabe, Viet Nguyen aka Tony,

9   Raul Barreto Bejines, Humberto Flores, Cesar Arambula aka the Carpet Guy, Britney

10   Ramirez aka Brit, Rafael Ramirez, and Alvaro Valencia.

11   a.   Distribution of, and possession with intent to distribute, controlled

12   substances, and conspiracy to commit these offenses, in violation of Title 21,

13   United States Code, Sections 841(a)(1), 841(b)(1), and 846;

14   b.   Money laundering and conspiracy to launder money, in violation of

15   Title 18, United States Code, Sections 1956 and 1957;

16   c.   Use of communication facilities to commit, facilitate, or further an

17   act or acts which constitute a felony in violation of Title 21, United States Code,

18   Section 843(b);

19   d.   Interstate and foreign travel to promote, manage, establish, carry on,

20   or facilitate unlawful activity, in violation of Title 18, United States Code,

21   Section 1952;

22   e.   Possession of a firearm in furtherance of a drug trafficking crime, in

23   violation of Title 18, United States Code, Section 924(c); and

24   f.   Prohibited person in possession of a firearm, in violation of Title 18,

25   United States Code, Section 922(g).

26

27

AFFIDAVIT OF SHAWNA MCCANN - 3
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7.      I make this Affidavit in support of an application for warrants authorizing searches of the subject locations and vehicles,[1] which are further described below and in Attachments A and A1 through A48 (attached hereto and incorporated by reference as if fully set forth herein), for evidence, fruits and instrumentalities, as further described in Attachment B (attached hereto and incorporated by reference as if fully set forth herein), of violations of the above-listed statutes, committed by the subjects listed above, and others, as described herein.

8.      For each of the following locations, I request that authority to search extend to all parts of the property, including main structure, garage(s), storage structures, outbuildings, and curtilage, and all vehicles, containers, compartments, or safes located on the property, whether locked or not, where the items described in Attachment B (list of items to be seized) could be found. For each of the following vehicles, I request that authority to search extend to all parts of the vehicle and any cases, containers, compartments, or safes located in the vehicle, whether locked or not, where the items described in Attachment B (list of items to be seized) could be found. Additionally, as is discussed herein, members of this conspiracy have been known to use vehicles with hidden compartments. For this reason, I am requesting that if agents are unable to thoroughly search or access a particular area of a vehicle at the location where the vehicle is found, the vehicle may be transported to another location where they would have at their disposal the appropriate tools and equipment to properly search the vehicle, and the search may continue at that location.

9.      I am seeking warrants for the following subject locations[2] and subject vehicles:[3]

---

[1] The residences and vehicles to be searched are highlighted in bold font in this affidavit.

[2] I have verified the descriptions of the subject properties and vehicles, either by personally viewing them myself, or through my discussions with other law enforcement officers who have personally viewed them.

[3] During this investigation, agents have already identified residences and vehicles as Subject Premises 1–52 and Subject Vehicles 1–50. For consistency, agents are continuing the numbering of target premises and vehicles here.

AFFIDAVIT OF SHAWNA MCCANN - 4
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       a.      A 2007 GMC Yukon bearing Washington license plate BXU6800
2 (**Subject Vehicle 51**), as further described in Attachments A and A1. Herbert
3 Scott uses this vehicle. The probable cause with respect to this vehicle is discussed
4 at paragraphs 24–47.[4]

5       b.      2200 SW Barton Street, Unit 102, Seattle, Washington (**Subject**
6 **Premises 54**), as further described in Attachments A and A2. Edward
7 Abercrombie resides here. The probable cause with respect to this residence is
8 discussed at paragraphs 48–60.

9       c.      A 2006 red Dodge Charger bearing Washington license plate
10 BVA1384 (**Subject Vehicle 52**), as further described in Attachments A and A3.
11 Edward Abercrombie uses this vehicle. The probable cause with respect to this
12 vehicle is discussed at paragraphs 48–60.

13       d.      A black 2012 Jeep Grand Cherokee bearing Washington license
14 plate BUK9041 (**Subject Vehicle 66**), as further described in Attachments A and
15 A4. Edward Abercrombie also uses this vehicle. The probable cause with respect
16 to this vehicle is discussed at paragraphs 48–60.

17       e.      The person of Edward Abercrombie, as further described in
18 Attachments A and A5. The probable cause with respect to this person is discussed
19 at paragraphs 48–60.

20       f.      3111 S Hudson Street, Seattle, Washington (**Subject Premises 55**),
21 as further described in Attachments A and A6. Sedric McNeair resides here. The
22 probable cause with respect to this residence is discussed at paragraphs 61–70.

23       g.      A blue 2002 Oldsmobile Bravada bearing Washington license plate
24 AEK3653 (**Subject Vehicle 67**), as further described in Attachments A and A7.

25

26

27

---

[4] Based on GPS location data for TT17, used by Herbert Scott, agents believe Herbert Scott is currently residing at a hotel in Tukwila, Washington. Due to the transient nature of hotel rooms as a primary residence, agents intend to apply for a separate search warrant for Herbert Scott's residence closer to the planned takedown date.

AFFIDAVIT OF SHAWNA MCCANN - 5
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sedric McNeair uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 61–70.

h.     The person of Sedric McNeair, as further described in Attachments A and A8. The probable cause with respect to this person is discussed at paragraphs 61–70.

i.     17700 151st Avenue SE, Apartment 8D, Renton, Washington (**Subject Premises 71**), as further described in Attachments A and A9. Jason Hester resides here. The probable cause with respect to this residence is discussed at paragraphs 71–82.

j.     A black 2004 Dodge Ram bearing Washington license plate C17426W (**Subject Vehicle 68**), as further described in Attachments A and A10. Jason Hester uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 71–82.

k.     The person of Jason Hester, as further described in Attachments A and A11. The probable cause with respect to this person is discussed at paragraphs 71–82.

l.     1106 SW 139th Street, Unit 13-150, Burien, Washington (**Subject Premises 56**), as further described in Attachments A and A12. Sergio Reyes-Pina resides here. The probable cause with respect to this residence is discussed at paragraphs 83–99.

m.     A red 2004 Pontiac GTO, VIN Number 6G2VX12G74L235542 (**Subject Vehicle 53**), as further described in Attachments A and A13. Sergio Reyes-Pina uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 83–99.

n.     A gold 2011 BMW 328 bearing Washington license plate number BWN5107 (**Subject Vehicle 54**), as further described in Attachments A and A14. Sergio Reyes-Pina uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 83–99.

AFFIDAVIT OF SHAWNA MCCANN - 6
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

o.      A blue 1993 GMC van bearing Washington license plate BUE0575 (**Subject Vehicle 55**), as further described in Attachments A and A15. Sergio Reyes-Pina uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 83–99.

p.      12602 Occidental Avenue South, Seattle, Washington (**Subject Premises 62**), as further described in Attachments A and A16. Craig Fellers and James Fellers reside here. The probable cause with respect to this residence is discussed at paragraphs 100–114.

q.      The person of Craig Fellers, as further described in Attachments A and A17. The probable cause with respect to this person is discussed at paragraphs 100–114.

r.      The person of James Fellers, as further described in Attachments A and A18. The probable cause with respect to this person is discussed at paragraphs 100–114.

s.      11455 SE 164th Street, Renton, Washington (**Subject Premises 57**), as further described in Attachments A and A19. Samuel Duarte Avila resides here. The probable cause with respect to this residence is discussed at paragraphs 115–134.

t.      A cream 1986 Toyota Corolla bearing Washington license plate CV3495A (**Subject Vehicle 69**), as further described in Attachments A and A20. Samuel Duarte Avila uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 115–134.

u.      7726 52nd Avenue Court E, Tacoma, Washington (**Subject Premises 58**), as further described in Attachments A and A21. Elyas Kerow resides here. The probable cause with respect to this residence is discussed at paragraphs 135–150.

v.      17914 17th Avenue Court E, Spanaway, Washington (**Subject Premises 59**), as further described in Attachments A and A22. David Armer

AFFIDAVIT OF SHAWNA MCCANN - 7
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  resides here. The probable cause with respect to this residence is discussed at

2  paragraphs 151–161.

3     w.    A white 1993 Mazda Miata MX-5 convertible bearing Washington

4  state license plate number BTY0100 (**Subject Vehicle 56**), as further described in

5  Attachments A and A23. David Armer uses this vehicle. The probable cause with

6  respect to this vehicle is discussed at paragraphs 151–161.

7     x.    A gray 2007 Subaru Impreza bearing Washington license plate

8  BXG5600 (**Subject Vehicle 70**), as further described in Attachments A and A24.

9  David Armer also uses this vehicle. The probable cause with respect to this vehicle

10  is discussed at paragraphs 151–161.

11     y.    1012 7th Avenue NW, Puyallup, Washington (**Subject**

12  **Premises 60**), as further described in Attachments A and A25. Brett Radcliff

13  resides here. The probable cause with respect to this residence is discussed at

14  paragraphs 162–176.

15     z.    A red 2008 Lexus IS bearing Washington state license plate number

16  BTF0103 (**Subject Vehicle 57**), as further described in Attachments A and A26.

17  Brett Radcliff uses this vehicle. The probable cause with respect to this vehicle is

18  discussed at paragraphs 162–176.

19     aa.    A silver 2001 BMW 330 bearing Washington license plate

20  BVB6733 (**Subject Vehicle 71**), as further described in Attachments A and A27.

21  Brett Radcliff also uses this vehicle. The probable cause with respect to this

22  vehicle is discussed at paragraphs 162–176.

23     bb.    21917 30th Avenue South, Unit #4, Des Moines, Washington,

24  (**Subject Premises 61**), as further described in Attachments A and A28. Cresencio

25  Moreno Aguirre resides here. The probable cause with respect to this residence is

26  discussed at paragraphs 177–186.

27     cc.    A silver 2008 Subaru Tribeca bearing Washington license plate

number BVA6233 (**Subject Vehicle 58**), as further described in Attachments A

AFFIDAVIT OF SHAWNA MCCANN - 8
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and A29. Cresencio Moreno Aguirre uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 177–186.

dd.    9330 Southwest Gorsuch Road, Vashon, Washington (**Subject Premises 63**), as further described in Attachments A and A30. Gabriel Timmen resides here. The probable cause with respect to this residence is discussed at paragraphs 187–195.

ee.    The person of Gabriel Timmen, as further described in Attachments A and A31. The probable cause with respect to this person is discussed at paragraphs 187–195.

ff.    10825 11th Avenue Southwest, Seattle, Washington (**Subject Premises 64**), as further described in Attachments A and A32. Viet Nguyen aka Tony reside here. The probable cause with respect to this residence is discussed at paragraphs 196–208.

gg.    A black 2014 Mercedes coupe bearing Washington license plate BVV7319 (**Subject Vehicle 59**), as further described in Attachments A and A33. Viet Nguyen aka Tony uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 196–208.

hh.    18760 NE 59th Court, #H1059 Redmond, Washington (**Subject Premises 65**), as further described in Attachments A and A34. Raul Barreto Bejines resides here. The probable cause with respect to this residence is discussed at paragraphs 209–227.

ii.    A black 2005 Volkswagen Jetta bearing Washington license plate BKH4556 (**Subject Vehicle 60**), as further described in Attachments A and A35. Raul Barreto Bejines uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 209–227.

jj.    1003 7th Avenue Southeast, #A, Puyallup, Washington (**Subject Premises 66**), as further described in Attachments A and A36. Humberto Flores

AFFIDAVIT OF SHAWNA MCCANN - 9
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

resides here. The probable cause with respect to this residence is discussed at paragraphs 228–239.

kk.    The person of Humberto Flores, as further described in Attachments A and A37. The probable cause with respect to this person is discussed at paragraphs 228–239.

ll.    1119 W Sam Street, Kent, Washington (**Subject Premises 67**), as further described in Attachments A and A38. Cesar Arambula and Britney Ramirez reside here. The probable cause with respect to this residence is discussed at paragraphs 240–273.

mm.    A grey 2012 Toyota Tundra bearing Washington license plate LEM204J (**Subject Vehicle 61**), as further described in Attachments A and A39. Cesar Arambula uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 240–273.

nn.    A white 2017 Toyota Corolla bearing Washington license plate BQG3751 (**Subject Vehicle 62**), as further described in Attachments A and A40. Cesar Arambula and Britney Ramirez use this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 240–273.

oo.    The person of Britney Ramirez, as further described in Attachments A and A41.  The probable cause with respect to this person is discussed at paragraphs 240–273.

pp.    112 1/2 5th Avenue SW, Pacific, Washington (**Subject Premises 68**), as further described in Attachments A and A42. Rafael Ramirez resides here. The probable cause with respect to this residence is discussed at paragraphs 274–293.

qq.    A black 2003 Ford Excursion bearing Washington license plate AEJ2423 (**Subject Vehicle 63**), as further described in Attachments A and A43. Rafael Ramirez is believed to use this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 274–293.

AFFIDAVIT OF SHAWNA MCCANN - 10
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    rr.    A silver 2019 Toyota Camry bearing Washington license plate
2    number BPD1725 (**Subject Vehicle 64**), as further described in Attachments A
3    and A44. Rafael Ramirez also uses this vehicle. The probable cause with respect
4    to this vehicle is discussed at paragraphs 274–293.

5    ss.    A gold 1998 Lincoln Town Car bearing Washington license plate
6    AYB0054 (**Subject Vehicle 65**), as further described in Attachments A and A45.
7    Rafael Ramirez also uses this vehicle. The probable cause with respect to this
8    vehicle is discussed at paragraphs 274–293.

9    tt.    The Mustang Shop d/b/a TMS Performance at 8504 S 228th Street,
10    Kent, Washington (**Subject Premises 69**), as further described in Attachments A
11    and A46. Alvaro Valencia works here. The probable cause with respect to this
12    business is discussed at paragraphs 294–312.

13    uu.    2918 Brookdale Road East, Tacoma, Washington (**Subject Premises
14    70**), as further described in Attachments A and A47. Alvaro Valencia resides here.
15    The probable cause with respect to this residence is discussed at paragraphs 294–
16    318.

17    vv.    The person of Alvaro Valencia, as further described in Attachments
18    A and A48. The probable cause with respect to this person is discussed at
19    paragraphs 294–318.

### SOURCES OF INFORMATION

21    10.    I have obtained the facts set forth in this Affidavit through my personal
22    participation in the investigation described below; from my review of intercepted calls to
23    date; from oral and written reports of other law enforcement officers; from records,
24    documents, and other evidence obtained during this investigation; and from confidential
25    sources who are associated with and knowledgeable about the subjects of this
26    investigation. I have obtained and read official reports prepared by various law
27    enforcement officers participating in this and other investigations. I have not included
     every fact known concerning this investigation. I have set forth the facts that I believe are

AFFIDAVIT OF SHAWNA MCCANN - 11
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  necessary for a fair determination of probable cause for the requested search warrants.

2  During this investigation, investigators have made use of numerous investigative

3  techniques, including but not limited to making controlled purchases of controlled

4  substances; executing search warrants; seizing drugs and drug proceeds; conducting

5  video and physical surveillance; and conducting a financial investigation.

6          11.      When I refer to vehicle ownership or driver's licenses in this Affidavit, I

7  have reviewed the relevant state vehicle records from the Washington State Department

8  of Licensing, or the equivalent agency in other states or countries. When I refer to the

9  criminal history of a subject, I have read the available criminal history from state or

10  federal agencies. When I refer to telephone subscription records, I have read the

11  subscriber records obtained from the telephone company by administrative subpoena or

12  court order, or I have obtained the information from other law enforcement officers

13  familiar with this investigation. When I refer to telephone toll records, I have received the

14  information from the telephone company pursuant to an administrative subpoena or

15  court-authorized pen register. When I refer to customer information regarding utilities,

16  power, or vehicle rentals, I obtained this information pursuant to an administrative

17  subpoena. When I refer to GPS data for telephones, that data was obtained pursuant to

18  court authorization, granted in the Western District of Washington.

19          12.      During the course of this investigation, we have obtained authorization in

20  the Western District of Washington to intercept wire communication over multiple target

21  telephones, including but not limited to the telephones summarized in the following table:

| Target Telephone | User | Date of Order | Date Ended |
|---|---|---|---|
| TT14 – (206) 898-8457 | Jamar Howard | September 3, 2020 | October 2, 2020 |
| TT17 – (206) 946-5202 | Herbert Scott | September 3, 2020 | October 2, 2020 |
| TT20 – (206) 397-7007 | Jimmy Carter | September 3, 2020 | October 2, 2020 |
| TT18 – (206) 214-5569 | Sergio Reyes-Pina | October 23, 2020 | November 21, 2020 |
| TT38 – (206) 683-2485 | Sergio Reyes-Pina | October 23, 2020 | November 21, 2020 |

AFFIDAVIT OF SHAWNA MCCANN - 12
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| TT34 – (425) 321-4206 | Raul Barreto Bejines | October 23, 2020 | November 21, 2020 |
| TT45 - (253) 248-9563 | Samuel Duarte Avila | February 8, 2021 | March 9, 2021 |
| TT62 – (253) 239-7246 | Samuel Duarte Avila | February 8, 2021 | March 9, 2021 |
| TT59 - (206) 489-6958 | Cesar Arambula | February 8, 2021 | March 9, 2021 |

13.     During this investigation, investigators intercepted thousands of drug-related conversations and text messages. In this Affidavit, I discuss some of these intercepted calls and text messages. Communications occurred in English and Spanish. A combination of agents, task force officers, detectives, and professional staff have listened to these calls and summarized their content, including translations from Spanish to English. I have relied upon the written summaries (line sheets and transcripts) prepared by the monitors for the description of the calls referenced below, and I have also personally listened to the calls. I know through training and experience, including experience with this investigation, that individuals involved in the distribution of controlled substances and other criminal activity often use coded communications when referring to their illegal activity. I have used this training and experience, as well as the training and experience of other experienced law enforcement officers familiar with this investigation who have reviewed these summaries and have listened to the calls, to explain what I believe to be an accurate interpretation for these coded communications, which are included in brackets in this Affidavit.

14.     In this Affidavit, I discuss some of the pertinent portions of intercepted calls and generally do not include the entire intercepted conversation. I indicate where possible the parties who were intercepted on the call. In so doing, I often rely on voice recognition/comparison by myself, other agents, and/or the monitors. For example, if we have identified an individual as the user of a particular phone (through use of a ruse call, surveillance/GPS, etc.), and that person starts using a different phone, we will typically recognize the voice of that person when using the new phone.

AFFIDAVIT OF SHAWNA MCCANN - 13
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

15.     Some examples of coded terms used by members of the drug trafficking organization being investigated, referred to as the "Michael Walker DTO" for the reasons described below, include "hard," "heezy," and "heezard" (crack cocaine); "soft," "seezy," and "seezoft" (powder cocaine); "fish," "fishscale," or "scales" (type of cocaine, usually good quality); and "fire" (often marijuana, but also used to describe high potency of cocaine). Some terms to indicate quantity have been "nino," "neen," or "nina" (nine ounces of cocaine); "baby" (four and a half ounces of cocaine); "half" or "heezy" (half ounce); "ball" (eightball referring to one-eighth of an ounce); and "queezy" (quarter-ounce). Drug customers are often referred to as "jug" or "joog."

16.     DTO members also use the word "need" and "on" to convey the desire to be supplied with drugs. DTO members often say, "I need to see you," "I need you," "I need on" to arrange a drug transaction. Oftentimes when this is said, no other discussion occurs regarding amounts or prices. Based upon my training and experience, I believe the expected transaction is already known by both parties because of the length of time and frequency the parties have been dealing with each other.

17.     Context is also important in interpreting coded language; for example, when someone says "one" is selling for "14-5," that indicates that the speaker is discussing an ounce of cocaine for $1,450. Based on my training and experience, including during this investigation, I am familiar with current and recent price ranges of drugs in the Seattle area, which depends on quality; I know that an ounce of cocaine can cost anywhere from $1,100 to $2,000 per ounce. The price has fluctuated significantly over the last year, due at least in part to the global pandemic and its effect on the ease of transporting goods and crossing borders. Additionally, price is affected by the volume, such that larger amounts are sold at some discount as compared to smaller amounts.

18.     In this Affidavit, I am seeking authority to search locations and vehicles associated with drug distributors. To give perspective as to the amount of drugs being distributed, and because most of the distribution in this investigation centers on cocaine, I will draw the distinction as to user amounts and distributor amounts of this drug based

AFFIDAVIT OF SHAWNA MCCANN - 14
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

upon my training, experience, and knowledge of this investigation. For example, crack cocaine is often sold on the street in the open air drug markets of the Seattle area. Street dealers often sell $10 or $20 rocks or wafers of crack cocaine to users. These rocks are often .1 or .2 grams of cocaine each.  User amounts of cocaine, both powder and crack, also include "teeners" (1/16 of an ounce or 1.75 grams) and single grams. Street dealers themselves may be supplied "eight balls" (1/8 of an ounce or 3.5 grams), quarter-ounce (7 grams), half-ounce (14 grams), and ounce (28 grams) quantities or more.  Often those purchasing multiple ounces or more of cocaine are distributing to other distributors. Around the time of the narcotics transactions discussed herein, when purchasing an ounce of cocaine, the price was around $1,100 to $1,700, give or take a couple of hundred dollars.  Larger amounts of cocaine and associated prices are discussed throughout this Affidavit.

## SUMMARY OF THE INVESTIGATION

19.    Based upon historical confidential source information, investigators identified Michael Walker as a large-scale cocaine source of supply and also a source of supply of marijuana. Information provided by confidential sources, the use of traditional investigative techniques, and the use of wiretaps led to the identification of numerous individuals suspected to be involved with the drug trafficking and money laundering activities of Michael Walker. Investigators refer to this network of suspected drug traffickers as the Michael Walker Drug Trafficking Organization (DTO).

20.    Many of the target subjects and their associates have affiliation with Seattle-area gangs, predominantly those originating from the Central District neighborhood of Seattle. These gangs include, but are not limited to, Union Street Black Gangster Disciples (BGD), Deuce 8 BGD, and other local Crip and Blood gangs. Because of these associations, investigators believe that the Michael Walker DTO may be a significant source of supply of drugs being distributed by these gangs. Many involved with these gangs have been investigated for crimes ranging from street-level narcotics to

AFFIDAVIT OF SHAWNA MCCANN - 15
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   robbery, shootings, and murder. Many target subjects and associates have long-standing
2   relationships with others engaged in criminal activity, some spanning decades.

3        21.    On March 31, 2021, agents obtained indictments and arrest warrants for
4   19 individuals associated with the Michael Walker DTO, who were charged with
5   narcotics and firearms related charges, including conspiracy to distribute controlled
6   substances.  On the same day, agents obtained approximately 89 federal search warrants
7   for 40 locations, associated vehicles, and persons. These search warrants authorized
8   agents to not only search for and seize cellular/communication devices, but also to search
9   the contents of any cellular/communication devices that were seized.

10        22.    On April 7, 2021, agents executed the arrest and search warrants in a
11   takedown that resulted in the arrests of 24 individuals, including19 indicted individuals
12   and 5 individuals arrested on complaint and subsequently indicted. The searches of the
13   residences, vehicles, and persons during this takedown resulted in the seizure of over 40
14   firearms, nearly $450,000 in cash and nearly 4 kilograms of cocaine.  Due to the size of
15   this investigation and the ongoing global pandemic concerns, agents made the decision to
16   bifurcate the searches and arrests of the targets in this investigation by conducting two
17   takedowns. The April 7, 2021, takedown focused on current and former gang associates
18   of the Michael Walker DTO, who were also local narcotics distributors. The second
19   planned takedown, concerning this Application, will focus on narcotics traffickers
20   associated with the Michael Walker DTO, many of whom appear to have interstate and
21   international narcotics connections.

22        **SUBJECT LOCATIONS AND VEHICLES TO BE SEARCHED**

23        23.    In this section, I discuss the identification of individual subjects, examples
24   of their intercepted communications and drug transactions, seizures of their contraband,
25   and their associated locations and vehicles for which search warrants are sought.

26   **A.    Herbert Scott's Vehicle**

27        24.    Investigators have identified Herbert Scott as a multi-ounce redistributor of
cocaine working with several members of the Michael Walker DTO, including Kevin

AFFIDAVIT OF SHAWNA MCCANN - 16
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Gipson,[5] Sergio Reyes-Pina, Edward Abercrombie, and Sedric McNeair. During this
2  investigation, based on physical surveillance and GPS location data for Herbert Scott's
3  cell phone (TT17) (identification discussed below), agents identified Herbert Scott's
4  vehicle as a 2007 GMC Yukon bearing Washington license plate BXU6800, registered to
5  Herbert Scott (**Subject Vehicle 51**).

6      25.     Herbert Scott was first identified while agents were conducting a court-
7  authorized interception of communications on Kevin Gipson's number, TT6, in July and
8  August 2020.  Then, on September 3, 2020, agents obtained a court-authorized wire and
9  electronic communications interception on TT17, used by Herbert Scott. During the
10 period of wire and electronic communications interception, agents observed Herbert Scott
11 conducting multiple cocaine transactions on a daily to weekly basis, as described in more
12 detail below. These drug transactions and agents' observations are noted below for
13 purposes of establishing probable cause to search **Subject Vehicle 51**.

14     26.     Herbert Scott has felony convictions for drug possession,[6] conspiracy to
15 possess controlled substances with intent to manufacture/distribute, possession of
16 controlled substances with intent to manufacture/distribute, and unlawful possession of a
17 firearm.

18     27.     During physical surveillance conducted while intercepting communications
19 on TT6, Kevin Gipson's phone, agents identified Herbert Scott as the user of TT17. On
20 July 31, 2020, at approximately 10:32 a.m., investigators intercepted a wire
21 communication from Kevin Gipson using TT6 to Herbert Scott at TT17 (Session 3415).
22 During this call, the following discussion took place:

23          TT17: What's up KG [Kevin Gipson]?
24          TT6: What's up with you?

25
26  [5] Kevin Gipson is currently charged in *United States v. Lumumba-Olabisi, et al.*, CR20-056 RSM, with conspiracy to distribute controlled substances.

27  [6] The Washington Supreme Court has recently held that Washington's state law prohibiting mere possession of controlled substances is unconstitutional.

AFFIDAVIT OF SHAWNA MCCANN - 17
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   TT17: Aww. Shit shit. How you doin' bro?

2   TT6: Shit, I'm alright man. Just chillin'.

3   TT17: Yup yup.

4   TT6: Your people still on, or no [have cocaine or not]?

5   TT17: Uh yeah, they're still on [have cocaine]. I'm out here…yawns… excuse
6   me. I just got up. I'm way out on the other side of town. I'm about to head
    back to the house. I'm going to hit it.

7   TT6: Oh ok. Hit me up.

8   TT17: Ok

9   TT6: Ok. Appreciate you man.

10   28.      On July 31, 2020, at approximately 12:56 p.m., Kevin Gipson using TT6
11   called Herbert Scott at TT17 (Session 3444). During this call, the following discussion
12   took place:

13   TT17: What's up bro? I'm waiting for a call back [from supplier of cocaine]. Huh?

14   TT6: My man how you doing?

15   TT17: Alright. Alright. I'm waiting for a call back.

16   TT6: Ok. I'm about to run to the store. I'm going straight back home.

17   TT17: Ok.

18   29.      On July 31, 2020, at approximately 4:20 p.m., Herbert Scott using TT17
19   called Kevin Gipson at TT6 (Session 3476). During this call, the following discussion
    took place:

20   TT6: Hello?

21   TT17: Hello. My bad bro. I fell asleep. Yeah. I missed his [supplier's] call, but he
22   called me back and uh… it's 13, 13 [$1,300].

23   TT6: 13 for what?

24   TT17: 13 [$1,300] for the whole one [one ounce of cocaine].

25   TT6: Ok. Let me get it.

26   TT17: Um, I've got to call him [supplier] and have him come see me [bring the
    cocaine].

27   TT6: 13 for the whole one?

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT17: 13 for the whole one.

TT6: Let me get two of them [two ounces of cocaine].

TT17: Only because, I mean, you know only because I fucked with him last, he stingy. I be putting other people and, so I done probably sold about a bird and a half [kilogram and a half of cocaine] for him [supplier] the last two weeks.

TT6: Let me get two of them.

TT17: Yeah.

TT6: Is it hard [crack] or soft [powder]?

TT17: Ah no, soft.

TT6: Yeah let me get, let me get two of them [two ounces of powder cocaine].

TT17: Yep yep.

TT6: I got the two.

TT17: Let me um, let me call him [supplier] real quick. You might have to come over this way.

TT6: Where you at?

TT17: I'm in the West [Seattle].

TT6: Ok.

TT17: Let me call him real quick and see.

TT6: Alright.

30.     On July 31, 2020, at approximately 4:26 p.m., Herbert Scott using TT17 called Kevin Gipson at TT6 (Session 3477). During this call, the following discussion took place:

TT6: Hello.

TT17: Hello?

TT6: What's up?

TT17: What's up bro? Hello?

TT6: Yeah this is KG.

TT17: Yeah so ah, can you be here in like an hour? I'm going to send you the address.

TT6: Sure that.

AFFIDAVIT OF SHAWNA MCCANN - 19
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT17: Okay. I'm gonna shoot you the address.

TT6: Alright.

TT17: Alright.

TT6: One hour?

TT17: Yep.

TT6: Alright.

31.     On July 31, 2020, at approximately 4:27 p.m., Herbert Scott using TT17 sent an MMS/chat text message to Kevin Gipson at TT6: "8630 delridge way sw" (PID 1125). On July 31, 2020, at approximately 5:23 p.m., Kevin Gipson using TT6 called Herbert Scott at TT17 (Session 3488). During this call, Kevin Gipson told Herbert Scott that he was there "outside on Cloverdale and 84th" and then clarified, "Delridge Way Southwest" parked at "8600. I'm on the corner because there ain't nowhere to park." Herbert Scott said "8630" and "alright here I come."

32.     On July 31, 2020, agents were conducting surveillance in the area of 8630 Delridge Way SW, Seattle, Washington. At approximately 5:27 p.m., agents observed a male, who agents identified based on a comparison to his driver's license photograph as Herbert Scott, exit the apartment building at 8630 Delridge Way SW, Seattle, Washington, and meet with Kevin Gipson, also identified based on a comparison to his driver's license photograph. Herbert Scott and Kevin Gipson went inside the apartment building. At approximately 6:22 p.m., agents observed Herbert Scott and Kevin Gipson exit the apartment building. Kevin Gipson got into a red Ford Explorer, which agents had seen Kevin Gipson driving on prior physical surveillance, and drove off, and Herbert Scott returned to the Delridge Way apartment building. On July 31, 2020, from approximately 6:27 p.m. to 6:31 p.m., Kevin Gipson using TT6 called three people and told them "I got it" or let them know "I was back." (Sessions 3494, 3496, 3499.)  On July 31, 2020, at approximately 7:09 p.m., Kevin Gipson using TT6 called Herbert Scott at TT17 (Session 3502). During this call, Kevin Gipson said he appreciated Herbert Scott for "looking out."

AFFIDAVIT OF SHAWNA MCCANN - 20
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     Based on my training and experience, and the training and experience of other agents I am working with on this investigation, I believe that during these above-referenced calls, Herbert Scott using TT17 communicated with Kevin Gipson to arrange a sale of two ounces of powder cocaine to Kevin Gipson, and that Kevin Gipson drove to Herbert Scott's apartment building to purchase and receive the cocaine. Based on my training and experience, I know that "soft" is a common term used by drug traffickers to refer to powder cocaine. I also know, based on my training and experience, that drug traffickers commonly use terms like "whole one" and "a bird" to refer to the quantity of narcotics, specifically one ounce and one kilogram, respectively. Additionally, the price of one ounce of powder cocaine in the Seattle area, at the time of this narcotics transaction, was within the range of approximately $1,100 to $1,700. I also know, based on my training and experience, that drug traffickers commonly use terms like "I got it," "I'm on," and "I'm back" to refer to getting resupplied with narcotics and having narcotics available to re-distribute.

34.     Additionally, on August 12, 2020, at approximately 6:13 p.m., GPS location data for TT17 indicated Herbert Scott was in the vicinity of 15th Avenue Southwest and Southwest 98th Street, Seattle, Washington. At approximately 7:03 p.m., investigators observed Herbert Scott in the driver's seat of a silver Chevrolet Impala with a temporary tag in a strip mall parking lot at 9823 15th Avenue Southwest, Seattle, Washington. Investigators identified Herbert Scott based on a comparison to his driver's license photograph. After a few minutes, Herbert Scott drove off in the silver Impala, and investigators lost sight of him. At approximately 7:28 p.m., GPS location data for TT17 indicated Herbert Scott was in the vicinity of Costco at 4401 4th Avenue South, Seattle, Washington. At approximately 7:38 p.m., investigators observed the silver Impala parked unoccupied in the Costco parking lot. At approximately 7:47 p.m., investigators observed Herbert Scott shopping inside Costco with two unknown females. At approximately 8:29 p.m., investigators observed Herbert Scott and the two females exit Costco, load items into the trunk of the silver Impala, and then Herbert Scott and the two females left

in the vehicle with Herbert Scott driving. Investigators followed them directly to Herbert Scott's apartment complex, 8630 Delridge Way Southwest, Seattle, Washington. Herbert Scott parked the silver Impala in front of the apartment complex, and Herbert Scott and the two females went inside the apartment building. The next GPS location data for TT17 was in the vicinity of Herbert Scott's apartment.

35.    On September 9, 2020, at approximately 1:11 p.m., Sergio Reyes-Pina using TT18 (identification discussed below) sent the following text message to Herbert Scott at TT17: "Got fishscale at 14." (Session 816.) I know, based on my training and experience and the training and experience of other investigators I work with, that "fishscale" and "scales" are common terms used by drug traffickers as code or slang to refer to good quality cocaine, due to the shine or sheen. Accordingly, I believe that Sergio Reyes-Pina used TT18 to offer Herbert Scott good quality "fishscale" cocaine at $1,400 per ounce.

36.    Later on September 9, 2020, at approximately 1:45 p.m., Sergio Reyes-Pina using TT18 called Herbert Scott at TT17. (Session 843.) During this call the following discussion took place:

TT17:  You said how much?

TT18:  Uh, for the fishscale one [good powder cocaine]? The one that has like [unintelligible]?

TT17:  14 [$1,400 per ounce] for the fishscale?

TT18:  Yeah. It's different scale. And it's definitely like yellow [good quality], which people want yellow. Cuz the yellow means it has more real coke [cocaine] than cut [cutting agent].

TT17:  Okay, so umm, I'm trying see, I'm trying to see who I can hit real quick [customers] to help me get off this fucking, this high fucking debt that I owe you and shit.

TT18:  Yeah cuz I got a lot of product [cocaine] too, that's the thing. I have a lot of product, and I have no money to re-up [get resupplied] and pick up some more [cocaine]. So I have the 10.50 [lower quality cocaine for $1,050 per ounce], give it to you... well if you are trying to give it to them hella cheap, like hella cheap to get rid of it, and it's still good, I'll give it to you for 9.50

[sell it to Scott for $950 who will turn around and sell it to customers for $1,050]. Then I got this other kind that is a little bit more dusty, powdery but it's better at 10.50 [medium quality cocaine to sell to Scott at $1,050 per ounce]. And then the fishscale at 14 [good quality cocaine for $1,400 per ounce]. So you can give everybody a variety, and I got a lot of shit.

TT17: Ok.

TT18: Like a bunch of shit. I will give everyone a deal. Like if you want a 9 piece [9 ounces], I'll give you a 9 piece at like 8k [$8,000], and then you give it to them [customers] at $8,500 and you make $500 every time. And they'll like that. Or try like 83 [$8,300 to sell to customer], and I'll do like 79 [sell it to Scott at $7,900].

TT17: And then what about 9 piece [9 ounces] for 14 [$1,400 per ounce]?

TT18: You could do 13.5 [$1,350] times 9 [ounces] [price TT18 would charge Scott], and you charge them [customers] 14 [$1,400] times 9 [ounces].

TT17: Ok, Ok, Ok.

TT18: Alright, yeah just let me know, and if you need to know more about the quality or whatever just call me back. I have them all right now, I got like four 9 pieces [four 9-ounce units] of the cheap ones [lower quality cocaine], and then I think one 9 piece [one 9-ounce unit] of the alright one [medium quality cocaine] at 10.50 that's better than the ones I've been giving you. And then I got a 9 piece [one 9-ounce unit of the good quality cocaine]. But I can get more of the fishscale [good quality cocaine]. I just have [unintelligible] but I'll get another 9 piece [9 ounces of good quality cocaine] tomorrow.

TT17: Alright.

37.     Based on my training and experience and the intercepted communications, I believe that Sergio Reyes-Pina was offering to sell three types of cocaine to Herbert Scott, at varying levels of quality and corresponding pricing, in units of 9 ounces. I know that "piece" is a common term to refer to a unit of narcotics, typically an ounce, and that "yellow" and "creamy" are common terms to refer to good quality cocaine. I also know from my training and experience, the training and experience of other investigators on this case, and our experience on a previous investigation that is related to this one, that cocaine is commonly sold in 9-ounce units, as such a unit is approximately one-quarter of a kilogram of cocaine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

38.     On September 11, 2020, at approximately 5:57 p.m., investigators intercepted a phone call from Herbert Scott using TT17 to Sergio Reyes-Pina at TT18. (Session 1389.) During this call the following discussion took place:

TT17: They still got some of the raw [good quality cocaine]?

TT18: Yeah.

TT17: Ok. I need, uh, I need, uh, half [ounce] of the raw [good quality cocaine].

TT18: Uh, I got two [ounces] raws [good quality cocaine].

TT17: Huh?

TT18: I got, uh, two raws. I got one raw that's um 2k [$2,000 per ounce], and there's a raw that's 1,400 [$1,400 per ounce].

TT17: Naw, what you mean, ahh, you got one raw that's what?

TT18: Uh, 1,400 [$1,400 per ounce] that has a little bit of cut [cutting agent] but it's still fishscale [good quality], and then I got the 21, 20, 2,000 [$2,000 per ounce] that's all fishscale [pure cocaine] no cut [cutting agent].

TT17: Ok, we didn't talk about that the other day, I want, I can still, what we talked about was a 1,400 fishscale [$1,400 per ounce]. I can still whip it [cook the powder cocaine into crack cocaine].

TT18: Yeah, yeah, yeah.

TT17: I can still whip [cook] it, and it all come back [no amounts lost in the cooking process] right?

TT18: Oh no, not all of it.

TT17: What's, [unintelligible].

TT18: Uh, probably like 20, 21, 22. Thing is, I've never cooked it [cocaine]. I just know exactly how much cut [cutting agent used] they have because the plug [supplier] who get it [cocaine] from Mexico, they give us the uh, the percentage. This one has…

TT17: Ok [unintelligible] hey look, listen, I'm gonna meet you, stay at Top Hat.[7] I'll be right there.

---

[7] Agents believe "Top Hat" was a reference to a specific neighborhood/area in West Seattle between Burien and White Center off Meyers Way, which also has several businesses named after the area. Both Herbert Scott and Sergio Reyes-Pina resided in and frequented this area at the time of this interception, based on GPS location data from their cell phones and physical surveillance conducted by agents.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT18: Ok, the thing is, it's [cocaine] not on me. I would have to go get it [cocaine]. And it's right here at the 128th [house].[8]

TT17: Come to the house [Herbert Scott's residence].

TT18: Where at?

TT17: Come to the house, Delridge [at that time, Herbert Scott resided at 8630 Delridge Way SW in Seattle, Washington].

TT18: Ok.

TT17: Alright.

39.     Based on my training and experience, I believe that during this call Herbert Scott asked to buy powder cocaine from Sergio Reyes-Pina and asked whether the cocaine was good quality, such that when it was cooked into crack cocaine it would still be the same quantity (*i.e.*, none of the product would be lost or evaporate in the cooking process). Sergio Reyes-Pina indicated that he had two different types of cocaine, one that had no cutting agent in it for $2,000 per ounce and another type of cocaine that had some cutting agent in it for $1,400 per ounce. Herbert Scott stated he wanted to buy the fishscale type of cocaine for $1,400 per ounce, which Sergio Reyes-Pina had previously offered to Herbert Scott. Sergio Reyes-Pina then agreed to bring the cocaine to Herbert Scott's then-residence.

40.     After intercepting this communication, agents established physical surveillance at 8630 Delridge Way SW, Apt 101, Seattle, Washington. At approximately 7:03 p.m., investigators intercepted a text message from Herbert Scott using TT17 to Sergio Reyes-Pina at TT18 that read: "U coming to alley right" (Session 1410), to which Sergio Reyes-Pina using TT18 replied "Yea." (Session 1420). At approximately 7:23 p.m., investigators observed a BMW (**Subject Vehicle 54**)[9] drive down the alley behind

[8] Agents believe "the 128th" was a reference for Sergio Reyes-Pina's stash house (**Subject Premises 62**) which is located one-half of a block from S 128th Street.

[9] **Subject Vehicle 54** is used by Sergio Reyes-Pina, and it is discussed in more detail in Section E of this affidavit.

AFFIDAVIT OF SHAWNA MCCANN - 25
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8630 Delridge Way SW, Apt 101, Seattle, Washington.[10] At approximately 7:43 p.m., investigators observed the BMW being driven southbound out of the alley by a younger Hispanic male matching Sergio Reyes-Pina's general physical description, with another younger Hispanic male as a passenger.  Because of the conditions and the tint on the BMW, it was too dark for investigators to positively identify the driver as Sergio Reyes-Pina. Agents were able to read the license plate of the BMW as BFR6140, however, and a records check showed that the BMW was registered to Arielle Piteo-Tarpy at an address in Lake Forest Park, Washington, but had been sold on August 29, 2020, to Sergio Reyes Pina at 130 SW 112 Street, #A204, Seattle, Washington.

41.     At approximately 7:59 p.m., investigators observed **Subject Vehicle 54** park on the west side of the 12600 block of Occidental Avenue South, Burien, Washington. The passenger stayed in the vehicle, but the driver got out of **Subject Vehicle 54** and went into the house at 12602 Occidental Avenue S, Seattle, Washington (**Subject Premises 62**).[11]  At approximately 8:05 p.m., investigators observed the driver return to **Subject Vehicle 54** and put a large bag in the trunk of the car, get back into the driver's seat, and drive away. At approximately 8:12 p.m., investigators observed **Subject Vehicle 54** pull back into the alley behind 8630 Delridge Way SW, Apt 101, Seattle, Washington. At approximately 8:23 p.m., investigators observed two males standing near **Subject Vehicle 51** in the alley. At approximately 8:35 p.m., investigators drove down the alley and observed **Subject Vehicle 54** parked directly next to **Subject Vehicle 51**. Based on my training and experience and the intercepted communications described above, I believe that investigators observed Sergio Reyes-Pina meeting with Herbert Scott to complete the transaction they had discussed, and that Sergio Reyes-Pina

---

[10] Due to other vehicles and obstructions in the alley and the darkness of night, investigators were unable to observe whether anyone got out of the BMW or entered the apartment complex or came from the complex and contacted the BMW.

[11] **Subject Premises 62** is discussed in more detail later in this affidavit, but it is the residence of Craig Fellers and James Fellers, and agents believe that Sergio Reyes-Pina uses it as a place to store his stash of narcotics.

1  had to re-supply his cocaine at a stash house in Burien (**Subject Premises 62**) to

2  complete the deal.

3       42.    On September 14, 2020, at approximately 7:14 p.m., investigators

4  intercepted a phone call from Herbert Scott using TT17 to Sergio Reyes-Pina at TT18.

5  (Session 1951.) During this call, Herbert Scott asked for "a quart [quarter ounce of

6  cocaine]." Sergio Reyes-Pina clarified, "uh, quarter [ounce] of what [type of cocaine]?"

7  Herbert Scott said, "fourteen [the fishscale cocaine that was $1,400 per ounce]." The

8  parties then agreed to meet at the NAPA Auto Parts store in Kent to conduct the cocaine

9  transaction. At approximately 7:46 p.m., investigators observed **Subject Vehicle 51** pull

10  into the NAPA Auto Parts parking lot in Kent and park next to **Subject Vehicle 54**. At

11  approximately 7:48 p.m., investigators intercepted a phone call from Herbert Scott using

12  TT17 to Sergio Reyes-Pina at TT18. (Session 1964.) During this call the following

13  discussion took place:

14      TT17: C'mon bro.

15      TT18: Hey, I'm getting it [cocaine] ready. I'm weighing it [cocaine] now.

16      TT17: Just do, do the half [ounce of cocaine].

17      TT18: Half ounce?

18      TT17: Do the half [ounce of cocaine].

19      TT18: Ok, let me get it ready.

20      TT17: Alright.

21      43.    At approximately 7:49 p.m., investigators observed a smaller Hispanic

22  male, matching the physical description of Sergio Reyes-Pina, walk from the NAPA Auto

23  Parts store and get into the rear driver's side seat of **Subject Vehicle 51**. A few minutes

24  later, the Hispanic male matching Sergio Reyes-Pina's description exited **Subject**

25  **Vehicle 51**, got into **Subject Vehicle 54**, and both vehicles left the parking lot. Agents

26  believe that Herbert Scott and Sergio Reyes-Pina met to conduct the transaction for a half

27  ounce of cocaine.

AFFIDAVIT OF SHAWNA MCCANN - 27
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     On November 10, 2020, Herbert Scott using TT17 and Sergio Reyes-Pina using TT18 exchanged the following text messages:

> TT17: G [nickname for Sergio] my fault bro I'm not trying to duck you I'm trying to put something together now bro [working on narcotics deal] thanks for working with me to bro I got you geo [nickname for Sergio]. (SID 1291)
>
> TT18: Yupyup hmu. (SID 1292)
>
> TT18: Got the raw [powder cocaine] at 14 [$1,400 per ounce] rn [right now] and rerock [crack cocaine] at 7 each [$700]. (SID 1293)
>
> TT17: Ok bro. (SID 1295)

45.     Based on my training and experience, I believe that Herbert Scott told Sergio Reyes-Pina that he was working on putting together a narcotics transaction and that Sergio Reyes-Pina quoted prices for cocaine and crack cocaine to Herbert Scott.

46.     Based on the investigation to date, agents believe that Herbert Scott continues to drive **Subject Vehicle 51**, but has moved out of 8630 Delridge Way SW, Apt 101, Seattle, Washington and is currently residing at a hotel room in Tukwila. Specifically, agents obtained GPS location data on TT17, which showed that Herbert Scott remained at 8630 Delridge Way SW, Apt 101, Seattle, Washington overnights from August 2020 to October 2020, but renewed GPS location data for TT17 showed that Herbert Scott remained at the Jett Inn Motel located at 3747 S 142nd St, Tukwila, Washington from May 21, 2021, to June 21, 2021. During this time, agents frequently observed **Subject Vehicle 51** parked at the Jett Inn Motel. On May 21, 2021, agents observed **Subject Vehicle 51** parked unoccupied at Uncle Ruckus Cannabis located at 1436 E Republican Street, Seattle, Washington, and GPS location data for TT17 placed Herbert Scott at this location. Agents observed Herbert Scott exit Uncle Ruckus Cannabis at approximately 12:30 a.m., get into **Subject Vehicle 51**, and drive off. On May 25, 2021, agents observed **Subject Vehicle 51** parked unoccupied in front of 9644 18th Avenue Southwest, Seattle, Washington, and GPS location data for TT17 placed Herbert Scott at this location. Additionally, **Subject Vehicle 51** is registered under his name.

AFFIDAVIT OF SHAWNA MCCANN - 28
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

47.     I know based on my training and experience, that drug traffickers frequently keep their narcotics, narcotics proceeds, and firearms in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Herbert Scott is a cocaine redistributor who likely keeps his narcotics supply, proceeds, and firearms in **Subject Vehicle 51**.

**B.     Edward Abercrombie's Residence and Vehicles**

48.     Edward Abercrombie is a multi-ounce redistributor of cocaine working with several members of the Michael Walker DTO, including Herbert Scott and Jamar Howard.[12] During this investigation, based on physical surveillance and GPS location data for Edward Abercrombie's cell phone (TT21) (identification discussed below), agents identified Edward Abercrombie's residence as 2200 SW Barton Street, Unit 102, Seattle, Washington (**Subject Premises 54**),[13] and his vehicles as a 2006 red Dodge Charger bearing Washington license plate BVA1384, registered to Edward Abercrombie at 823 SW Henderson Street, Seattle, Washington (**Subject Vehicle 52**), and a black 2012 Jeep Grand Cherokee bearing Washington license plate BUK9041, registered to Maksym Mamochka in Bonney Lake, Washington with a record of sale to "Alisha G. Harrias" at 7732 16th Ave SW, Seattle, Washington on or about March 1, 2021 (**Subject Vehicle 66**).  As set forth below, agents believe that Alisha Harris is the

---

[12] Jamar Howard is currently charged in *United States v. Snipes, et al.*, CR21-057 RSM, with conspiracy to distribute controlled substances.

[13] Edward Abercrombie's driver's license lists his address as 1027 S Donovan Street, Seattle, Washington, but the address has not been updated since September 1, 2018. Agents conducted physical surveillance on the Donovan Street address in April and May 2021, and they did not observe Edward Abercrombie residing overnight at this address.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    girlfriend/significant other of Edward Abercrombie, based on the fact that the law

2    enforcement database CLEAR lists 823 SW Henderson Street, Seattle, Washington as

3    Alisha Harris's prior address and Edward Abercrombie's prior address and current

4    business address. According to the law enforcement database CLEAR, utility records

5    show that Alisha Harris moved to **Subject Premises 54** in March 2021. Agents believe

6    that Edward Abercrombie is currently residing with Alisha Harris at **Subject Premises**

7    **54** based on GPS location data for TT21 placing Edward Abercrombie at **Subject**

8    **Premises 54** overnight from May 21, 2021, to June 21, 2021.

9        49.    Edward Abercrombie has federal felony convictions for felon in possession

10   of a weapon and possession/delivery of opium. Edward Abercrombie has state felony

11   convictions for drug possession with intent to distribute, conspiracy drug possession with

12   intent to distribute, forgery, drug possession, escape, and vehicle theft.

13       50.    Agents identified Edward Abercrombie as the user of TT21 after observing

14   Edward Abercrombie in the same area as GPS location data for TT21 at multiple

15   locations and times. For example, on September 23, 2020, at approximately 1:00 p.m.,

16   GPS data for TT21 indicated the user of the phone was in the vicinity of the La Quinta

17   Inn, 2824 South 188th Street, SeaTac, Washington. At approximately 1:45 p.m., agents

18   arrived at La Quinta and observed a red 2006 Dodge Charger, Washington license

19   BVA1384 (**Subject Vehicle 52**), registered to Edward Abercrombie, parked unoccupied

20   in the parking lot. At approximately 2:43 p.m., agents observed Edward Abercrombie exit

21   the hotel alone and leave in **Subject Vehicle 52**. At this time, agents positively identified

22   Edward Abercrombie from a comparison to his driver's license photograph. At

23   approximately 3:00 p.m., GPS data for TT21 indicated Edward Abercrombie was in the

24   vicinity of 16th Avenue Southwest and Southwest 100th Street in Seattle. At

25   approximately 3:05 p.m., agents arrived at that location and observed **Subject Vehicle 52**

26   parked in the parking lot of Taradise Café, 9808 16th Avenue Southwest, Seattle,

27   Washington. At approximately 3:45 p.m., agents observed Edward Abercrombie leave

alone in **Subject Vehicle 52**. At approximately 3:48 p.m., GPS data for TT21 indicated

AFFIDAVIT OF SHAWNA MCCANN - 30
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that the device was in the vicinity of Super Saver, 10616 16th Avenue Southwest in Seattle. At approximately 3:51 p.m., agents arrived at that location and saw **Subject Vehicle 52** parked unoccupied in the store parking lot. Moreover, in May 2021, agents located a Facebook account under the username Abercrombie&Feast, which had several photographs of Edward Abercrombie, identified based on a comparison to his driver's license photograph, and a picture of a business card posted that listed Abercrombie&Feast as the business name, Edward Abercrombie as the Chef,  823 SW Henderson Street, Seattle, Washington as the business address, and TT21 as the business number.

51.     During the period of wire and electronic communications interceptions on Herbert Scott using TT17 and Jamar Howard using TT14, agents heard Edward Abercrombie discussing narcotics deals and pricing, as described in more detail below. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 54** and **Subject Vehicles 52** and **66**.

52.     On September 4, 2020, at approximately 3:33 p.m., Jamar Howard using TT14[14] made a call to Edward Abercrombie at TT21. (Session 251.) During this call the following discussion took place:

> TT14: Dirty [Curtis Snipes][15] told me to call you.
>
> TT21: Aw shoot man. I didn't even know you was all still waiting [for narcotics]. Thinkin' that someone wasn't gonna call me, so I made a move [sold narcotics to someone else] but I'm a uhh hit [call] you on the next one [next narcotics deal]. Can I hit [call] the number or what?

---

[14] Agents identified Jamar Howard as the user of TT14 after they obtained GPS location data for TT14, conducted physical surveillance in the GPS ping radii for TT14, and observed Jamar Howard, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS location data for TT14 at different locations and times.

[15] Curtis Snipes is currently charged in *United States v. Snipes, et al.*, CR21-057 RSM, with conspiracy to distribute controlled substances, distribution of cocaine, and being a felon in possession of a firearm. Based on confidential source information, intercepted communications in this investigation, and a search of Curtis Snipes's residence in Tacoma, Washington, agents learned that Curtis Snipes's street nickname is "Dirty."

AFFIDAVIT OF SHAWNA MCCANN - 31
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   TT14: Yeah it's all good.

2   TT21: Ok, I'll just hit [call] the number then on the next one [next narcotics deal].

3   TT14: Ok Ok.

4   53.     Based on my training and experience, I believe that Jamar Howard was

5   discussing a drug transaction with Edward Abercrombie and that Edward Abercrombie

6   told Jamar Howard that he would call Jamar Howard for the next drug transaction. I

7   know that the term "move" is a common term used by drug traffickers to refer to a drug

8   transaction.

9   54.     On September 8, 2020, at approximately 5:42 p.m., Herbert Scott using

10   TT17 called Edward Abercrombie at TT21. (Session 528.) During this call the following

11   discussion took place:

12   TT17: [unintelligible] how much for the half [half ounce of cocaine]?

13   TT21: It's 900 [$900].

14   TT17: Yeah.

15   TT21: Alright, I'll let you know when I'm on that side [near Renton where Jamar

16         Howard lived].

17   TT17: Alright.

18   TT21: Alright.

19   TT17: I might have a little mo [call disconnected].

20   55.     Based on my training and experience, I believe that Herbert Scott asked to

21   buy a half ounce of cocaine from Edward Abercrombie and that Edward Abercrombie

22   gave a price of $900. Based on my training and experience and the intercepted

23   communications, I know that $900 is within the range of pricing for a half ounce of

24   cocaine at that time.

25   56.     Based on the investigation to date, agents believe that Edward Abercrombie

26   lives at **Subject Premises 54** and drives **Subject Vehicles 52** and **66**. GPS location data

27   on Edward Abercrombie's cell phone, TT21, shows that Edward Abercrombie remained

     at **Subject Premises 54** overnights from May 21, 2021, to the present.

AFFIDAVIT OF SHAWNA MCCANN - 32
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

57.     For example, on May 25, 2021, GPS location data for TT21 placed Edward Abercrombie at Uncle Ike's Dispensary located at 9822 15th Avenue Southwest, Seattle, Washington. At approximately 5:56 p.m., agents observed Edward Abercrombie, identified based on a comparison to his driver's license photograph, exit the dispensary. Agents observed Edward Abercrombie get into **Subject Vehicle 66** and drive off. Edward Abercrombie was the only occupant of the vehicle. Agents lost Edward Abercrombie in traffic, and drove to the Westwood Vista Apartments located at 2200 Southwest Barton Street in Seattle (apartment complex of **Subject Premises 54**) to see if Edward Abercrombie had driven home. Agents arrived at **Subject Premises 54** and located **Subject Vehicle 66** parked unoccupied in the apartment complex parking lot of **Subject Premises 54**. Shortly thereafter, at approximately 6:07 p.m., GPS location data for TT21 placed Edward Abercrombie at **Subject Premises 54.**

58.     On June 1, 2021, at approximately 1:54 p.m., agents observed **Subject Vehicle 66** pull in and park in the upper parking lot of the apartment complex where **Subject Premises 54** is located. Agents observed Edward Abercrombie, identified based on a comparison to his driver's license photograph, exit **Subject Vehicle 66** and enter the apartment complex of **Subject Premises 54**.[16] Around that same time, GPS location data for TT21 placed Edward Abercrombie in the vicinity of **Subject Premises 54**. On June 2, 2021, at approximately 2:12 p.m., agents observed Edward Abercrombie at the Westwood shopping center. Around that same time, GPS location data for TT21 placed Edward Abercrombie at this shopping center. Agents observed Edward Abercrombie walk across the street and enter the apartment complex of **Subject Premises 54**. Agents observed **Subject Vehicle 52** parked on the street in front of **Subject Premises 54**.  The next GPS location data for TT21 placed Edward Abercrombie at **Subject Premises 54**. On June 11, 2021, agents observed **Subject Vehicle 66** pull in

---

[16] This apartment complex has interior access units and a lock out exterior door, such that agents were unable to follow Edward Abercrombie to a specific unit once he entered the complex.

AFFIDAVIT OF SHAWNA MCCANN - 33
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and park in the apartment complex lot of **Subject Premises 54**, and they also observed

2  **Subject Vehicle 52** parked on the street in front of **Subject Premises 54**.

3      59.    On June 15, 2021, agents observed that the mail box for the apartment

4  complex where **Subject Premises 54** was located contained names on the outside of each

5  mail box for each apartment unit, and the mail box for **Subject Premises 54** listed the

6  name "Howard" on the outside. Agents conducted law enforcement database checks in

7  LexisNexis and observed that Alisha Harris has an alias name of Alisha Howard. Agents

8  also obtained utility information for **Subject Premises 54,** which showed that the utilities

9  are in the name of and paid by Alisha Harris. As set forth above, agents believe Alisha

10  Harris is the girlfriend of Edward Abercrombie and that Edward Abercrombie lives in

11  **Subject Premises 54** with Alisha Harris.

12      60.    I know based on my training and experience, that drug traffickers

13  frequently keep their narcotics, narcotics proceeds, and firearms in their residences,

14  vehicles, and stash locations in order to protect their supply and to have the narcotics on

15  hand for transactions. I also know that drug traffickers maintain records and other

16  trafficking-related materials in their premises, including residences, for a long period of

17  time, including current and prior cell phone devices that contain text messages and

18  contact lists of drug trafficking associates and pay-owe sheets. Based on the above-

19  referenced intercepted communications, I believe that Edward Abercrombie is a cocaine

20  redistributor working for the Michael Walker DTO who likely keeps his narcotics supply,

21  proceeds, and firearms in **Subject Premises 54** and **Subject Vehicles 52** and **66**.

22  **C.**    <u>**Sedric McNeair's Residence and Vehicle**</u>

23      61.    Sedric McNeair is a multi-ounce redistributor of cocaine working with

24  several members of the Michael Walker DTO, including Herbert Scott. During this

25  investigation, based on physical surveillance, agents identified Sedric McNeair's

26  residence as 3111 S Hudson Street, Seattle, Washington (**Subject Premises 55**), and his

27  vehicle as a blue 2002 Oldsmobile Bravada bearing Washington license plate AEK3653

registered to Chanel Fleming at 813 141st Place Southeast, Bellevue, Washington

AFFIDAVIT OF SHAWNA MCCANN - 34
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(**Subject Vehicle 67**).  As set forth below, agents conducted physical surveillance at **Subject Premises 55** and observed Sedric McNeair coming and going from this residence and driving **Subject Vehicle 67**. During the period of wire and electronic communications interceptions on Herbert Scott using TT17, agents heard Sedric McNeair discussing a narcotics deal and pricing, as described in more detail below. This drug transaction and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 55** and **Subject Vehicle 67**.

62.     Sedric McNeair has a federal felony conviction for felon in possession of a firearm and eight state felony convictions for unlawful possession of firearm, drug possession, and vehicle theft. Sedric McNeair is currently on federal supervised release.[17]

63.     On September 9, 2020, at approximately 2:01 p.m., Herbert Scott using TT17 called Sedric McNeair at TT27.[18] (Session 860). During this call the following discussion took place:

TT17: Have you been touching bases?

TT27: Aw, you know, first, second, and third.

TT17: The first, the [unintelligible] is still 18 [$1,800 for an ounce of powder cocaine]?

TT27: Right.

TT17: Huh?

TT27: Right.

---

[17] Within the last month, an officer with U.S. Probation conducted a home visit at Sedric McNeair's residence and did not observe any controlled substances or firearms in plain view.  The officer had provided advance notice of the visit, however, and U.S. Probation would not confirm whether or not the address the officer visited was **Subject Premises 55**.

[18] In May 2021, agents conducted a law enforcement database search for social media accounts associated with TT27 and located a Telegram account with a profile picture of Sedric McNeair, identified based on a comparison to his driver's license photograph. Additionally, TT27 was subscribed to Chanel Flemings at 12256 76th Avenue S, Seattle, Washington, which is the same name under which **Subject Vehicle 67**, driven by Sedric McNeair, is registered. Lastly, Herbert Scott went to the vicinity of Sedric McNeair's residence, **Subject Premises 55**, after telling the user of TT27 that Scott was going to TT27's house. Agents attempted to obtain GPS location data on TT27; however, Sedric McNeair ceased using this number just prior to when agents obtained a search warrant for GPS location data on TT27. I know based on my training and experience that drug traffickers commonly change their phone numbers in order to evade law enforcement detection.

AFFIDAVIT OF SHAWNA MCCANN - 35
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT17: Well shit. I'm getting it. I just got my boy just sent me, the Mexican [believed to be Sergio Reyes-Pina], he has it at 16 [$1,600 for an ounce of powder cocaine].

TT27: Shoot. I probably should [unintelligible] some of that. Does it look better?

TT17: Oh really? I have some scale [fishscale/powder cocaine] at 16 [$1,600 per ounce] that we can cook back and everything [cook into crack cocaine].

TT27: Shit, my nephew called me with some 14 shit [$1,400 for an ounce of powder cocaine]. I just haven't went and looked at it yet [checked out the quality].

TT17: Ok ok.

TT27: That shit is driving though. You know what I'm saying.

TT17: Yeah it's [cocaine] is coming back [to Seattle area].

TT27: So many people starting to have it [cocaine].

TT17: Yep, you already know.

TT27: What's been up though?

TT17: Oh I ain't been doing shit. You at the house?

TT27: I'm about to be in a minute.

TT17: I'm gonna slide through there then.

TT27: Alright.

TT17: Alright.

64.     Based on my training and experience, I believe that Herbert Scott called Sedric McNeair to see how much Sedric McNeair was selling an ounce of cocaine for, after Herbert Scott was offered cocaine from Sergio Reyes-Pina on a separate intercepted call, and that Sedric McNeair indicated he was going to be looking at buying cocaine at $1,400 per ounce from his nephew. Based on intercepted communications and confidential source information, I know that during the early months of the Covid-19 pandemic, cocaine was in low supply in the Seattle area, and I believe that Sedric McNeair and Herbert Scott were discussing that cocaine was starting to come back into Seattle as the city was reopening.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

65.     About 20 minutes later, at approximately 2:20 p.m., Herbert Scott using TT17 called Sedric McNeair at TT27. (Session 865.) During this call, Herbert Scott asked if Sedric McNeair was at home, and Sedric McNeair said he would be home in 20 minutes, and Sedric McNeair referenced that Herbert Scott was already in the neighborhood. Cell site location data for TT17 at the time of this call showed that Herbert Scott was in the vicinity of Sedric McNeair's residence, **Subject Premises 55**. Based on this location data and the intercepted communications described above, I believe that Herbert Scott met with Sedric McNeair at **Subject Premises 55** to further discuss cocaine availability, quality, and pricing.

66.     On May 14, 2021, agents were conducting physical surveillance in the parking lot of the Chevron gas station at 10805 Pacific Highway South in Seattle.[19] At approximately 1:58 p.m., agents observed **Subject Vehicle 67** pull in and park at one of the pumps. Agents had observed this vehicle on prior occasions parked in front of **Subject Premises 55**. Agents identified the driver and sole occupant of the vehicle as Sedric McNeair based on a comparison to his driver's license photograph. Approximately thirty seconds after parking, a heavyset male in his late 20's to early 30's approached the driver's side window of the vehicle.  The male reached through the driver side open window and conducted what appeared to be a hand-to-hand exchange with Sedric McNeair. The male quickly put his hand in his pocket and walked away. Sedric McNeair then drove out of the gas station parking lot.  Based on my training and experience, I believe that during this brief interaction, Sedric McNeair supplied this unknown male with narcotics in a hand-to-hand exchange from **Subject Vehicle 67**.

67.     Based on the investigation to date, agents believe that Sedric McNeair lives at **Subject Premises 55** and is still driving **Subject Vehicle 67**.  For example, on May 25, 2021, agents conducting physical surveillance observed **Subject Vehicle 67** parked at

---

[19] Agents had received information from a confidential human source that this gas station parking lot was a common drug dealing spot for Sedric McNeair.

**Subject Premises 55** from 7:30 p.m. to 11:30 p.m. Two days later, on May 27, 2021, at 7:00 p.m., agents again observed **Subject Vehicle 67** parked at **Subject Premises 55**. At 7:26 p.m., agents observed Sedric McNeair drive away from **Subject Premises 55** in **Subject Vehicle 67**. Shortly thereafter, agents lost Sedric McNeair in traffic. Agents returned to **Subject Premises 55** at approximately 11:30 p.m. and observed **Subject Vehicle 67** back at the residence. Additionally, **Subject Premises 55** is currently listed as Sedric McNeair's residence on his driver's license.

68.     Agents also believe that Sedric McNeair continues to use **Subject Vehicle 67** to conduct drug transactions. On June 1, 2021, at approximately 3:18 p.m., agents located **Subject Vehicle 67** parked on the south side of South Byron Street at Rainier Avenue South in Seattle. Agents observed Sedric McNeair, the only occupant of the car, seated in the driver's seat of **Subject Vehicle 67**. Agents observed a male approach the driver's side of **Subject Vehicle 67**. The male reached through the window and made a hand-to-hand exchange of an unknown item with Sedric McNeair. At approximately 3:24 p.m., Sedric McNeair pulled out and drove away northbound on Rainier Avenue South in **Subject Vehicle 67**. Agents then observed Sedric McNeair get gas at a gas station on Rainier Avenue South in Seattle, before getting back into his vehicle and driving away northbound on Rainier Avenue South. At approximately 3:40 p.m., agents observed Sedric McNeair pull over on the side of the road at 14th Avenue South/South Main Street. He waited there for approximately 20 minutes, before he pulled out and headed eastbound on South Main Street. As he drove, Sedric McNeair was being followed closely by a green 1993 Nissan Pathfinder bearing Washington state license plate number BKG0639, which was occupied by two males. At approximately 4:05 p.m., Sedric McNeair parked in front of the Auto Zone located at 306 23rd Avenue South in Seattle. The Pathfinder also pulled into the lot and parked just to the east of Sedric McNeair. Sedric McNeair got out of **Subject Vehicle 67** and went into the Auto Zone and, at approximately 4:10 p.m., agents observed Sedric McNeair exit the store and talk to one of the males, who had exited the Pathfinder. Sedric McNeair then went back inside

AFFIDAVIT OF SHAWNA MCCANN - 38
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the Auto Zone, and the unknown male got back into the Pathfinder and moved it so that it
2  was parked directly next to **Subject Vehicle 67**. At approximately 4:19 p.m., Sedric
3  McNeair exited the store again and got into **Subject Vehicle 67**. Another male
4  approached Sedric McNeair and talked to him through the driver's window. At
5  approximately 4:26 p.m., agents observed Sedric McNeair and the male in the Pathfinder
6  do a hand-to-hand exchange through the windows of the cars. Sedric McNeair then pulled
7  out of the lot driving alone in **Subject Vehicle 67** and went southbound on Martin Luther
8  King Jr Way South.

9       69.     At approximately 4:52 p.m., Sedric McNeair drove by a black 2007
10  Cadillac Escalade bearing Washington state license plate number ARZ3877. Sedric
11  McNeair motioned with his hand for the Escalade to follow him. Sedric McNeair drove
12  to the Safeway parking lot located at 9262 Rainier Avenue South in Seattle, and the
13  Escalade parked next to him. A male got out of the driver's seat of the Escalade and made
14  a hand-to-hand exchange with Sedric McNeair. The male then went back the Escalade
15  and put something inside. The male then returned to Sedric McNeair and the two of them
16  talked. At approximately 5:00 p.m., Sedric McNeair in **Subject Vehicle 67** and the
17  Escalade left, driving southbound on Rainier Avenue South. The Escalade eventually
18  turned off, and Sedric McNeair continued into Renton. Sedric McNeair continued to
19  drive **Subject Vehicle 67**, and surveillance personnel lost sight of him shortly after 6:10
20  p.m. Agents drove directly to **Subject Premises 55** to see if Sedric McNeair went home
21  and at approximately 6:27 p.m., observed **Subject Vehicle 67** parked at **Subject
22  Premises 55**.[20] Based on my training and experience, I believe that during the brief
23  interactions observed by agents as Sedric McNeair drove around in **Subject Vehicle 67**
24

25  [20] Agents drove directly to **Subject Premises 55** but were unable to get to the residence before Sedric McNeair
26  arrived and went inside. This residence is on a quiet street, and agents are unable to sit for lengthy periods of time
    conducting surveillance without risk of being detected. Therefore, it was difficult for agents to observe Sedric
27  McNeair physically walking in and out of **Subject Premises 55**. However, agents observed Sedric McNeair
    immediately prior to arriving or departing **Subject Premises 55** on several occasions when he was driving **Subject
    Vehicle 67** as the sole occupant, indicating that Sedric McNeair was coming and going from **Subject Premises 55**.

AFFIDAVIT OF SHAWNA MCCANN - 39
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    on June 1, Sedric McNeair supplied unknown males with narcotics in hand-to-hand

2    exchanges and then returned to **Subject Premises 55** after these series of drug

3    transactions.

4         70.    I know based on my training and experience, that drug traffickers

5    frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

6    stash locations in order to protect their supply and to have the narcotics on hand for

7    transactions. I also know that drug traffickers maintain records and other trafficking-

8    related materials in their premises, including residences, for a long period of time,

9    including current and prior cell phone devices that contain text messages and contact lists

10   of drug trafficking associates and pay-owe sheets. Based on the above-referenced

11   intercepted communications, I believe that Sedric McNeair is a multi-ounce cocaine

12   redistributor working with Herbert Scott, who likely keeps his narcotics supply and

13   proceeds in **Subject Premises 55** and **Subject Vehicle 67**.

14   **D.**    **Jason Hester's Residence and Vehicle**

15        71.    Jason Hester is believed to be a multi-ounce source of supply of cocaine to

16   Kenneth Lee[21] and other members of the Michael Walker DTO. During this investigation,

17   based on physical surveillance and GPS location data for Jason Hester's cell phone

18   (TT85), agents identified Jason Hester's residence as 17700 151st Avenue SE, Apartment

19   8D, Renton, Washington (**Subject Premises 71**), and his vehicle as a black 2004 Dodge

20   Ram bearing Washington license plate C17426W registered to Jason Hester and Cherise

21   Hester at **Subject Premises 71** (**Subject Vehicle 68**).

22        72.    Hester was identified as the user of TT85 based on open source research

23   and GPS location data for TT85 coupled with physical surveillance. First, agents

24   conducted a social media database check for any social media accounts associated with

25   TT85 and located (1) a Snapchat account associated with TT85 and a display name of

26

27   ---
[21] Kenneth Lee is currently charged in *United States v. Lumumba-Olabisi, et al.*, CR21-056 RSM, with conspiracy to distribute controlled substances.

AFFIDAVIT OF SHAWNA MCCANN - 40
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"Jason Hester," and (2) a Skype account associated with the email address hester.jason206@gmail.com. Second, agents obtained a search warrant for GPS location data for TT85, conducted physical surveillance in the area of the GPS ping radii for TT85, and observed Jason Hester in the area of the GPS location data for TT85, as set forth below.

73.     During the period of wire and electronic communications interceptions on Jimmy Carter using TT20,[22] agents identified Jason Hester as a likely source of supply of cocaine to Kenneth Lee at TT29,[23] as described in more detail below. These interceptions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 71** and **Subject Vehicle 68**.

74.     On September 9, 2020, at approximately 11:20 a.m., Kenneth Lee using TT29 attempted to call Jimmy Carter at TT20 with no answer. (Session 722.) At approximately 11:57 a.m., Jimmy Carter using TT20 called Kenneth Lee at TT29. (Session 726.) During this call, Jimmy Carter said he was upstairs and missed Kenneth Lee's call. Kenneth Lee said, "I got hold of him [supplier] but he at 19 a piece [$1,900 per ounce of powder cocaine]." Jimmy Carter thought that price was too high and replied, "I've been holding off this long. I'll just wait." Kenneth Lee said, "yeah, not unless [supplier] go down the way. And we get them for 15 [$1,500 per ounce of powder cocaine]." Jimmy Carter responded, "He said he got some for 15, but he ain't never come up [followed through with the narcotics deal]. You know that talk." Based on my training and experience, I believe that Jimmy Carter contacted Kenneth Lee to see how much it

---

[22] Jimmy Carter was identified as the user of TT20 after agents obtained GPS location data for TT20, conducted physical surveillance in the GPS ping radii for TT20, and observed Jimmy Carter, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS location data for TT20 at different locations and times. Jimmy Carter is currently charged in *United States v. Lumumba-Olabisi, et al.*, CR21-056 RSM, with conspiracy to distribute controlled substances.

[23] Kenneth Lee was identified as the user of TT29 after agents obtained GPS location data for TT29, conducted physical surveillance in the GPS ping radii for TT29, and observed Kenneth Lee, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS location data for TT29. Additionally, Kenneth Lee's residence also housed a business associated with Kenneth Lee, which displayed on the exterior of the property a business sign with TT29 as the contact information.

AFFIDAVIT OF SHAWNA MCCANN - 41
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

would cost to get cocaine from Kenneth Lee's supplier, and that Jimmy Carter declined to buy powder cocaine from Kenneth Lee because $1,900 per ounce was too high.  It appears that both Kenneth Lee and Jimmy Carter were waiting to hear from a supplier about a deal of $1,500 per ounce of powder cocaine. I know that "piece" is a common term used by drug traffickers to refer to an ounce of narcotics.

75.    Prior to these calls, at approximately 11:01 a.m., toll records for TT29 showed that Kenneth Lee using TT29 made an outgoing call to TT85 that lasted 43 seconds.[24] The toll records also show that, after speaking with Jimmy Carter at approximately 11:57 a.m., Kenneth Lee using TT29 received an incoming call from a different phone number and then made an outgoing call to TT85 that lasted 13 seconds.

76.    On September 11, 2020, between 1:51 p.m. and 1:53 p.m., Kenneth Lee using TT29 attempted to call Jimmy Carter at TT20 with no answer. At approximately 2:02 p.m., Jimmy Carter using TT20 called Kenneth Lee at TT29. (Session 1116.) During this call, Kenneth Lee said, "I had a cat [supplier] who has two [ounces of cocaine] of them for 18 [$1,800 per ounce]. I didn't know if you were interested [in buying those narcotics], but you didn't pick up [answer the phone]." Jimmy Carter replied, "Um, did you try it out [check the quality of the cocaine]? You know it's for sure straight [good quality]?" Kenneth Lee said, "Oh yeah yeah yeah. It was good [quality] . . . so I didn't know if you were ready. That's why I didn't grab them. I was like naw, I don't know if the number [price], you know. I don't wanna spend nobody else's money." Jimmy Carter replied, "If you said it's powder [good quality] man, shit I'll snatch it." The parties then agreed to talk later to arrange the cocaine transaction.

77.    Prior to this call, toll records for TT29 showed that Kenneth Lee using TT29 had received a call from TT85 at approximately 12:49 p.m. that lasted for 90

---

[24] Kenneth Lee using TT29 made/received communications from three different numbers between his contact with Jason Hester at TT85 at approximately 11:01 a.m. and his subsequent contact with Jimmy Carter at TT20 at approximately 11:20 a.m.

AFFIDAVIT OF SHAWNA MCCANN - 42
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  seconds.[25] After the call with Jimmy Carter at about 2:02 p.m., Kenneth Lee using TT29

2  sent a text message to TT85 at approximately 2:41 p.m.[26] A short time later, at

3  approximately 3:02 p.m., toll records for TT29 showed that Kenneth Lee using TT29

4  made an outgoing call to TT85.  Immediately after this call and without making or

5  receiving any other communications on TT29, Kenneth Lee attempted to call Jimmy

6  Carter at TT20 at approximately 3:03 p.m. One minute later and without Kenneth Lee

7  making or receiving any other communications, at approximately 3:04 p.m., Kenneth Lee

8  using TT29 called Jimmy Carter at TT20 and told Jimmy Carter that "he didn't answer so

9  I'll wait till he hit me back." Based on my training and experience, I believe that Kenneth

10  Lee told Jimmy Carter that Kenneth Lee's supplier did not answer when he had called.

11         78.    Later, on September 11, 2020, between 3:37 p.m. and 3:46 p.m., toll

12  records for TT29 showed that Kenneth Lee using TT29 made three outgoing calls to

13  TT85. Then, at approximately 3:52 p.m., Jimmy Carter using TT20 called Kenneth Lee at

14  TT29. (Session 1153.) During this call, Kenneth Lee said, "it done went up back to 2

15  [$2,000 per ounce of cocaine]." Jimmy Carter replied, "We should have did it for the 19

16  [bought the two ounces of cocaine for $1,900 a piece]." Kenneth Lee said, "you know,

17  cause it ain't in the budget [$2,000 per ounce is too high]." Jimmy Carter said, "nah, it

18  ain't [in the budget]. I can't do nothin' with it [make a profit off of it], not unless you can

19  uh do, do you know how to um for me [cut the powder cocaine with a cutting agent and

20  cook the powder cocaine into crack cocaine]?" Kenneth Lee said, "uh, yeah, you know,

21  like I usually do [how Kenneth Lee cuts and cooks his cocaine]? You probably put about

22  21 [amount of cutting agent]. 21 or something like that." Jimmy Carter replied, "if you

23  do, do it, can you uh you know, do it for me [Kenneth Lee cut and cook up the cocaine

24  that Jimmy Carter buys]?" Kenneth Lee said, "yeah, I can put the 21 [cutting agent] on

25

26  [25] Between Kenneth Lee's call with Jason Hester at approximately 12:49 p.m., and his first attempted call to reach Jimmy Carter at 1:51 p.m., Kenneth Lee was in contact with six different phone numbers.

27  [26] Between Kenneth Lee's call with Jimmy Carter at about 2:02 p.m. and his text message to Jason Hester at 2:41 p.m., Kenneth Lee made one outgoing call to a different phone number.

there, [unintelligible] about 21, yeah? . . . I mean but, you know, yours, but your people [Jimmy Carter's customers] a little different than mine [Kenneth Lee's customers], so I you know, I can't make that call for you [how to cut and cook the cocaine], you know. I know 14 [cutting agent] is [unintelligible], you know what I'm sayin." Jimmy Carter replied, "I'll snatch them for the 19 [$1,900 per ounce of cocaine] . . . So what I was gonna tell you is, ok, snatch them [buy the 2 ounces of cocaine], take a beezy out of both of em [take 1/8 of an ounce out of each ounce of cocaine], and then just do em, and just hit the rest [cut and cook the remaining cocaine]." Kenneth Lee agreed. Based on my training and experience, I believe that Jimmy Carter told Kenneth Lee to buy two ounces of powder cocaine from Kenneth Lee's supplier on behalf of Jimmy Carter and then to cut and cook most of the powder cocaine into crack cocaine for Jimmy Carter.

79.     Based on the collection of intercepted calls between Jimmy Carter and Kenneth Lee on September 9 and 11, 2020, and the corresponding toll records for Kenneth Lee using TT29, I believe that the user of TT85 – Jason Hester – is Kenneth Lee's source of supply for cocaine, based on the pattern in which Kenneth Lee contacted the user of TT85 before and after talking with Jimmy Carter about getting supplied with cocaine.

80.     Based on the investigation to date, agents believe that Jason Hester lives at **Subject Premises 71**. **Subject Premises 71** is currently listed as Jason Hester's residence on his driver's license. Agents obtained GPS location data on Jason Hester's cell phone, TT85, which showed that Jason Hester remained at **Subject Premises 71** overnights from May 21, 2021, to the present. Agents also conducted physical surveillance at **Subject Premises 71** and observed Jason Hester at this residence. For example, on May 26, 2021, at approximately 11:00 a.m., GPS location data for TT85 put Jason Hester within range of **Subject Premises 71**. Upon arrival, agents located **Subject Vehicle 68** parked unoccupied in front of the garage to **Subject Premises 71**. At approximately 2:48 p.m., a female in her 30's came out from the alcove to **Subject Premises 71** and opened the garage. The female lit a cigarette and began to smoke. The

female opened the driver's door to **Subject Vehicle 68**, retrieved an unknown item from the vehicle, and closed the door. At approximately 2:51 p.m., agents observed Jason Hester, identified based on a comparison to his driver's license photograph, exit the alcove in front of **Subject Premises 71** and speak with the female. At approximately 2:58 p.m., Jason Hester and the female went back towards the alcove leading to **Subject Premises 71**. At approximately 2:59 p.m., Jason Hester exited the alcove of **Subject Premises 71**, got into the driver's seat of **Subject Vehicle 68**, and drove out of the parking lot alone in **Subject Vehicle 68**. At approximately 3:09 p.m., Jason Hester reached the intersection of 108th Avenue Southeast and Southeast Petrovitsky Road. GPS location data for TT85 showed the device had moved and was within range of that location. At approximately 3:14 p.m., Jason Hester pulled into the parking lot of Mary Jane's House of Glass in Renton. Jason Hester parked **Subject Vehicle 68** and went inside the business. At approximately 3:27 p.m., GPS location data for TT85 put the device within range of that location, indicating that Jason Hester is the user of TT85.

81.     Agents conducting physical surveillance also observed **Subject Vehicle 68** parked in front of **Subject Premises 71** on May 21, 2021, in conjunction with GPS location data for TT85 placing Jason Hester in the vicinity of **Subject Premises 71**.

82.     I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Jason Hester is like a multi-ounce cocaine source of supply to Michael Walker DTO members including Kenneth Lee, who likely keeps his narcotics supply and proceeds in **Subject Premises 71** and **Subject Vehicle 68**.

AFFIDAVIT OF SHAWNA MCCANN - 45
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**E.**     **Sergio Reyes-Pina's Residence and Vehicles**

83.     Sergio Reyes-Pina is a multi-ounce to kilogram redistributor of cocaine working with several members of the Michael Walker DTO, including Samuel Duarte Avila and Herbert Scott. During this investigation, based on physical surveillance, intercepted communications, and GPS location data for Sergio Reyes-Pina's cell phones (TT18 and TT38, identification discussed below), agents identified Sergio Reyes-Pina's residence as 1106 SW 139th Street, Unit 13-150, Burien, Washington (**Subject Premises 56**),[27] and vehicles used by Sergio Reyes-Pina as (1) a red 2004 Pontiac GTO bearing VIN number 6G2VX12G74L235542, registered to Sergio Reyes Pina at 1106 SW 139th Street, Unit 150, Burien, Washington[28] (**Subject Vehicle 53**), (2) a gold 2011 BMW 328 bearing Washington license plate number BWN5107, registered to Sergio Reyes Pina at 1106 SW 139th Street, Unit 150, Burien, Washington. (**Subject Vehicle 54**), and (3) a blue 1993 GMC van bearing Washington license plate BUE0575, registered to Sergio Reyes-Pina at 1106 SW 139th Street, #150, Burien, Washington (**Subject Vehicle 55**). Specifically, agents obtained GPS location data on Sergio Reyes-Pina's cell phones, TT18 and TT38, which showed that Sergio Reyes-Pina remained at **Subject Premises 56** overnights from September 2020 to November 2020 and March 2021 to April 2021 (the periods during which the GPS location data was being collected). As set forth below, agents conducted physical surveillance at **Subject Premises 56** and observed Sergio Reyes-Pina at this residence.

84.     On October 23, 2020, agents obtained a court-authorized wire and electronic communications interception on TT18 and TT38 used by Sergio Reyes-Pina. During the period of wire and electronic communications interception, agents observed

---

[27] Sergio Reyes-Pina's address on his driver's license is listed as 1106 SW 139th Street, Apt 150, Burien, Washington.

[28] As set forth below, agents have observed Sergio Reyes-Pina driving **Subject Vehicle 53** after it was reported as sold, and as recently as May 2021 observed Sergio Reyes-Pina still driving **Subject Vehicle 53** with Oregon plates, indicating that Sergio Reyes-Pina was the purchaser/user of this vehicle but has not yet registered the vehicle from the sale.

AFFIDAVIT OF SHAWNA MCCANN - 46
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Sergio Reyes-Pina conducting multiple cocaine transactions on a daily to weekly basis, as

2  described in more detail below. These drug transactions and agents' observations are

3  noted below for purposes of establishing probable cause to search **Subject Premises 56**

4  and **Subject Vehicles 53**, **54**, and **55**.

5    85. On September 14, 2020, agents intercepted communications between

6  Sergio Reyes-Pina using TT18 and Herbert Scott using TT17 regarding a cocaine

7  transaction that happened at approximately 7:49 p.m. in the parking lot of the Kent

8  NAPA Auto Parts store, described in more detail above. Earlier that day, at

9  approximately 12:45 p.m., agents observed an unoccupied gold 2011 BMW 328 (**Subject**

10  **Vehicle 54**) in the parking lot of the apartment complex in which **Subject Premises 56** is

11  located. At approximately 3:05 p.m., agents observed a male, identified as Sergio Reyes-

12  Pina based on a comparison to his driver's license photograph, approach **Subject Vehicle**

13  **54**. Sergio Reyes-Pina entered the driver's seat of **Subject Vehicle 54** and began

14  accessing items in the interior, and agents observed him retrieve a plastic grocery-sized

15  bag containing what appeared to be an unknown white substance. At approximately 3:10

16  p.m., agents observed Sergio Reyes-Pina drive off in **Subject Vehicle 54** and,

17  approximately 8 minutes later, pull over alongside a blue GMC van (**Subject Vehicle**

18  **55**), registered to Sergio Reyes-Pina at **Subject Premises 56**. Standing next to the van

19  was an unidentified white male wearing a black baseball hat, a black jacket, baggy jeans

20  and a black facemask. Agents then observed Sergio Reyes-Pina and the unknown male

21  move an unknown object from **Subject Vehicle 55** to **Subject Vehicle 54**.

22    86. Agents also intercepted a conversation between Herbert Scott using TT17

23  and Sergio Reyes-Pina using TT18 on November 10, 2020 (described in more detail in an

24  earlier section), in which Herbert Scott told Sergio Reyes-Pina that he was working on

25  putting together a narcotics transaction and that Sergio Reyes-Pina quoted prices for

26  cocaine and crack cocaine to Herbert Scott.

27    87. Moreover, as set forth below in Part M, on November 6, 2020, Sergio

Reyes-Pina using TT18 and Viet Nguyen using TT52 exchanged calls and text messages

AFFIDAVIT OF SHAWNA MCCANN - 47
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to arrange a time to meet at Sergio Reyes-Pina's house, **Subject Premises 56**, to conduct a cocaine transaction. Sergio Reyes-Pina using TT18 texted his home address to Viet Nguyen as: "1106 sw 139th st burien wa [apartment complex for **Subject Premises 56**]." (Session 1700.)

88.   On November 17, 2020, at approximately 7:25 p.m., Sergio Reyes-Pina using TT18 called Isaac Macario Capilla at (253) 754-8046 (TT66).[29] (Session 3458). Sergio Reyes Pina asked Isaac Macario Capilla where he could meet him and said he had enough money for "one" (ounce of cocaine) and that another person, believed to be Cresencio Moreno Aguirre, wanted "two" (ounces of cocaine), indicating that Sergio Reyes-Pina was trying to get three ounces of cocaine from Isaac Macario Capilla. Sergio Reyes-Pina asked Isaac Macario Capilla to buy the cocaine for $1,200 per ounce and said that he had $1,500 on him, indicating he would have to get the rest of the money from Cresencio Moreno Aguirre. The parties agreed to meet in an hour. Immediately after this call, at approximately 7:27 p.m., Sergio Reyes-Pina using TT18 texted Cresencio Moreno Aguirre at TT80 (identification discussed below): "Mb plug said givm 30min so lets say hr tops." (Session 3459). At approximately 8:07 p.m., Isaac Macario Capilla using TT66 texted Sergio Reyes-Pina at TT18: "Where can I see you?" (Session 3471.) Sergio Reyes-Pina using TT18 replied, "I'm in the house at the 128 and occidental (**Subject Premises 62**), here the one of the mechanic." (Session 3475).[30] At approximately 8:54 p.m., Isaac Macario Capilla using TT66 called Sergio Reyes-Pina at TT18 and said he was there in a truck. (Session 3510). At that same time, agents, via remote surveillance, observed a

---

[29] Agents identified the user of TT66 as Isaac Macario Capilla based on intercepted calls and physical surveillance conducted on November 17, 2021, as set forth herein, during which Sergio Reyes-Pina arranged to meet with the user of TT66 and, when the user of TT66 confirmed that he was at the meeting location, agents observed Isaac Macario Capilla at that location, indicating that Isaac Macario Capilla was the user of TT66.

[30] **Subject Premises 62**, discussed below in Part F, is the residence of Craig and James Fellers. Investigators have observed multiple cars in the front yard of the house, consistent in appearance with a mechanic's yard. A review of Craig Fellers's Facebook page that is accessible to the public has photos of Craig Fellers, photos of the residence at 12602 Occidental Avenue South, and references to working on cars. A review of James Fellers's Facebook page that is accessible to the public depicts photos of James Fellers, photos of the residence at 12602 Occidental Avenue South, photos of James Fellers with lots of cash, and photos of cars and engines.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

white 2015 Dodge Ram 1500 bearing Washington license plate C87697R, registered to Isaac Macario Capilla, arrive at **Subject Premises 62** and meet with Sergio Reyes-Pina. Agents observed Sergio Reyes-Pina get into the front passenger seat of the white Dodge Ram, which then drove off. At 8:59 p.m., Sergio Reyes-Pina using TT18 called Cresencio Moreno Aguirre at TT80 and said that he was with his source of supply and asked Cresencio Moreno Aguirre if Cresencio Moreno Aguirre would have the money tonight, which Cresencio Moreno Aguirre confirmed. During this intercepted call, agents followed the white Dodge Ram to Sergio Reyes-Pina's residence at **Subject Premises 56**. The white Dodge Ram parked outside **Subject Premises 56**, and agents observed Sergio Reyes-Pina exit the truck and walk towards **Subject Premises 56**. About three minutes later, agents observed Sergio Reyes-Pina walk away from **Subject Premises 56** carrying a small bag and get into the white Dodge Ram. Agents followed the white Dodge Ram back to **Subject Premises 62**. Agents observed Isaac Macario Capilla and Sergio Reyes-Pina conduct what appeared to be a hand-to-hand transaction in the white Dodge Ram; agents identified Isaac Macario Capilla and Sergio Reyes-Pina based on a comparison to their driver's license photographs. Sergio Reyes-Pina then exited the white Dodge Ram, and Isaac Macario Capilla drove off.

89.    On February 22, 2021, at approximately 12:43 p.m., investigators intercepted a phone conversation between Samuel Duarte Avila using TT45 (identification discussed in Part G) and Sergio Reyes-Pina using TT18. (Session 5504.) During the call, Sergio Reyes-Pina told Samuel Duarte Avila that he needed "one" (ounce of cocaine), and the parties agreed to meet up after Samuel Duarte Avila got off work. At approximately 3:59 p.m., Sergio Reyes-Pina using TT18 sent the following text message to Samuel Duarte Avila at TT45: "Swing by to pick up the money." (Session 5587.) Samuel Duarte Avila replied, "1425 minimum. They did not go for any less." (Session 5593.) At approximately 8:17 p.m., investigators intercepted a phone conversation between Samuel Duarte Avila using TT45 and Sergio Reyes-Pina at TT18. (Session 5652.) During the conversation, Sergio Reyes-Pina told Samuel Duarte Avila that he was

AFFIDAVIT OF SHAWNA MCCANN - 49
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

on the way to Samuel Duarte Avila's house. At approximately 8:34 p.m., remote video surveillance captured a vehicle, identified by physical surveillance later that night as **Subject Vehicle 53**, arrive at Samuel Duarte Avila's residence (**Subject Premises 57**, discussed in Part G). Via remote video surveillance, agents observed Sergio Reyes-Pina exit **Subject Vehicle 53** and meet with Samuel Duarte Avila in the driveway. At approximately 8:56 p.m., remote video surveillance captured Sergio Reyes-Pina leaving in **Subject Vehicle 53**.[31] Surveillance personnel staged near Samuel Duarte Avila's residence followed Sergio Reyes-Pina and identified the vehicle he was driving as **Subject Vehicle 53**, which Department of Licensing records showed had been sold but had no new owner listed. Based on the surveillance and the intercepted communications, agents believe that Sergio Reyes-Pina went to Samuel Duarte Avila's house (**Subject Premises 57**) to conduct the cocaine transaction.

90.     On February 27, 2021, at approximately 4:53 p.m., Sergio Reyes-Pina using TT18 called Samuel Duarte Avila at TT45. (Session 8003.) During this call the following discussion took place:

TT45:  Well, the-the one who just arrived, dude, that guy [supplier] is going to leave quickly if it does not go out [sell out of cocaine that supplier brought]. And you know that guy does not wait. It's always, 'He's already left.' 'Son of a bitch.' I'm just telling you. It's not pressure or anything. I'm not pressured either because well, why the fuck?

TT18:  And is-and is that one the 13 [$1,300 per ounce type of cocaine] one or what?

TT45:  Huh?

TT18:  And is that new one the 13 one or what?

---

[31] Due to the quiet street that Samuel Duarte Avila's residence is on, agents were unable to conduct physical surveillance in front of his house without risk of being detected. Agents therefore relied on remote video surveillance for observations directly at or in front of Samuel Duarte Avila's residence. However, the placement of the remote video surveillance system was such that it made it difficult for agents to observe license plates and vehicle make/model based solely on the remote surveillance. Agents conducting physical surveillance were therefore staged one block away from Samuel Duarte Avila's residence in order to conduct drive-bys to observe specific vehicles and licenses plates and to establish mobile surveillance on persons of interest leaving the residence.

AFFIDAVIT OF SHAWNA MCCANN - 50
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT45: Mm... No, no. The 13, the 13 one already lowered the amount--1350, he already lowered it to 13 [$1,300 per ounce]. But that's if you get it all [buy the whole ounce].

TT18: That's why, but I'm telling you I have two buddies [customers]. One wants a half [ounce of cocaine] and the other wants an ounce [of cocaine]. How much do I tell the one ounce one?

TT45: Okay, what kind [of cocaine] does the ounce one want?

TT18: The cheapest kind.

TT45: Okay. The cheapest one costs 1350 [$1,350 per ounce of cocaine].

TT18: But is it good [quality]?

TT45: Yes, that's how much the other guy gives them to me for, dude. The one who arrived from before [other supplier]. [Unintelligible] arrived better.

TT18: Uh-huh.

TT45: And very [unintelligible]. 1350--

TT18: Get an ounce [of cocaine] minimum, but I'm going to see.

TT45: Okay, let me set it [one ounce of cocaine] aside. Because I'm here in Kent De Moines, dude.

TT18: Yes?

TT45: If you want to stop by near here.

TT18: Well, let me see which of the two [customers] want--which one of the two will want something.

TT45: This is 1350 [$1,350 per ounce type of cocaine]. The other one [supplier] is going to give it to you for 14, 14 [unintelligible], dude [$1,400 per ounce]. He went down to 14-3 [$1,430 per ounce].

TT18: Okay.

TT45: Okay. Let me know.

TT18: Uh-huh.

91.     Based on my training and experience, I believe Samuel Duarte Avila was telling Sergio Reyes-Pina that he had cocaine from one supplier who was selling the cocaine at $1,350 per ounce and another supplier who was selling the cocaine at $1,400 per ounce, and Sergio Reyes-Pina indicated that he had two customers who wanted to buy cocaine, one-half of an ounce and one ounce, respectively.

AFFIDAVIT OF SHAWNA MCCANN - 51
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

92.     On March 2, 2021, at approximately 5:27 p.m., Samuel Duarte Avila using TT45 called Sergio Reyes-Pina at TT38.[32] (Session 9449.) During this call the following discussion took place:

TT45: But it's just that—it's also tough. The guy [supplier] isn't going to bring any more [cocaine] because he's hot [on law enforcement radar], man.

TT38: Uh-huh.

TT45: He [supplier] was just telling me about it. What you can do, look. . . If someone [runner] can go down there, he can. . . Oh baby, the girl here. If someone is going to go down there, he can make the connection [put in contact with supplier to bring cocaine load to Washington].

TT38: Down where?

TT45: There to, uh--I can't tell you because--well, when I see you later, tomorrow, or whenever.

TT38: Is it many hours away, or what?

TT45: Uh, Ora-Orange County.

TT38: California?

TT45: Uh-huh.

TT38: Damn, no, I don't know who [can drive down to California] right now.

TT45: Yeah.

TT38: Yeah, no [unintelligible].

TT45: But it's good for you, he can give you ha-half in about 20 [half kilogram of cocaine for $20,000].

TT38: Yeah, I know.

TT45: And the good kind [quality cocaine].

[…]

TT45: Yeah. This one--half [kilogram of cocaine] of this one is left for me. I wanted to get it for me, to make money, because I haven't made anything.

---

[32] Agents obtained a search warrant for GPS location data TT38, conducted physical surveillance in the area of the GPS location data, and confirmed the user of TT38 was Sergio Reyes-Pina based on identifying Sergio Reyes-Pina from his driver's license photograph and seeing him in the same area of the GPS pings for TT38 at multiple different locations and times. Moreover, agents had already identified Sergio Reyes-Pina as the user of TT18, and the voices for the users of the two devices, as heard on intercepted communications, are the same.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

[…]

TT45: That shit this guy gave me is there, dude. I don't plan on doing it right now, dude. I was going to sell it, dude, but. . . I don't have money, I'm broke. But anyways, uh, that half [kilogram of cocaine] is there in case you want it one of these days. If not--

TT38: Oh.

TT45: --well, the other guy has the one [ounce] for 14-50 [$1,450].

TT38: Yeah, I don't know. Oh, to, hum, make up what the--the other guy--

TT45: That guy [other supplier] is out of town, dude.

93.     Based on my training and experience, I believe that Samuel Duarte Avila and Sergio Reyes-Pina discussed trying to find someone to drive to Orange County, California to pick up cocaine from one of their suppliers and drive the cocaine to Washington state because the supplier believes he is on law enforcement's radar and does not want to make the trip. I also believe that a supplier left Samuel Duarte Avila a half kilogram of cocaine and the parties discussed trying to find a buyer for the cocaine.

94.     Sergio Reyes-Pina has also discussed owning firearms on intercepted calls, supporting the need for after-hours service of these search warrants to ensure that law enforcement officers executing these search warrants will be able to serve the warrants before the subjects are awake, thereby reducing the risk to law enforcement officers. For example, on November 1, 2020, Sergio Reyes-Pina had the following text message conversation with James Fellers at (206) 823-8232 (identification discussed below):

TT18: Where my piece [gun] at. (Session 678)

James Fellers: Huh? (Session 680)

TT18: glock (Session 682)

James Fellers: In ur car (Session 684)

95.     On November 12, 2020, at approximately 8:31 p.m., Sergio Reyes-Pina using TT38 called an unknown male using phone number (206) 537-9664 (referred to as UM9664). (Session 2904.) During this call, UM9664 asked if Sergio Reyes-Pina had any "straps" for sale, and I know, based on my training and experience, that "strap" is

common slang for a firearm. Sergio Reyes-Pina responded that he needed the Glock 17 for himself and suggested that the Mossberg (a known brand of shotgun) was for sale at the time. UM9664 then asked if "James [Fellers]" was trying to sell his little revolver, and Sergio Reyes-Pina said he might be.

96.     Based on the investigation to date, agents believe that Sergio Reyes Pina lives at **Subject Premises 56** and drives, owns, and/or has access to **Subject Vehicles 53**, **54**, and **55**. As set forth above, agents during physical surveillance observed Sergio Reyes-Pina driving or accessing **Subject Vehicles 53**, **54**, and **55**, most often in conjunction with drug trafficking. Additionally, on May 22, 2021, via remote video surveillance, agents observed Sergio Reyes-Pina pull up and park at the suspected stash house (**Subject Premises 62**) driving **Subject Vehicle 53**. Agents obtained GPS location data on Sergio Reyes-Pina's cell phones, TT18 and TT38, which showed that Sergio Reyes-Pina remained at **Subject Premises 56** overnights from September 2020 to November 2020 and March 2021 to April 2021.

97.     Agents conducted physical surveillance at **Subject Premises 56** and observed Sergio Reyes-Pina at this residence. For example, on September 17, 2020, at approximately 3:52 p.m., GPS location data for TT18 placed Sergio Reyes-Pina at **Subject Premises 56**. At approximately 4:17 p.m., agents observed **Subject Vehicle 54** parked unoccupied in the apartment complex parking lot outside **Subject Premises 56**. On September 24, 2020, at approximately 5:02 p.m., agents located Sergio Reyes-Pina, based on GPS location data for TT18, seated in the passenger seat of **Subject Vehicle 54** with an unknown female driver. At approximately 5:09 p.m., agents observed **Subject Vehicle 54** pull into the apartment complex of **Subject Premises 56**. Sergio Reyes-Pina exited the vehicle and went towards the door of **Subject Premises 56** and out of agents' view. At approximately 5:13 p.m., agents observed **Subject Vehicle 54** depart **Subject Premises 56** with Sergio Reyes-Pina now driving and a third unknown occupant in the vehicle, along with the unknown female who had previously been seen driving the vehicle. At approximately 5:17 p.m., agents observed **Subject Vehicle 54** arrive at Sergio

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Reyes-Pina's suspected stash house, **Subject Premises 62**, and GPS location data for TT18 placed Sergio Reyes-Pina at the stash house. Agents observed Sergio Reyes-Pina get out of **Subject Vehicle 54** and walk towards **Subject Premises 62**. At approximately 5:29 p.m., agents observed Sergio Reyes-Pina walk back to **Subject Vehicle 54** and drive off. At approximately 5:50 p.m., agents observed **Subject Vehicle 54** park at Samuel Duarte Avila's residence in Renton (**Subject Premises 57**). Earlier that day, at approximately 4:55 p.m., investigators intercepted a call between Herbert Scott using TT17 and Sergio Reyes-Pina using TT18 in which Sergio Reyes-Pina stated he was going to "Renton right now to go see what other options I have [check out new cocaine product]." (Session 3920.) Agents observed **Subject Vehicle 54** depart Samuel Duarte Avila's residence (**Subject Premises 57**) at approximately 6:05 p.m. and go to the Walmart in Renton, where Sergio Reyes-Pina was observed entering the store and then exiting the store with purchased items. Sergio Reyes-Pina returned to **Subject Premises 56** and parked **Subject Vehicle 54** in front of the apartment unit. Accordingly, agents believe that they observed Sergio Reyes-Pina leaving **Subject Premises 56** and going immediately to his stash house and returning to **Subject Premises 56** after visiting Samuel Duarte Avila's residence in Renton (**Subject Premises 57**) who discussed having new cocaine to inspect.

98.     Agents also located an incident report from King County Sheriff's Office, dated March 30, 2021, in which Sergio Reyes-Pina reported a violation of a no-contact order with him as the protected person against the mother of his child for her staying at his residence the prior night and calling him. Sergio Reyes-Pina told the officer that he lived at **Subject Premises 56**, and the incident report identifies both TT18 and TT38 and phone numbers for Sergio Reyes-Pina.

99.     I know based on my training and experience, that drug traffickers frequently keep their narcotics, narcotics proceeds, and firearms in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other

AFFIDAVIT OF SHAWNA MCCANN - 55
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Sergio Reyes-Pina is cocaine redistributor who likely keeps his narcotics supply, proceeds, and firearms in **Subject Premises 56** and **Subject Vehicles 53**, **54**, and **55**.

**F.** **Sergio Reyes-Pina's Stash House / Craig and James Fellers' Residence**

100.    Craig Fellers and James Fellers are drug trafficking associates of Sergio Reyes-Pina, specifically caretakers and residents of Sergio Reyes-Pina's drug stash house. During this investigation, based on physical and video surveillance, intercepted communications, and GPS location data for Sergio Reyes-Pina's cell phones TT18 and TT38, agents identified Sergio Reyes-Pina's stash house and James and Craig Fellers' residence as 12602 Occidental Avenue South, Seattle, Washington (**Subject Premises 62**).[33]

101.    During the period of wire and electronic communications interceptions on Sergio Reyes-Pina using TT18 and TT38, agents observed Sergio Reyes-Pina discussing narcotics transactions and keeping narcotics at **Subject Premises 62**. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 62**.

102.    On September 11, 2020, at approximately 5:57 p.m., investigators intercepted a phone call from Herbert Scott using TT17 to Sergio Reyes-Pina at TT18. (Session 1389.) During this call, as set forth above in Part A, Herbert Scott asked to buy cocaine from Sergio Reyes-Pina, and Sergio Reyes-Pina stated that the cocaine was not on him and that he would have to retrieve the cocaine from a house near 128th Street (**Subject Premises 62**) before bringing it to Herbert Scott. Agents noted that 12602 Occidental Avenue S, Seattle, Washington is right off of S 128th Street. Additionally,

---

[33] Both James Fellers and Craig Fellers have **Subject Premises 62** listed as their residence on their driver's licenses.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  GPS location data for TT18 and TT38 showed that Sergio Reyes-Pina frequents **Subject**
2  **Premises 62** several times a week, as demonstrated below.

3  　　　103.　　On September 24, 2020, at approximately 4:55 p.m., investigators
4  intercepted a call from Herbert Scott using TT17 to Sergio Reyes-Pina at TT18. (Session
5  3920.) During this call, Herbert Scott asked, "can we uh, can we meet by, you know
6  where the park is" and asked, "what do you have [cocaine]?" Sergio Reyes-Pina stated: "I
7  have one of the 12 that's pretty fishscaley," meaning one ounce of powder cocaine for
8  $1,200 that is decent quality. Sergio Reyes-Pina continued: "It's not uh, the same kind,
9  it's a little bit better. Actually, it's a lot better. But if you wanted to get the other one,
10 that's why I'm going to Renton right now, to go see what other options I have." Herbert
11 Scott said, "I need the one [ounce of cocaine], maybe a little like 10-50 [at $1,050]."
12 Sergio Reyes-Pina replied, "Ok, I'll go pick that up right now [from the stash house],
13 that's what I was gonna do." Based on my training and experience, I believe that during
14 this call Herbert Scott asked to purchase cocaine from Sergio Reyes-Pina, and Sergio
15 Reyes-Pina indicated he had some cocaine available and was going to look at different
16 types of cocaine later that day from a supplier in Renton, Washington (likely Samuel
17 Duarte Avila and/or Cesar Arambula). I believe that Herbert Scott wanted to purchase the
18 cocaine that Sergio Reyes-Pina already had available and that Sergio Reyes-Pina said he
19 would pick up that cocaine, likely at **Subject Premises 62**, for Herbert Scott.  Shortly
20 after this conversation, at approximately 5:17 p.m., investigators on physical surveillance
21 observed Sergio Reyes-Pina's BMW (**Subject Vehicle 54**) arrive at **Subject Premises**
22 **62**. At approximately 5:18 p.m., GPS location data for TT18 placed the device at **Subject**
23 **Premises 62**. Investigators observed Sergio Reyes-Pina standing in front of **Subject**
24 **Premises 62**, but agents were unable to maintain physical surveillance at **Subject**
25 **Premises 62** without risk of being detected and therefore had to rely on occasional drive-
26 bys of the residence. At approximately 5:29 p.m., investigators observed Sergio Reyes-
27 Pina walk back to **Subject Vehicle 54** and depart **Subject Premises 62**.

AFFIDAVIT OF SHAWNA MCCANN - 57
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

104.    Agents reviewed video surveillance obtained from the vicinity of Sergio Reyes-Pina's stash house at **Subject Premises 62**. On September 26, 2020, at approximately 5:18 p.m., video surveillance captured **Subject Vehicle 54** park across the street from **Subject Premises 62**. A Hispanic male with a small build, matching the physical description of Sergio Reyes-Pina, got out of the driver's side of **Subject Vehicle 54** and walked across the street to **Subject Premises 62**. From approximately 5:31 p.m. to 6:01 p.m., GPS location data for TT18 placed the device at **Subject Premises 62**. At approximately 6:10 p.m., video surveillance showed Sergio Reyes-Pina and a tall white male, matching the physical features of James Fellers or Craig Fellers (who are brothers and look similar), exit **Subject Premises 62**. At approximately 6:11 p.m., Sergio Reyes-Pina briefly opened the trunk of **Subject Vehicle 54**; he then got into the driver's seat, the tall white male got into the passenger seat, and **Subject Vehicle 54** drove off. At approximately 6:17 p.m., GPS location data for TT18 showed that the device had left **Subject Premises 62**. At approximately 7:01 p.m., investigators intercepted a text message to Herbert Scott at TT17 from Sergio Reyes-Pina using TT18 that read: "just picked up sum fishscale at 13 a z. 20 grams coms bak and it shinny" (obtained new cocaine selling at $1,300 per ounce that cooks up to crack cocaine well). (Session 4410.) At approximately 7:01 p.m., investigators intercepted another text message to Herbert Scott at TT17 from Sergio Reyes-Pina using TT18 that read: "Or nossers at 1k [a unit of narcotics for $1,000]." (Session 4412.) Investigators believe Sergio Reyes-Pina was telling Herbert Scott that he had just obtained a new amount of cocaine, presumably from **Subject Premises 62** where Sergio Reyes-Pina was observed via video surveillance shortly before sending these text messages to Herbert Scott.

105.    On September 28, 2020, at approximately 4:02 p.m., surveillance video captured **Subject Vehicle 54** parking across the street from **Subject Premises 62**, and a small build Hispanic male matching the physical description of Sergio Reyes-Pina getting out of the driver's seat. Sergio Reyes-Pina went to the rear driver's side area of the car before walking across the street and into **Subject Premises 62**. At approximately 4:22

1   p.m., GPS location data for TT18 placed the device within the vicinity of **Subject**

2   **Premises 62**. At approximately 5:15 p.m., surveillance video captured Sergio Reyes-Pina

3   exiting the residence and walking to **Subject Vehicle 54**, carrying a container that

4   appeared to be larger than a shoebox. Sergio Reyes-Pina put the box on the ground and

5   opened the driver's door and then the trunk. Sergio Reyes-Pina then pulled an extra-large

6   trash bag from the trunk and looked inside it before pulling an unknown item from the

7   trunk and putting it into the trash bag. At approximately 5:16 p.m., Sergio Reyes-Pina put

8   the container and the trash bag into **Subject Vehicle 54**. He left the trunk open and

9   walked back across the street to **Subject Premises 62**. At approximately 5:20 p.m.,

10  Sergio Reyes-Pina and an unknown white male, with physical features similar to those of

11  James Fellers or Craig Fellers, exited **Subject Premises 62** and walked over to **Subject**

12  **Vehicle 54**. They both looked at something in the trunk and, at approximately 5:21 p.m.,

13  Sergio Reyes-Pina removed the trash bag from the trunk. The bag appeared to be less full

14  than before. Sergio Reyes-Pina walked across to the driveway of **Subject Premises 62**

15  and left the bag on the hood of a car in the driveway. Sergio Reyes-Pina then walked

16  back to **Subject Vehicle 54** and got into the driver's seat. The unknown white male got

17  into the passenger seat and, at approximately 5:22 p.m., **Subject Vehicle 54** drove away.

18  Agents were unable to view the contents of this bag.

19      106.    On October 1, 2020, at approximately 2:54 p.m., investigators intercepted a

20  call between Herbert Scott (TT17) and Sergio Reyes-Pina (TT18). (Session 5340.)

21  During this call, Herbert Scott asked for "the H for 5 [half ounce of cocaine for $500]"

22  and discussed giving Sergio Reyes-Pina money towards the drug debt Herbert Scott owed

23  Sergio Reyes-Pina from prior narcotics transactions. Herbert Scott said "I wanna meet

24  right now, as soon as possible," and Sergio Reyes-Pina replied, "I'm at my house right

25  now, but I gotta go to the, uh, mechanic guy's house [**Subject Premises 62**] cause, uh, I

26  have it [cocaine] over there." Sergio Reyes-Pina continued, "if you really want to come

27  over, you can like come inside the house and everything, they're [James Fellers and Craig

    Fellers who reside at **Subject Premises 62**] cool about it. They know everything. Um,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  you can just come inside and talk about it in there or something? If you wanted it to be

2  ASAP." Herbert Scott told Sergio Reyes-Pina that he would "rather [Sergio Reyes-Pina]

3  just come out to the car," to which Sergio Reyes-Pina agreed. Herbert Scott then asked

4  Sergio-Reyes Pina, "What's the uh, what, what, what is it on again [where's **Subject**

5  **Premises 62**]," and Sergio Reyes-Pina responded, "It's on 128th right behind the 76, uh,

6  with a bunch of cars right there. Um, so it's Occidental and 128th. [a description that is

7  consistent with **Subject Premises 62**]" About 30 minutes later, at approximately 3:24

8  p.m., Herbert Scott using TT17 called Sergio Reyes-Pina at TT18 and told Sergio Reyes-

9  Pina that he was outside. (Session 5358.)  At approximately 3:24 p.m., video surveillance

10  showed Herbert Scott's white Yukon (**Subject Vehicle 51**) parking across the street from

11  the stash house. At approximately 3:29 p.m., video surveillance showed Sergio Reyes-

12  Pina's BMW (**Subject Vehicle 54**) parking next to **Subject Vehicle 51** across the street

13  from **Subject Premises 62**. A small male, matching the physical description of Sergio

14  Reyes-Pina, exited the driver's seat of **Subject Vehicle 54** and ran across the street into

15  **Subject Premises 62**, while Herbert Scott remained in **Subject Vehicle 51**. At

16  approximately 3:30 p.m., Sergio Reyes-Pina exited **Subject Premises 62** and walked

17  across the street to the passenger side of the white Yukon. Sergio Reyes-Pina appeared to

18  be carrying a small item in his hands. Sergio Reyes-Pina briefly got into the rear

19  passenger seat of **Subject Vehicle 51** with Herbert Scott, and then a few seconds later

20  Sergio Reyes-Pina got out of the Yukon, and Herbert Scott drove off while Sergio Reyes-

21  Pina returned to **Subject Premises 62**.

22      107.    Based on my training and experience, I believe that during this call, Herbert

23  Scott asked to purchase a half ounce of cocaine from Sergio Reyes-Pina for $500. Sergio

24  Reyes-Pina agreed to meet Herbert Scott at the stash house, **Subject Premises 62,** to

25  conduct the narcotics transaction at their cars outside the stash house, and that Sergio

26  Reyes-Pina provided the information about the location of the stash house to Herbert

27  Scott, indicated that the occupants of the stash house, James and Craig Fellers, were

AFFIDAVIT OF SHAWNA MCCANN - 60
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   aware of Sergio Reyes-Pina's narcotics activity, and indicated he stores his cocaine in

2   **Subject Premises 62**.

3       108.   Accordingly, investigators believe that **Subject Premises 62** is a stash

4   house, and not merely the residence of Sergio Reyes-Pina's suppliers, because Sergio

5   Reyes-Pina often indicates that he does not have his product on him and must go pick it

6   up, referencing a location where he keeps his drugs. Investigators also believe that Craig

7   Fellers and James Fellers live at **Subject Premises 62** and permit Sergio Reyes-Pina to

8   use their residence at a stash house. Both Craig Fellers and James Fellers list **Subject**

9   **Premises 62** as their address on their driver's licenses. Moreover, when discussing the

10  stash house with Herbert Scott, Sergio Reyes-Pina referred to it as "the mechanic guy's

11  house," and investigators have observed multiple cars in the front yard of the house,

12  consistent in appearance with a mechanic's yard. A review of Craig Fellers' Facebook

13  page that is accessible to the public has photos of Craig Fellers, photos of the exterior of

14  **Subject Premises 62** at 12602 Occidental Avenue South, and references to working on

15  cars. A review of James Fellers' Facebook page that is accessible to the public depicts

16  photos of James Fellers, photos of the exterior of **Subject Premises 62**, photos of James

17  Fellers with lots of cash, and photos of cars and engines. Sergio Reyes-Pina appears to

18  have access to **Subject Premises 62** at any time and goes there several times per week

19  based on review of pole camera video and GPS data. Investigators have observed that,

20  often when he goes to **Subject Premises 62**, Sergio Reyes-Pina interacts with a white

21  male (or males with a similar appearance) in his late 20s or early 30s who matches the

22  general description of Craig Fellers and James Fellers, who are brothers and look similar.

23  Although Washington State Department of Licensing records indicate that several

24  additional people use **Subject Premises 62** on their licenses, all of those individuals are

25  18 to 38 years older than James Fellers, who is 30 years old, and Craig Fellers, who is 25

26  years old. Finally, Sergio Reyes-Pina stated that "they know everything," referring to

27  more than one person living at **Subject Premises 62**; this statement leads investigators to

AFFIDAVIT OF SHAWNA MCCANN - 61
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  believe that both Craig Fellers and James Fellers are involved in the storage and/or

2  distribution of narcotics at the stash house for the DTO.

3      109.    On November 4, 2020, between 11:47 a.m. and 3:47 p.m., Sergio Reyes-

4  Pina using TT18 and Elyas Kerow using TT49 had the following conversation via text

5  message:

6      TT49: Do 1200 [$1,200 per ounce of cocaine]? (Session 1195)

7      TT18: Cant. (Session 1197)

8      TT49: That shit cook back ? [good quality to cook powder cocaine into crack
          cocaine] (Session 1199)

9
       TT18: Fuck yea comes bak 32 grams outa 28. (Session 1202)

10
       TT49: Ok let me get a zip [ounce of cocaine] to show my guy [buyer] (Session

11      1206)

12      TT49: He might want the whole 20 [ounces]. (Session 1208)

13      TT49: Send a better pic [of the cocaine]. (Session 1210)

14      TT18: Ok needa go to james [Fellers at **Subject Premises 62**] to take pic (Session
          1212)

15
       TT18: Im omw [on my way] to james [Fellers' house, **Subject Premises 62**]. U

16      want a pic? (Session 1241)

17      TT49: Yeah. (Session 1243)

18      TT18: Ima send u a pic [of the cocaine] frm the other # [TT38]. (1252)

19      110.    At the time Sergio Reyes-Pina sent the text message stating he would send

20  a picture from his other phone number to Elyas Kerow, cell site location data for TT18

21  showed that Sergio Reyes-Pina was at **Subject Premises 62**. Accordingly, I believe that

22  Elyas Kerow asked Sergio Reyes-Pina for a photograph of the cocaine Sergio Reyes-Pina

23  was selling in order to check the quality of the cocaine, and that Sergio Reyes-Pina went

24  to **Subject Premises 62** where he was keeping the cocaine in order to take a photograph

25  of the cocaine.

26

27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

111.    On November 20, 2020, at approximately 10:16 p.m., Sergio Reyes-Pina using TT38 sent Craig Fellers at phone number (206) 226-8069[34] the following text message: "Craig please let me know if you see any Coke [cocaine] wrapped in a green saran wrap it was in the car and now it's gone." (Session 4876.) Prior to this at 9:40 p.m., cell site location data for TT38 showed that Sergio Reyes-Pina was at or near **Subject Premises 62**.

112.    Agents have observed Sergio Reyes-Pina at **Subject Premises 62** recently. For example, on May 22, 2021, at approximately 6:40 p.m., agents observed, via remote video surveillance, **Subject Vehicle 53**, known to be driven by Sergio Reyes-Pina, pulled up at **Subject Premises 62** and Sergio Reyes-Pina sitting in the driver's seat of the vehicle.

113.    Based on my training and experience, I know that drug traffickers frequently have stash houses or other stash locations to store and conceal their narcotics and narcotics proceeds. I also know that drug traffickers commonly have other individuals reside at their stash houses to protect their narcotics supply and proceeds. Here, I believe that James Fellers and/or Craig Fellers reside at **Subject Premises 62** and know about Sergio Reyes-Pina's drug trafficking and the narcotics being stashed at their house, and are assisting Sergio Reyes-Pina in his narcotics trafficking activities by allowing Sergio Reyes-Pina to store his narcotics at **Subject Premises 62**.

114.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced

---

[34] This phone number is subscribed to "Craig A. Fellers" at **Subject Premises 62.**

AFFIDAVIT OF SHAWNA MCCANN - 63
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  intercepted communications, I believe that Craig Fellers and James Fellers are drug

2  trafficking associates working with Sergio Reyes-Pina, who keeps his narcotics supply

3  and proceeds in **Subject Premises 62**.

4  **G.**     **Samuel Duarte Avila's Residence and Vehicle**

5         115.    Samuel Duarte Avila is a multi-ounce to kilogram redistributor of cocaine

6  working with several members of the Michael Walker DTO, including Sergio Reyes-

7  Pina, Cresencio Moreno Aguirre, Cesar Arambula, and Rafael Ramirez. During this

8  investigation, based on physical surveillance, intercepted communications, and GPS

9  location data for Samuel Duarte Avila's cell phones (TT45 and TT62, identification

10  discussed below), agents identified Samuel Duarte Avila's residence as 11455 SE 164th

11  Street, Renton, Washington (**Subject Premises 57**), and his vehicle as a cream 1986

12  Toyota Corolla bearing Washington license plate CV3495A registered to Aldrin Agpalza

13  Diga at 514 S 53rd Place, Renton, Washington (**Subject Vehicle 69**).[35]

14         116.    During the period of wire and electronic communications interceptions on

15  Samuel Duarte Avila using TT45 and TT62, agents heard and observed Samuel Duarte

16  Avila discussing narcotics deals and pricing on a daily to weekly basis. These drug

17  transactions and agents' observations are noted below for purposes of establishing

18  probable cause to search **Subject Premises 57** and **Subject Vehicle 69**.

19         117.    On November 10, 2020, at approximately 4:41 p.m., investigators

20  intercepted a phone call between Sergio Reyes-Pina using TT18 and Elyas Kerow using

21  TT49.[36] (Session 2415.) During the call, Elyas Kerow told Sergio Reyes-Pina that he

22

23

24  _____

[35] **Subject Premises 57** is also listed as Samuel Duarte Avila's residence on his driver's license.

25  [36] In December 2020, investigators spoke with a DEA agent regarding information from a source of information that
was being recruited as a new confidential source (SOI). The SOI was not receiving any consideration for

26  information provided and had no criminal convictions. This SOI reported that he knew "E" was trafficking in
various types of controlled substances, including cocaine. SOI identified Elyas Kerow as "E" based on his driver's

27  license photograph. SOI also provided the phone number for Elyas Kerow as TT49. Additionally, investigators have
observed on multiple occasions via remote video surveillance a white Mazda Miata arriving at Samuel Duarte
Avila's residence with two occupants who match the driver's license photos and physical descriptors of David
Armer and Elyas Kerow. Additionally, agents identified a second phone number used by Elyas Kerow, TT82, which

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

needed "one" ounce of cocaine. Sergio Reyes-Pina told Elyas Kerow it would be "1350" ($1,350 per ounce of cocaine). They then discussed the purity of the product and agreed to meet later that day for the cocaine transaction.

118.    Shortly after this call, between approximately 4:47 p.m. and 5:22 p.m., Sergio Reyes-Pina using TT18 and TT38, Elyas Kerow using TT49, and David Armer using TT61 (identification discussed in Part I) had the following text message communication:

TT49: Send pictures. (Session 2416)

TT49: Clear pictures. (Session 2418)

TT61: You got pics? (Session 2420)

TT18: Yea on iphone hold up. (Session 2422)

TT61: Ok. (Session 2424)

TT38:  (SID 398)

TT18: Sent e the pic. (Session 2428)

TT49: Ok if that's it I'll get it. (Session 2430)

TT49: How much do you want for too? [price for two ounces of cocaine] (Session 2432)

TT49: 2? (Session 2434)

TT61: We [David Armer and Elyas Kerow] gonna head out get some food first I seee. The pic [of the cocaine] it looks good just don't wanna buy anything

---

was subscribed to Elyas Kerow, and based on a voice comparison identified Elyas Kerow as the user of both TT49 and TT82.

that we can't move [sell] so we'll give it [cocaine] a chance but if it's not good we gonna pass but bring 2 [ounces of cocaine]. (Session 2436, 2438)

TT18: Ok. (Session 2440)

TT18: 27 [$2,700 for two ounces of cocaine]. (Session 2442)

119.    Based on my training and experience, I believe that Elyas Kerow and David Armer were interested in buying two ounces of cocaine from Sergio Reyes-Pina but wanted pictures of the cocaine to ensure that it was good quality before buying.  Sergio Reyes-Pina sent a photograph of the cocaine he had available and said the price for the two ounces of cocaine was $2,700.

120.    On November 10, 2020, at approximately 5:39 p.m., Samuel Duarte Avila using TT45 called Sergio Reyes-Pina at TT18. (Session 2445.) During this call, Sergio Reyes-Pina and Samuel Duarte Avila discussed cocaine amounts and prices at which to sell the cocaine to customers to increase narcotics profits. Sergio Reyes-Pina told Samuel Duarte Avila, "these dudes [Elyas Kerow and David Armer] will be ready in one hour." At approximately 5:49 p.m., Sergio Reyes-Pina using TT18 called Samuel Duarte Avila at TT45. (Session 2448.) During this call, Sergio Reyes-Pina told Samuel Duarte Avila that his guy (Elyas Kerow) would buy "two" ounces of cocaine at "25" ($2,500). Samuel Duarte Avila said that would be "1250" [$1,250 per ounce], and Sergio Reyes-Pina agreed. Based on my training and experience, I believe that Sergio Reyes-Pina arranged to buy two ounces of cocaine from Samuel Duarte Avila for $2,500 and that Sergio Reyes-Pina planned to turn around and sell that cocaine to Elyas Kerow and David Armer for $2,700, thereby making a $200 profit off of the transaction.

121.    On November 10, 2020, at approximately 6:08 p.m., Sergio Reyes-Pina using TT18 called Samuel Duarte Avila at TT45. (Session 2456.) During this call, Sergio Reyes-Pina told Samuel Duarte Avila that "him and his friend" (Elyas Kerow and David Armer) would go to his Samuel Duarte Avila's house (**Subject Premises 57**) and give Samuel Duarte Avila the money for two ounces of cocaine. Samuel Duarte Avila asked if the money would be "in cash at 13" [$1,300 per ounce of cocaine], and Sergio Reyes-

AFFIDAVIT OF SHAWNA MCCANN - 66
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pina confirmed. Sergio Reyes-Pina asked Samuel Duarte Avila to send his address. Samuel Duarte Avila asked Sergio Reyes-Pina how long, and Sergio Reyes-Pina replied that "they" were on the freeway. A few minutes later, at approximately 6:19 p.m., Samuel Duarte Avila using TT45 sent the following text message to Sergio Reyes-Pina at TT18: "11455 se 164th st renton [**Subject Premises 57**]." (Session 2466.)

122.    Based on my training and experience, I believe that Sergio Reyes-Pina made arrangements with Samuel Duarte Avila for Sergio Reyes-Pina's customers, Elyas Kerow and David Armer, to go directly to Samuel Duarte Avila to get and pay for the cocaine that they were purchasing, instead of having Sergio Reyes-Pina get the cocaine from Samuel Duarte Avila himself and then provide it to his customers. I believe that Samuel Duarte Avila texted his address, **Subject Premises 57**, to Sergio Reyes-Pina for him to pass along to Elyas Kerow and David Armer to meet and conduct the two-ounce cocaine transaction.

123.    On November 10, 2020, between approximately 6:07 p.m. and 6:26 p.m., Sergio Reyes-Pina using TT18 and Elyas Kerow using TT49 had the following conversation via text message:

> TT49: Ok we [Elyas Kerow and David Armer] on the freeway. (Session 2454)
>
> TT18: Ima send u my plugs [source of supply's] address meet there [for cocaine transaction]. (Session 2457)
>
> TT49: Yup. (Session 2459)
>
> TT49: Coming through Auburn on 167. (Session 2461)
>
> TT18: 11455 se 164th st renton [**Subject Premises 57**]. (Session 2468)
>
> TT49: 15 min. (Session 2472)
>
> TT18: Ok park behind the buick i think it is next to sum tall n longish bush, right next to the driveway of that address. There w be a yelow hummer looking thing in drive way. That how u knw it the right house. (Session 2474, 2476.)

124.    On November 10, 2020, at approximately 6:26 p.m., Sergio Reyes-Pina using TT18 sent the following text message to Samuel Duarte Avila at TT45: They

AFFIDAVIT OF SHAWNA MCCANN - 67
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

[Elyas Kerow and David Armer] are in a white Kia. (Session 2482.) At approximately 6:35 p.m., Sergio Reyes-Pina using TT18 called Samuel Duarte Avila at TT45 and told him that "they" (Elyas Kerow and David Armer) should be there. (Session 2484.) At approximately 6:36 p.m., Samuel Duarte Avila using TT45 called Sergio Reyes-Pina at TT18. (Session 2485.) During this call, Sergio Reyes-Pina stated that the "guys" (Elyas Kerow and David Armer) were driving a convertible Mazda. Samuel Duarte Avila told Sergio Reyes-Pina that they just parked.

125.    On November 10, 2020, at approximately 6:37 p.m., investigators on physical surveillance observed a white 1993 Mazda Miata MX-5 convertible bearing Washington license plate BTY0100, registered to David Armer at 17914 17th Avenue Court East, Spanaway, Washington (**Subject Vehicle 56**), pull up and park in front of **Subject Premises 57**. At approximately 6:37 p.m., Elyas Kerow using TT49 texted Sergio Reyes-Pina at TT18: "Here" (Session 2486). At approximately 6:38 p.m., Sergio Reyes-Pina using TT18 and Elyas Kerow using TT49 spoke over the phone, and Sergio Reyes-Pina told Elyas Kerow that he would not make it on time and to just give "him" (Samuel Duarte Avila) the "27" ($2,700) and Samuel Duarte Avila would give Elyas Kerow the "two" ounces of cocaine. (Session 2491.)

126.    Based on my training and experience, I believe that Sergio Reyes-Pina sent Elyas Kerow and David Armer the address the house for his source of supply, Samuel Duarte Avila, so that Elyas Kerow and David Armer could meet directly with Samuel Duarte Avila to conduct the two-ounce cocaine transaction. Sergio Reyes-Pina then told Elyas Kerow that he would not be able to make the cocaine transaction meeting at Samuel Duarte Avila's house, and to give the $2,700 directly to Samuel Duarte Avila in exchange for two ounces of cocaine.

127.    On November 10, 2020, at approximately 6:39 p.m., investigators observed Samuel Duarte Avila, identified based on a comparison to his driver's license photograph, exit **Subject Premises 57** and walk over and lean into the passenger side of the white Mazda Miata. On November 10, 2020, at approximately 6:59 p.m., Samuel

AFFIDAVIT OF SHAWNA MCCANN - 68
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Duarte Avila using TT45 texted Sergio Reyes-Pina at TT18: "They [Elyas Kerow and

2   David Armer] werecshort 400 [$400]." (Session 2493.) Based on my training and

3   experience, I believe that Elyas Kerow and David Armer arranged a cocaine transaction

4   through Sergio Reyes-Pina to buy two ounces of cocaine from Samuel Duarte Avila at

5   **Subject Premises 57**, but that Elyas Kerow and David Armer did not bring the full

6   amount for the cocaine transaction and were short by $400.

7        128.    On March 4, 2021, at approximately 11:16 a.m., Samuel Duarte Avila using

8   TT62[37] called Cresencio Moreno Aguirre at TT80 (identification discussed below).

9   (Session 548.) During this call the following discussion took place:

10       TT62: Hey, you think your buddy [supplier] will give it [half kilogram of cocaine]
            to you for 22 [$22,000]? Or you think he won't? Because if not, well, I

11          already have the business [unintelligible] here, well, if he wants to do

12          something there, well, he needs to say something.

13       TT80: Dude, my friend [supplier] will give it [half kilogram] to me for 22
            [$22,000], dude, I already told you. What I don't want is to do the work for

14          free [make no profit off the cocaine transaction].

15       TT62: No, I don't either, dude. How am I going to give him only 250 bucks?

16       TT80: [unintelligible].

17       TT62: I make more with the other ones [ounces of cocaine]. I make almost the
            same with the fucking ounces [of cocaine].

18

19       TT80: Well, I know, dude. That's why I'm telling you, the guy sells it [half
            kilogram] for 22 [$22,000], dude. It was the price he gave me, I told you he

20          went down 1000 bucks.

21       TT62: Yes.

22       TT80: But, well--

23       TT62: This guy [unintelligible]--

24       TT80: --the same, dude [supplier]. . .

25       TT62: -- dude. I'm starting to not like him, dude, for real.

26  _____

[37] Agents obtained a search warrant for GPS location data for TT62 and confirmed the user was also Samuel Duarte
Avila based on observing him in the vicinity of the GPS pings for TT62 at different locations and times.

27  Additionally, agents conducted a voice comparison between the user of TT45 and TT62, and confirmed the voice
was the same user, Samuel Duarte Avila.

AFFIDAVIT OF SHAWNA MCCANN - 69
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    TT80: Well, don't get anything for him--

2    TT62: I'm already going to tell him to go to hell.

3    TT80: --anything, dude.

4    TT62: I told him [Sergio Reyes-Pina] to fuck off yesterday. I already told him that
5    I don't want to know anything about his fucking drama, fuck that. I told
6    him, "You know what? Look for someone to sell you some, dude. Because
     you're difficult [unintelligible]."

7    TT80: Uh-huh.

8    TT62: Fucking dramatic, shit.

9    TT80: What is he going to do?

10   TT62: How can he tell me that--that he's going to send the black guy after me,
11   dude? And I see the black guy and I ask him, 'What's up, dude?' Fuck. I
     met the guy up, I told him, 'Look fucker, if--if you're going to fuck me, I'm
12   going to fuck you first, bitch.'  That's what I told the black guy, and he said,
13   'What?' But he said, 'No, man, that fool. . .' He said, 'That guy wants to
     get me in trouble with you.' He hadn't said anything about--the black guy
14   hadn't told him anything, dude, It was all a fucking lie, dude. I was already
     talking shit to the black guy, dude.

15   TT80: Hmm.

16   TT62: Yesterday.

17   TT80: Fuck.

18   TT62: Yeah, dude. Well, this guy makes me get mad, dude. He tells me that he's
19   going to send the black guy after me, dude, and that [unintelligible], well
     he's threatening me, dude.

20   TT80: Uh-huh.

21   TT62: So I arranged to meet with the black guy to give him a gram [of cocaine]
22   [unintelligible], dude. But I didn't take the gram or anything, dude, not
     even half. And he said, 'Oh, I'll meet you there, by the hospital.' And he
23   came, dude, and he came at me mad. I said, 'Look, man. If you're going to
24   fuck with me, I'm going to fuck you first.'  And he said, 'What are you
     talking about, n*?' And I told him, 'No,' I told him, 'Well, I know this guy
25   is here and you [unintelligible] work.' 'No, man, I'm cool with you, man,'
26   he said, 'You always give me 10 bucks, 20 bucks, man, that's cool. I'm not
     gonna do shit to you.' 'Who told you? That fucker said you were going to
27   go to my house, and before you go, well, I'll come by here,' I told him that,

dude. He said it's just issues with that guy. He said, 'No, man, that guy has gotten--has gotten me in trouble two or three times.' What do you think?

TT80: No, it's messed up, dude.

TT62: [unintelligible] I told--I told fucking Gio [Sergio Reyes-Pina], I told him, 'Look, dude, stop being stupid, dude, because the one who's going to get beat up is you, fucker.'

TT80: Uh-huh.

TT62: 'You're. . .' I told him, 'You're playing with that fucking shit too much. You think you're a fucking narco [drug trafficker], and shit.'

129.     Based on my training and experience, I believe that Samuel Duarte Avila and Cresencio Moreno Aguirre were discussing a supplier, who Cresencio Moreno Aguirre knew, who was selling half a kilogram of cocaine at $22,000, but that Cresencio Moreno Aguirre did not want to re-sell the half kilogram of cocaine at $22,000 because he would not make any profit from the narcotics sale. I also believe that Samuel Duarte Avila discussed that Sergio Reyes-Pina also had a supplier who could sell a half kilogram of cocaine at a good price but that Samuel Duarte Avila did not want to deal with Sergio Reyes-Pina after Sergio Reyes-Pina caused issues on a prior cocaine transaction.

130.     On March 6, 2021, at approximately 6:18 p.m., Samuel Duarte Avila using TT62 called Cresencio Moreno Aguirre at TT80. (Session 680.) During this call the following discussion took place:

TT62: I'm working on the, the half [kilogram of cocaine], dude.

[discussion of getting gas]

TT80: Oh. What's up with the other thing? Did it happen or not?

TT62: I have the money here for you, dude. For, for--100 bucks, well, I have not gone out, dude.

TT80: 100 bucks, dude [unintelligible] mine. No, I was talking about the other one, dude.

TT62: Yes, yours. The other one--well, I'm working on that [half kilogram deal].

TT80: But you don't think it will happen today, right?

TT62: Who knows? This guy is like, like he wants to go down [on price] but I already told him no.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT80: What?

TT62: He wants to lower it [price] but I already told him 22 and a half [$22,500]. And maybe next time--if it happens often [buy more large quantities of cocaine], who knows? He wants me to lower [price] it more later.

TT80: Mm.

TT62: That's the thing.

TT80: Well, we have to start with one first [initial half kilogram deal], dude. Then we'll see.

TT62: Well, it can be done, but he wants to give 22 [$22,000 for the half kilogram].

TT80: No, but well, we won't make a profit if we do 22 right now, dude.

TT62: [unintelligible] Well, I know.

TT80: Uh-huh.

131.    Based on my training and experience, I believe that Samuel Duarte Avila and Cresencio Moreno Aguirre continued to discuss the half kilogram of cocaine deal and Cresencio Moreno Aguirre continued to not want to sell the cocaine for $22,000 because they would not make any profit.

132.    Samuel Duarte Avila has also discussed selling firearms on intercepted communications, supporting the need for after-hours service of these search warrants. For example, on February 15, 2021, Samuel Duarte Avila using TT45 was intercepted talking with an unknown male who was referred to as Franky. Franky told Samuel Duarte Avila that he got another gun and was selling it for $250. (Session 3004.) That same day after this call, Samuel Duarte Avila using TT45 texted Cresencio Moreno Aguirre at TT80: "There is a gun for 350." (Session 3133.) Based on my training and experience, I believe that Franky let Samuel Duarte Avila know that he had a gun to sell for $250 and that Samuel Duarte Avila offered that same gun to Cresencio Moreno Aguirre for $350, with Samuel Duarte Avila acting as the middle man to make $100 in profit from the deal.

133.    Based on the investigation to date, agents believe that Samuel Duarte Avila lives at **Subject Premises 57**. Specifically, agents obtained GPS location data on Samuel Duarte Avila's cell phones, TT45 and TT62, which showed that Samuel Duarte Avila

AFFIDAVIT OF SHAWNA MCCANN - 72
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  remained at **Subject Premises 57** overnights from November 2020 to April 2021.

2  Additionally, **Subject Premises 57** is currently listed as Samuel Duarte Avila's residence

3  on his driver's license. As set forth above, agents conducted physical surveillance at

4  **Subject Premises 57** and observed Samuel Duarte Avila conduct at least one suspected

5  drug transaction at this residence. As set forth below in Part I (regarding Brett Radcliff),

6  agents have observed Samuel Duarte Avila driving and conducting at least two narcotics

7  transactions using **Subject Vehicle 69**. Moreover, on May 9, 2021, at approximately

8  4:11 p.m., via remote video surveillance, agents observed Samuel Duarte Avila exit

9  **Subject Premises 57**, get into **Subject Vehicle 69**, and drive off, indicating that Samuel

10  Duarte Avila is still residing at **Subject Premises 57** and using **Subject Vehicle 69**.

11       134.    I know based on my training and experience, that drug traffickers

12  frequently keep their narcotics, narcotics proceeds, and firearms in their residences,

13  vehicles, and stash locations in order to protect their supply and to have the narcotics on

14  hand for transactions. I also know that drug traffickers maintain records and other

15  trafficking-related materials in their premises, including residences, for a long period of

16  time, including current and prior cell phone devices that contain text messages and

17  contact lists of drug trafficking associates and pay-owe sheets. Based on the above-

18  referenced intercepted communications, I believe that Samuel Duarte Avila is a cocaine

19  redistributor working for the Michael Walker DTO who likely keeps his narcotics supply,

20  proceeds, and firearms in **Subject Premises 57** and **Subject Vehicle 69**.

21  **H.**     **Elyas Kerow's Residence**

22       135.    Elyas Kerow is a multi-ounce redistributor of cocaine working with several

23  members of the Michael Walker DTO, including Sergio Reyes-Pina, Samuel Duarte

24  Avila, David Armer, and Brett Radcliff. During this investigation, based on physical

25

26

27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

surveillance and intercepted communications, agents identified Elyas Kerow's residence as 7726 52nd Avenue Court E, Tacoma, Washington (**Subject Premises 58**).[38]

136.   During the period of wire and electronic communications interceptions on Sergio Reyes-Pina using TT18 and Samuel Duarte Avila using TT45, agents intercepted communications in which Elyas Kerow discussed narcotics transactions on a weekly basis. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 58**.

137.   As set forth above in Part G, on November 10, 2020, agents intercepted communications in which Elyas Kerow and David Armer, working together, arranged to conduct a two-ounce cocaine transaction with Sergio Reyes-Pina as the middle man, who texted a picture of the cocaine, and Samuel Duarte Avila as the supplier, who conducted the cocaine transaction with Elyas Kerow and David Armer at Samuel Duarte Avila's residence (**Subject Premises 57**).

138.   Agents have conducted open source research on social media, which further demonstrates that Elyas Kerow and David Armer know each other. Agents located a public Facebook page under the name "Elyas Kerow" that posted numerous photographs and profile pictures of Elyas Kerow, identified based on a comparison to his driver's license photograph. In a photograph posted on this Facebook account by Elyas Kerow on April 16, 2021, depicting Elyas Kerow riding a four-wheeler, agents observed a comment from a Facebook account under the name "David Armer" who commented: "Lol I Wanan ride that." The Facebook account of David Armer has limited public access; however, agents reviewed the profile photograph displayed and believe the profile photograph is of David Armer based on a comparison to his driver's license photograph.

139.   Moreover, on January 6, 2021, at approximately 11:55 a.m., investigators again observed, via remote video surveillance, the white Mazda Miata (**Subject Vehicle**

---

[38] Elyas Kerow has a different address listed on his driver's license in Seattle; however, agents have not observed Elyas Kerow at this Seattle address during this investigation.

**56**) parked in front of Samuel Duarte Avila's residence (**Subject Premises 57**). Two males, matching the physical descriptions of David Armer and Elyas Kerow, exited **Subject Vehicle 56** and walked towards **Subject Premises 57**. At approximately 12:00 p.m., the two males matching the physical description of David Armer and Elyas Kerow exited **Subject Premises 57** with a third male who matched the physical description of Samuel Duarte Avila. The three males lifted the hood on a black sedan that was parked in Samuel Duarte Avila's driveway and pushed the vehicle out of the driveway. After accessing the hood and the trunk of the black sedan, Samuel Duarte Avila, Elyas Kerow, and David Armer returned the black sedan to the driveway. At approximately 1:11 p.m., Elyas Kerow and David Armer departed in **Subject Vehicle 56**, and shortly thereafter an unidentified individual departed in the black sedan. At approximately 1:42 p.m., Elyas Kerow and David Armer returned to **Subject Premises 57** in **Subject Vehicle 56**, and a grey SUV pulled into Samuel Duarte Avila's driveway with unknown occupants. The grey SUV departed Samuel Duarte Avila's residence at approximately 1:49 p.m. At approximately 3:28 p.m., the two males matching the physical description of David Armer and Elyas Kerow exited **Subject Premises 57** with David Armer carrying a bag in his hand. David Armer put the bag in the trunk of **Subject Vehicle 56**, and then both males drove off. At approximately 3:30 p.m., **Subject Vehicle 56** returned to Samuel Duarte Avila's residence, and Elyas Kerow, (identified based on a comparison to his driver's license photograph) got out of **Subject Vehicle 56**, quickly went into **Subject Premises 57**, and then returned to **Subject Vehicle 56**, which then drove off.

140.     During the recent wiretap of Samuel Duarte Avila using TT45, agents intercepted several cocaine trafficking communications between Samuel Duarte Avila and a male using TT82, whom Samuel Duarte Avila identified as "Elyas/Elias." Based on this identification, the subscriber information of TT82 in the name of Elyas Kerow, and observing Elyas Kerow at the residence where he texted for Samuel Duarte Avila to come

AFFIDAVIT OF SHAWNA MCCANN - 75
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to conduct a narcotics transaction, agents believed Elyas Kerow was the user of TT82.[39]

For example, on February 11, 2021, Samuel Duarte Avila using TT45 and Elyas Kerow

using TT82 had the following text message conversation:

> TT45: Elias , the old contractor [supplier], call me , hes got some material
> [cocaine] not a whole lot, every body wantsit, wont last." (Session 1252)

> TT82: No go [no deal] for today. (Session 1419)

141.    Based on my training and experience, I believe that Samuel Duarte Avila

told Elyas Kerow that his old cocaine supplier had some cocaine but that the cocaine

would not last because a lot of customers wanted to buy it. Elyas Kerow told Samuel

Duarte Avila that he was not able to buy cocaine that day.

142.    On February 26, 2021, at approximately 5:29 p.m., Elyas Kerow using

TT82 called Samuel Duarte Avila at TT45. (Session 7710.) During this call, Elyas Kerow

asked to buy "one" ounce of cocaine on behalf of an unknown male and "one half" ounce

of cocaine for himself from Samuel Duarte Avila, and Samuel Duarte Avila agreed and

said that it is Friday and everybody wants to get excited. Elyas Kerow and Samuel Duarte

Avila then exchanged the following text messages:

> TT82: Can I pay you for the half [ounce of cocaine] tomorrow. (Session 7719)

> TT82: And the full one [ounce of cocaine] tonight. (Session 7723)

> TT45: So you want credit for the half [ounce] is that what your saiing. (Session
> 7729)

> TT82: Yes. (Session 7731)

> TT82: tomorrow. (Session 7735)

> TT82: Till tomorrow I got these smaller [drug] sales so I'll have it [money] for
> you. (Session 7737)

---

[39] Agents attempted to obtain GPS location data for TT82 but were advised by the phone provider that the device was used on VOIP service and the provider is not capable of providing real time GPS location data for VOIP phones. However, the VOIP service, TextNow, does maintain the content of text messages to the extent the user does not delete such messages. Agents obtained a search warrant for the text message content of TT82, which agents served on May 26, 2021, and obtained text message content to and from TT82 from November 25, 2020, to May 26, 2021. In these text messages, Elyas Kerow identifies himself as the user of TT82 by texting on several occasions "This is elyas," "Hey it's elyas," and "my names elyas."

AFFIDAVIT OF SHAWNA MCCANN - 76
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT82: But the full one [ounce] he [unknown male] will buy tonight. (Session 7739)

143.    Based on my training and experience, I believe that Elyas Kerow arranged to buy from Samuel Duarte Avila one ounce of cocaine for an unknown male who would pay for it up front, and one half ounce of cocaine for himself that he would buy on credit and pay the following day from redistributed drug transaction proceeds. Based on subsequent intercepted communications, I believe that this cocaine transaction ultimately did not transpire because Elyas Kerow was unable to get a hold of the unknown male to get the money for the one ounce of cocaine.

144.    On February 27, 2021, at approximately 1:56 p.m., Elyas Kerow using TT82 called Samuel Duarte Avila at TT45 and asked Samuel Duarte Avila to sell him a half ounce of cocaine; Samuel Duarte Avila said he would call his supplier and get back to Elyas Kerow. (Session 7902.) Later on February 27, 2021, Elyas Kerow using TT82 and Samuel Duarte Avila using TT45 had the following text message communication:

TT82: Can you bring it [cocaine] to me and I'll give you some [money]. (Session 8053)

TT82: I'll have the money for it [cocaine] by tomorrow night. (Session 8055)

TT45: But are you sure you can do that,.? Dont want to get in trouble (Session 8057)

TT82: Yes that's forsure I'll have it [cocaine] sold tonight (Session 8061)

TT82: Can you bring it [cocaine] to me? (Session 8063)

TT82: And I'll hook you up? (Session 8065)

TT45: He [supplier]  agree ,send mecadress [where Elyas Kerow is staying to drop off the cocaine] (Session 8067)

TT82: 7726 52nd ave ct Tacoma wa 98443 (Session 8071)

TT82: 7726 52nd ave ct E Tacoma wa 98443 [**Subject Premises 58**] (Session 8080)

TT82: Make sure it says ct E in address. (Session 8084)

145.    Based on my training and experience, I believe that Elyas Kerow agreed to buy a half ounce of cocaine from Samuel Duarte Avila to redistribute and obtain money

1  from those redistributed drug sales and that Samuel Duarte Avila agreed to drop off the

2  cocaine to Elyas Kerow's house, **Subject Premises 58**.

3      146.    On March 7, 2021, agents intercepted the following text message

4  conversation between Samuel Duarte Avila using TT45 and Elyas Kerow using TT82:

5      TT45: Elias comunicate i heard  they [drug supplier who Elyas Kerow owes
6          money] are going to see you, and it doesnt look good man comunicate asap.
          (Session 12462)

7      TT82: Hey man sorry I been sick bro I'll get some money together [to pay off
8          some of the drug debt] for you in a couple days when I get paid I'm sorry
          hasn't even got to pay my phone yet. (Sessions 12479, 12481, and 12483)
9
       TT45: Call me please i can explain them  some one is already targeting you [for
10          failure to pay the drug debt]. (Session 12485)

11      TT82: Wtf seriously. (12491)

12      TT45: Man they tought  you bounce [left town without paying drug debt].
          (12493)
13
       TT45: Elias get done with this deal [pay off this drug debt] and stop  dealing with
14          them [drug suppliers who Elyas Kerow owes money to]. (Session 12530)

15      TT45: Dont give them mor business  let me know i deal with  them. (Session
16          12538)

17      TT82: Ok. (12540)

18      TT45: How much [drug debt] you owe? (12542)

19      TT82: 1050 [$1,050]. (Session 12544)

20      147.    Based on my training and experience, I believe that Samuel Duarte Avila

21  told Elyas Kerow to pay off his drug debt owed to another cocaine supplier before that

22  supplier comes after Elyas Kerow for failure to repay the debt, and then to only work

23  directly with Samuel Duarte Avila in the future to purchase more cocaine.

24      148.    As set forth below in Part J, on February 12, 2021, Elyas Kerow and Brett

25  Radcliff were intercepted discussing, and then were observed by agents on physical

26  surveillance conducting, a three-ounce cocaine transaction with Samuel Duarte Avila.

27      149.    Based on the investigation to date, agents believe that Elyas Kerow lives at

**Subject Premises 58**. On May 29, 2021, at approximately 2:26 p.m., agents observed

AFFIDAVIT OF SHAWNA MCCANN - 78
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Elyas Kerow via remote video surveillance exiting **Subject Premises 58** with an unknown male and getting into the passenger seat of a vehicle that the unknown male was driving. On June 1, 2021, at approximately 6:55 a.m., agents via remote video surveillance observed a vehicle pull into the driveway of **Subject Premises 58**, after which Elyas Kerow exited **Subject Premises 58** and got into the passenger side of the vehicle, before the vehicle drove off. On June 7, 2021, at approximately 6:51 a.m., agents via remote video surveillance observed a similar pattern, with Elyas Kerow exiting **Subject Premises 58** and getting into the passenger side of a waiting vehicle. Accordingly, agents believe that Elyas Kerow is still residing at **Subject Premises 58**.

150.   I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Elyas Kerow is a multi-ounce cocaine redistributor working with Sergio Reyes-Pina, Samuel Duarte Avila, David Armer, and Brett Radcliff, who likely keeps his narcotics supply and proceeds in **Subject Premises 58**.

## I.   David Armer's Residence and Vehicles

151.   David Armer is a multi-ounce redistributor of cocaine working with several members of the Michael Walker DTO, including Sergio Reyes-Pina, Samuel Duarte Avila, and Elyas Kerow. During this investigation, based on physical surveillance and GPS location data for David Armer's cell phone (TT61, identification discussed below), agents identified David Armer's residence as 17914 17th Avenue Ct E, Spanaway, Washington (**Subject Premises 59**), and his vehicles as a white 1993 Mazda Miata MX-5 convertible bearing Washington state license plate number BTY0100, registered to David

William Armer at 1425 186th Street Court E, Spanaway, Washington (**Subject Vehicle 56**), and a gray 2007 Subaru Impreza bearing Washington license plate BXG5600, registered to David William Armer at **Subject Premises 59** (**Subject Vehicle 70**).

152.    During the period of wire and electronic communications interceptions on Sergio Reyes-Pina using TT18 and Samuel Duarte Avila using TT45, agents observed David Armer discussing narcotics transactions. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 59** and **Subject Vehicles 56** and **70**.

153.    On October 31, 2020, at approximately 11:27 p.m., Sergio Reyes-Pina using TT18 sent the following MMS picture message to David Armer at TT61:

 (SID 311, 214.)

154.    On November 1, 2020, between approximately 12:53 a.m. and 12:57 a.m., Sergio Reyes-Pina using TT18 and David Armer using TT61 exchanged the following text messages:

TT61: What's that? [referring to the above photograph of cocaine] (Session 568)

TT61: lol. (Session 570)

TT18: Unlimited supply [of cocaine] available. (Session 572)

TT18: Jk haha. (Session 574)

TT18: Not [joking, there is a lot of cocaine available]. (Session 576)

TT61: Lol oh yea. (Session 578)

155.    Based on my training and experience, I believe that Sergio Reyes-Pina texted a photograph of cocaine to David Armer at TT61 and told David Armer that there

AFFIDAVIT OF SHAWNA MCCANN - 80
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   was an unlimited supply of cocaine available, then texted "Jk" meaning just kidding, and
2   finally texting "Not," which I believe meant that Sergio Reyes-Pina was taking back his
3   joke and reaffirming that there was a lot of cocaine available. David Armer responded
4   positively, indicating an intent to make narcotics proceeds from the cocaine supply that
5   Sergio Reyes-Pina had.

6       156.    As set forth above, on November 10, 2020, agents intercepted
7   communications between Sergio Reyes-Pina using TT18, Elyas Kerow using TT82,
8   David Armer using TT61, and Samuel Duarte Avila using TT45, discussing a cocaine
9   transaction. Specifically, Elyas Kerow was with David Armer, and both parties were
10  contacting Sergio Reyes-Pina to purchase cocaine. Sergio Reyes-Pina told David Armer
11  and Elyas Kerow to go to Samuel Duarte Avila's house to conduct the cocaine
12  transaction, and Sergio Reyes-Pina then told Samuel Duarte Avila that Elyas Kerow and
13  David Armer would be showing up to Samuel Duarte Avila's house in a white Mazda
14  convertible. Agents then observed **Subject Vehicle 56** arrive at Samuel Duarte Avila's
15  house around the same time that Elyas Kerow texted Sergio Reyes-Pina that he and
16  David Armer were at Samuel Duarte Avila's house to conduct the cocaine transaction. It
17  was too dark outside for agents to positively identify David Armer or Elyas Kerow on
18  this occasion.

19      157.    On November 19, 2020, at approximately 6:41 p.m., Sergio Reyes-Pina
20  using TT18 sent the following text message to David Armer at TT61: "Zips [ounce of
21  cocaine] at 13 [$1,300 per ounce] today and tmw but might go quick and the discount is
22  till re [supplier] runs out, he got 2 9p [two, nine-ounce packages of cocaine available].
23  Same fishsc ale [type of cocaine]." (Session 3783.) Based on my training and experience,
24  I believe that Sergio Reyes-Pina told David Armer that he had cocaine to sell at $1,300
25  per ounce and that his source of supply had two nine-ounce packages of good quality
26  cocaine to sell.

27      158.    Based on the investigation to date, agents believe that David Armer lives at
**Subject Premises 59** and drives **Subject Vehicle 56** and **Subject Vehicle 70**.

AFFIDAVIT OF SHAWNA MCCANN - 81
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Specifically, agents obtained GPS location data on David Armer's cell phone, TT61,

2   which showed that David Armer remained at **Subject Premises 59** overnights from

3   January 2021 to February 2021, the period during which investigators were receiving

4   GPS location data for TT61. On January 22, 2021, agents conducted physical

5   surveillance at **Subject Premises 59**. At approximately 7:34 a.m., agents observed

6   **Subject Vehicle 56** parked behind the residence in a driveway with alley access. At that

7   same time, GPS location data for TT61 showed that the device was in the vicinity of

8   **Subject Premises 59**. TT61 had a customer/subscriber name of David Armer at **Subject**

9   **Premises 59**. Additionally, **Subject Premises 59** is David Armer's current listed

10  residence on his driver's license, and **Subject Vehicles 56** and **70** are registered to David

11  Armer at **Subject Premises 59**.

12      159.    On May 12, 2021, at approximately 8:10 p.m., agents observed several

13  vehicles parked at **Subject Premises 59**, some of which were registered to David Armer,

14  including **Subject Vehicle 70**. On May 13, 2021, at approximately 10:20 p.m., agents

15  observed **Subject Vehicle 70** arrive and park in front of **Subject Premises 59**. Agents

16  observed a male matching David Armer's physical characteristics as described in DOL

17  records exit the driver's seat of **Subject Vehicle 70** and enter **Subject Premises 59**.

18      160.    On June 7, 2021, at approximately 7:15 p.m., agents conducting physical

19  surveillance at **Subject Premises 59** observed **Subject Vehicle 70** departing **Subject**

20  **Premises 59**. Agents were able to positively identify David William Armer as the driver

21  of **Subject Vehicle 70**, based on a comparison to his driver's license photograph, and

22  observed that he was alone in the vehicle. Agents followed David Armer in **Subject**

23  **Vehicle 70** until he parked in a parking lot on the north side of a building located at 16314

24  Pacific Avenue South in Spanaway. Agents observed a red minivan park next to David

25  Armer for approximately one minute before both vehicles left the area, but they could not

26  see the interaction between the two vehicles because their view was obscured. Agents

27  followed **Subject Vehicle 70** as it left the area. At approximately 7:30 p.m., David Armer

parked at Paradise Lanes, 12505 Pacific Avenue South in Spanaway. Agents observed

AFFIDAVIT OF SHAWNA MCCANN - 82
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   David Armer meet briefly with two unknown males before David Armer left alone in

2   **Subject Vehicle 70**. Agents followed David Armer from the parking lot and observed

3   David Armer meet another unknown male on a side street a couple of blocks away.

4   Agents then left that area and returned to **Subject Premises 59**. At approximately 8:52

5   p.m., agents observed David Armer arrive back at **Subject Premises 59** driving alone in

6   **Subject Vehicle 70**, park in the rear driveway, and walk towards **Subject Premises 59**.

7       161.    I know based on my training and experience, that drug traffickers

8   frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

9   stash locations in order to protect their supply and to have the narcotics on hand for

10   transactions. I also know that drug traffickers maintain records and other trafficking-

11   related materials in their premises, including residences, for a long period of time,

12   including current and prior cell phone devices that contain text messages and contact lists

13   of drug trafficking associates and pay-owe sheets. Based on the above-referenced

14   intercepted communications, I believe that David Armer is a multi-ounce cocaine

15   redistributor working with Sergio Reyes-Pina, Samuel Duarte Avila, and Elyas Kerow,

16   who likely keeps his narcotics supply and proceeds in **Subject Premises 59** and **Subject**

17   **Vehicles 56** and **70**.

18   **J.    Brett Radcliff's Residence and Vehicles**

19       162.    Brett Radcliff is a multi-ounce redistributor of cocaine working with

20   several members of the Michael Walker DTO, including Sergio Reyes-Pina, Samuel

21   Duarte Avila, and Elyas Kerow. During this investigation, based on physical surveillance

22   and GPS location data for Brett Radcliff's cell phone (TT84), agents identified Brett

23   Radcliff's residence as 1012 7th Avenue NW, Puyallup, Washington (**Subject**

24   **Premises 60**),[40] and his vehicles as a red 2008 Lexus IS bearing Washington state license

25

26

27   [40] **Subject Premises 60** is also Brett Radcliff's address on his driver's license. In addition to the communications
discussed in this section indicating that Brett Radcliff is the user of TT84, TT84 is subscribed to Tracy L. Radcliff at
**Subject Premises 60**. Based on the law enforcement database CLEAR, TT84 is associated with Brett Radcliff, and
Tracy Radcliff appears to be Brett Radcliff's mother who also lives at **Subject Premises 60**. Agents located an

AFFIDAVIT OF SHAWNA MCCANN - 83                                   UNITED STATES ATTORNEY
USAO #2019R01083                                              700 STEWART STREET, SUITE 5220
                                                                SEATTLE, WASHINGTON 98101
                                                                      (206) 553-7970

plate number BTF0103, registered to Brett D. Radcliff at **Subject Premises 60** (**Subject Vehicle 57**), and a silver 2001 BMW 330 bearing Washington license plate BVB6733 registered to Benjamin Hewson at 2702 Soundview Drive West, University Place, Washington (**Subject Vehicle 71**).

163.    During the period of wire and electronic communications interceptions on Samuel Duarte Avila using TT45, agents observed Brett Radcliff, along with Elyas Kerow, discussing narcotics transactions. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 60** and **Subject Vehicles 57** and **71**.

164.    On February 12, 2021, Samuel Duarte Avila using TT45 and Elyas Kerow using TT82 had the following text message conversation:

TT82: How many [units of cocaine] do you have left. (Session 1832)

TT45: 3 [ounces] now. (Session 1834)

TT45: 2 or 3 [ounces] there are flying. (Session 1836)

TT45: It wont be more [cocaine] until 2 weeks. (Session 1838)

TT82: I need 3 [ounces of cocaine] I'm going to be leaving my house right now. (Session 1840)

TT82: In 20 min sorry not right now. (Session 1842)

TT82: Where do you want me to come to your house ? (Session 1846)

TT45: Yes. (Session 1848)

TT82: It's me and my buddy Brett [Radcliff] in the red Lexus he's my good friend. (Session 1858.)

165.    Later that same day, at approximately 7:59 p.m., Samuel Duarte Avila using TT45 called Elyas Kerow at TT82. (Session 1896.) During this call, Samuel Duarte Avila said that he had to go near "Pacific" to get the "paint," which I believe is a reference to getting cocaine from his supplier, Rafael Ramirez. Samuel Duarte Avila

---

incident report from Puyallup Police Department on May 4, 2018, where Brett Radcliff was arrested for reckless driving. The report lists TT84 as Brett Radcliff's phone number and **Subject Premises 60** as his residence.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   asked if Elyas Kerow wanted to meet somewhere between Auburn and Pacific. Elyas

2   Kerow asked if it was the same "stuff" (type of cocaine) as the one before, and Samuel

3   Duarte Avila confirmed. Samuel Duarte Avila said the cocaine was "14" $1,400 per

4   ounce, which was $50 less. Samuel Duarte Avila and Elyas Kerow then agreed to meet at

5   the Auburn Outlet Mall near a Wendy's or Burger King.

6       166.   At approximately 8:49 p.m., agents observed Samuel Duarte Avila's known

7   vehicle, **Subject Vehicle 69**, and a red Lexus sedan bearing Washington license plate

8   BTF0103, registered to Brett D. Radcliff (**Subject Vehicle 57**), parked next to each other

9   in the parking lot of tire store in Auburn, located across from a Wendy's. Agents

10  observed two males outside of the vehicles, one of whom they identified as Samuel

11  Duarte Avila based on familiarity with him from prior physical surveillance. At

12  approximately 8:53 p.m., the unidentified male got into the driver's seat of **Subject**

13  **Vehicle 57**, and Samuel Duarte Avila got into the rear driver's side seat. At

14  approximately 9:03 p.m., Samuel Duarte Avila got out of the rear seat of **Subject**

15  **Vehicle 57** and into the driver's seat of **Subject Vehicle 69**. Samuel Duarte Avila,

16  driving **Subject Vehicle 69**, then pulled out and drove northbound through the mall

17  parking lot. **Subject Vehicle 57** did not move. At approximately 9:05 p.m., Samuel

18  Duarte Avila parked **Subject Vehicle 69** in a completely empty portion of a Walmart

19  parking lot in the area of the mall. At approximately 9:08 p.m., a lifted black Ford

20  Excursion (**Subject Vehicle 63**, discussed below in Part Q regarding Rafael Ramirez)

21  pulled up and parked next to Samuel Duarte Avila, who got out of **Subject Vehicle 69**

22  and into the front passenger seat of the Excursion. At approximately 9:12 p.m., Samuel

23  Duarte Avila got out of the Excursion and into the **Subject Vehicle 69**. Both vehicles

24  departed southbound through the mall parking lot. At approximately 9:14 p.m., Samuel

25  Duarte Avila arrived back at the tire store, where he again parked next to **Subject**

26  **Vehicle 57**. At approximately 9:20 p.m., agents observed Samuel Duarte Avila get out of

27  **Subject Vehicle 57** and get into **Subject Vehicle 69**, and **Subject Vehicle 57** drove away

shortly after.

AFFIDAVIT OF SHAWNA MCCANN - 85
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

167.    Based on my training and experience, I believe that Elyas Kerow agreed to buy three ounces of cocaine from Samuel Duarte Avila at $1,400 per ounce, and the parties met at the Auburn Outlet Mall to conduct the cocaine transaction. I believe that Samuel Duarte Avila driving **Subject Vehicle 69** first met with Elyas Kerow and his "buddy Brett" Radcliff in the "red Lexus" (**Subject Vehicle 57)** to get the money for the cocaine from them, then Samuel Duarte Avila drove to meet his cocaine supplier, who agents believe was Rafael Ramirez as set forth below, in the Walmart parking lot to get the cocaine, and then Samuel Duarte Avila drove back to **Subject Vehicle 57** to deliver the cocaine to Elyas Kerow and "Brett," who agents believe was Brett Radcliff based on his being the registered owner of the red Lexus, **Subject Vehicle 57**, and Elyas Kerow saying his buddy "Brett" would be with him in the red Lexus.

168.    On February 27, 2021, at approximately 3:16 p.m., Brett Radcliff using TT84 called Samuel Duarte Avila at TT45. (Session 7943.) During this call, Brett Radcliff asked, "how much is a gallon [one ounce of cocaine]?"  Samuel Duarte Avila replied, "The full…well I just found out from the guy [supplier], that the half of the gallon [half of the kilogram], he wants, uh let me check my message. He wants 24 [$24,000]. 24 or maybe uh, 13-5 each [which would be $1,350 for each ounce]." Brett Radcliff said, "13-5 each, ok cool….let me get right back to you. I'm just going to call two people [customers] and then I'm going to call you right back." Samuel Duarte Avila said, "Yeah find out because, he [supplier] came, and he's got it already, a lot of orders placed [cocaine deals] and he, but he kinda gave me the priority."

169.    Based on my training and experience, I believe that Brett Radcliff asked Samuel Duarte Avila the pricing for one ounce of cocaine, and that Samuel Duarte Avila said his supplier was selling a half kilogram of cocaine at $24,000, which priced the ounces of cocaine at $1,350 per ounce. Based on my training and experience, and the intercepted communications during this investigation, I know that in February 2021, the price of an ounce of cocaine was approximately $1,300 to $1,600 and the price of a half kilogram of cocaine was approximately $20,000 to $26,000.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

170.     On March 1, 2021, at approximately 4:24 p.m., agents intercepted the following incoming text message to Samuel Duarte Avila at TT45 from Brett Radcliff at TT84: "Can i get two more gallons [ounces of cocaine]?" (Session 8784.) At approximately 4:30 p.m., investigators intercepted the following outgoing text message from Samuel Duarte Avila using TT45 to Brett Radcliff at TT84: "Ok i order right now." (Session 8787.) At approximately 7:14 p.m., investigators intercepted a phone conversation between Samuel Duarte Avila using TT45 and Brett Radcliff using TT84. (Session 8947.) During the conversation, they agreed to meet in approximately 20 minutes at a Wendy's in Auburn where they had met on a prior occasion. At the time of the conversation, GPS location data for TT45 put Samuel Duarte Avila within range of **Subject Premises 61**, the known address of Cresencio Moreno Aguirre (discussed below in Part K).

171.     At approximately 7:39 p.m., surveillance was established at the Wendy's located at 902 Outlet Collection Way, Auburn, Washington, near the tire store at which the February 12, 2021, transaction discussed above had taken place. At approximately 7:50 p.m., agents observed **Subject Vehicle 57** near the Wendy's. At approximately 7:58 p.m., agents observed **Subject Vehicle 57** drive across the mall parking lot to a pizza parlor. Agents observed a thin white bearded male, in his 20's, identified as Brett Radcliff based on a comparison to his driver's license photograph, get out of the driver's seat of **Subject Vehicle 57** and walk into the establishment before coming out a couple of minutes later. **Subject Vehicle 57** then drove back to the Wendy's lot, and agents observed a passenger in the front seat of **Subject Vehicle 57**.

172.     At approximately 8:05 p.m., investigators intercepted a phone conversation between Samuel Duarte Avila using TT45 and Brett Radcliff using TT84. (Session 8974.) During the conversation, Samuel Duarte Avila told Brett Radcliff that he was taking the exit and would be there shortly. At approximately 8:10 p.m., agents observed a silver 2008 Subaru Tribeca bearing Washington license plate number BVA6233, registered to Cresencio Moreno Aguirre (**Subject Vehicle 58**), park directly next to **Subject Vehicle**

AFFIDAVIT OF SHAWNA MCCANN - 87
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**57**. Agents observed Samuel Duarte Avila, identified based on a comparison to his driver's license photograph, get out of the passenger seat of **Subject Vehicle 58** and get into the rear driver's side seat of **Subject Vehicle 57**. At approximately 8:23 p.m., Samuel Duarte Avila got out of **Subject Vehicle 57** and back into the front passenger seat of **Subject Vehicle 58**. **Subject Vehicle 58** then drove out of the lot. A few minutes later, **Subject Vehicle 57** drove out of the lot. Based on my training and experience, I believe Samuel Duarte Avila, likely driven by Cresencio Moreno Aguirre, met with Brett Radcliff to conduct a two-ounce cocaine transaction, as discussed in the text messages earlier in the day.

173.    On March 7, 2021, at approximately 5:50 p.m., Samuel Duarte Avila using TT45 called Brett Radcliff at TT84. (Session 12573.) During this call, Samuel Duarte Avila asked, "did you went down south to cali [California to pick up cocaine] or what?" Brett Radcliff replied, "No, I'm going to get it [cocaine] shipped up here this week…someone is going to send it [cocaine] to me in the mail." Samuel Duarte Avila said, "are you serious?" Brett Radcliff replied, "oh yeah, man. I've gotten quarter gallons [quarter ounces of cocaine] in the mail a lot of times…not to my address." Samuel Duarte Avila asked, "is it [cocaine] gonna get here though?" Brett Radcliff said, "oh yeah it always does…I've done it a bunch of times." Samuel Duarte Avila replied, "that's pretty good. That way you save a lot of money too." Brett Radcliff said, "you save a lot of money and a lot of being on the road…I was going to say, um, if your guy's looking to, cuz I'll drive down for bigger [quantities of cocaine]. The max that I'll do is a quarter gallon [quarter ounce of cocaine] in the mail, but if your guy wants to throw money on it next time I go down [drive down to California to pick up cocaine]. I'll go down there [California] soon, but the prices are pretty good." Samuel Duarte Avila replied, "I know man, I know. The whole thing is to bring, to come up here. Yeah definitely, just let me know when." Brett Radcliff said, "We'll have to get together this week after that package [of a quarter ounce of cocaine] comes through and I'll give you a little sample [of cocaine to test quality]…next time, I'm going to probably be driving down there in a week or

AFFIDAVIT OF SHAWNA MCCANN - 88
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  two, and then, we'll get together this week and talk about what we're going to do."
2  Samuel Duarte Avila said that Brett Radcliff has his address and that Brett Radcliff can
3  go to his house any time. Samuel Duarte Avila then asked if Brett Radcliff had any
4  cocaine. Brett Radcliff replied that he did have something, but was about to eat dinner
5  with his family. Brett Radcliff then told Samuel Duarte Avila that he lives in Puyallup,
6  that the bar Loose Wheel Bar & Grill is just down the street from his house, and that he
7  would text his address to Samuel Duarte Avila. Around that same time, Brett Radcliff
8  using TT84 texted the following address to Samuel Duarte Avila at TT45: "715 River Rd,
9  Puyallup, WA 98371 United States." (Session 12578.) Agents conducted open source
10 research and identified this address as the address for Loose Wheel Bar & Grill. **Subject**
11 **Premises 60** is about .6 miles from this bar, consistent with Brett Radcliff description of
12 the restaurant's location relative to **Subject Premises 60**.

13     174.    Based on my training and experience, I believe that Brett Radcliff told
14 Samuel Duarte Avila that he has in the past gotten, and is currently getting, a quarter
15 ounce of cocaine mailed to him from California, but that the package is being mailed to
16 an address that was not Brett Radcliff's home address. Brett Radcliff then offered to pick
17 up cocaine for Samuel Duarte Avila when he drives down to California in the next few
18 weeks, and offered to sell cocaine to Samuel Duarte Avila that night.

19     175.    Agents obtained GPS location data on Brett Radcliff's cell phone, TT84,
20 which showed that Brett Radcliff remained at **Subject Premises 60** overnights from
21 March 2021 to April 2021, the period during which investigators were receiving GPS
22 location data for this phone. On May 12, 2021, agents conducting physical surveillance
23 observed **Subject Vehicle 57** parked at **Subject Premises 60**, indicating that Brett
24 Radcliff still lives at **Subject Premises 60**. On June 6, 2021, at approximately 10:31 a.m.,
25 agents observed via remote video surveillance Brett Radcliff, identified based on a
26 comparison to his driver's license photograph, exit **Subject Premises 60**, get into
27 **Subject Vehicle 71** alone, and drive off. At this time, agents also observed **Subject**
**Vehicle 57** parked in front of **Subject Premises 60**. Later that day, at approximately

AFFIDAVIT OF SHAWNA MCCANN - 89
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

6:14 p.m., agents observed Brett Radcliff exit **Subject Premises 60** with a red backpack, get into **Subject Vehicle 71**, and drive off. On June 7, 2021, at approximately 5:53 p.m., agents observed Brett Radcliff exit **Subject Premises 60**, get into **Subject Vehicle 71**, and drive off. During a review of remote video surveillance from June 6, 2021 to June 15, 2021, agents observed Brett Radcliff making quick trips to and from **Subject Premises 60** driving **Subject Vehicle 71**, often carrying the red backpack. Agents believe these quick trips, in additional to the intercepted communications establishing Brett Radcliff as a redistributor of cocaine, is indicative of drug trafficking activity, namely going to and from **Subject Premises 60** using **Subject Vehicle 71** to pick up and/or distribute narcotics that may be carried/concealed in the backpack.

176. I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Brett Radcliff is a multi-ounce cocaine redistributor working with Sergio Reyes-Pina, Samuel Duarte Avila, and Elyas Kerow, who likely keeps his narcotics supply and proceeds in **Subject Premises 60** and **Subject Vehicles 57** and **71**.

## K.   Cresencio Moreno Aguirre's Residence and Vehicle

177. Cresencio Moreno Aguirre is a multi-ounce to kilogram redistributor of cocaine working with several members of the Michael Walker DTO, including Samuel Duarte Avila. During this investigation, based on physical surveillance and GPS location data for Cresencio Moreno Aguirre's cell phone (TT80),[41] agents identified Cresencio

---

[41] TT80 has a subscriber name of Cresencio Moreno Aguirre. Additionally, agents located an incident report from the Des Moines Police Department on August 31, 2020, in which Cresencio Moreno Aguirre was listed as the victim

Moreno Aguirre's residence as 21917 30th Avenue South, Unit #4, Des Moines, Washington (**Subject Premises 61**),[42] and his vehicle as a silver 2008 Subaru Tribeca bearing Washington license plate number BVA6233, registered to Cresencio Moreno Aguirre at 21917 30th Avenue S, Des Moines, Washington (**Subject Premises 61**) (**Subject Vehicle 58**).

178.     During the period of wire and electronic communications interceptions on Samuel Duarte Avila using TT45, agents observed Cresencio Moreno Aguirre discussing narcotics transactions. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 61** and **Subject Vehicle 58**.

179.     On February 10, 2021, at approximately 4:48 p.m., Samuel Duarte Avila using TT45 called Cresencio Aguirre Moreno at TT80. (Session 689.) During this call Cresencio Moreno Aguirre said, "He [third party supplier] says that if I need it [cocaine], it [cocaine] would be ready around 7:00 p.m. or 7:30 p.m." Also during this call, Cresencio Moreno Aguirre said that he was at his house and, at the end of this call Samuel Duarte Avila said, "I just arrived at your house, dude." Around that time, GPS location data for TT45 put Samuel Duarte Avila in the vicinity of Cresencio Moreno Aguirre's residence, **Subject Premises 61**. At approximately 5:50 p.m., agents arrived at **Subject Premises 61** and observed an older white Toyota Corolla or Civic, consistent with Samuel Duarte Avila's known vehicle, **Subject Vehicle 69**, pull out of the parking lot for the apartment complex where **Subject Premises 61** is located. Shortly thereafter, GPS location data for TT45 showed that Samuel Duarte Avila had left the area of **Subject Premises 61**. At approximately 6:25 p.m., agents observed a 2013 Dodge Dart

---

of a traffic accident. The incident report listed TT80 as Cresencio Moreno Aguirre's phone number, and noted that Cresencio Moreno Aguirre was driving **Subject Vehicle 58** and lived at **Subject Premises 61**.

[42] Cresencio Moreno Aguirre has a different address in Kent, Washington listed on his driver's license; however, his vehicle, **Subject Vehicle 58**, is registered to the apartment complex of **Subject Premises 61**. Agents have conducted physical surveillance at this Kent address and have not seen Cresencio Moreno Aguirre there, and GPS location data for TT80 has not placed Cresencio Moreno Aguirre at this Kent residence regularly, including overnights.

AFFIDAVIT OF SHAWNA MCCANN - 91
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   bearing Washington license plate number BXH3407, registered to Cresencio Moreno

2   Aguirre at **Subject Premises 61**, and **Subject Vehicle 58** parked in the apartment

3   complex parking lot near **Subject Premises 61**. At approximately 6:27 p.m., agents

4   observed a dark colored sedan pull into the apartment complex parking lot. A passenger

5   got out of the sedan and met up with a male in the lot. Both males then both got into

6   **Subject Vehicle 58**. At approximately 6:34 p.m., agents observed a male get out of the

7   passenger side of **Subject Vehicle 58** and get back into the passenger side of the dark

8   colored sedan. The sedan then drove away. At approximately 6:38 p.m., agents observed

9   **Subject Vehicle 58** drive away from **Subject Premises 61**; as **Subject Vehicle 58** was

10  leaving, agents identified the driver as Cresencio Moreno Aguirre based on a comparison

11  to his driver's license photograph.

12      180.   On February 12, 2021, at approximately 9:33 p.m., Cresencio Moreno

13  Aguirre using TT80 called Samuel Duarte Avila using TT45. (Session 1961.) During this

14  call Samuel Duarte Avila asked, "How much for a thousand... batteries…The pills...

15  those batteries that you sell a lot of." Cresencio Moreno Aguirre replied, "Which ones

16  dude? I sell two kinds." Samuel Duarte Avila said, "The Percocet or whatever they are

17  called." Cresencio Moreno Aguirre replied, "Oh! thirty, the 30s" and then gave a price of

18  "about nine for a thousand…About nine for each or so." Samuel Duarte Avila asked,

19  "About 900?" Cresencio Moreno Aguirre clarified, "If it's 900 pills, at nine, it would be

20  9,000 bucks, dude." Samuel Duarte Avila said, "So, if I sell them at 10...," and Cresencio

21  Moreno Avila cut him off and said, "You make 1,000 bucks, dude." Based on my

22  training and experience, I know that a Percocet is a pill containing oxycodone, a

23  prescription opioid and controlled substance. Moreover, I know that Percocet are often

24  prescribed and sold in the form of 30 milligram pills. Accordingly, investigators believe

25  that this conversation demonstrates that Cresencio Moreno Aguirre sells two types of

26  pills containing controlled substances, including Percocet, in addition to the cocaine that

27  he is believed to be supplying to Samuel Duarte Avila. Additionally, based on this

conversation, investigators believe that Samuel Duarte Avila expressed interest in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   purchasing a large quantity of Percocet pills from Cresencio Moreno Aguirre so that

2   Samuel Duarte Aguirre could resell them at a profit to lower-level narcotics dealers.

3        181.    On February 20, 2021, at approximately 4:53 p.m., Cresencio Moreno

4   Aguirre using TT80 called Samuel Duarte Avila at TT45. (Session 4607.) During this

5   call, Cresencio Moreno Aguirre said that he had five "yards of carpet" (five ounces of

6   cocaine) and suggested that they meet at his house. Cresencio Moreno Aguirre said that

7   he would get home in about 30 minutes, and Samuel Duarte Avila agreed to meet at

8   Cresencio Moreno Aguirre's house in 40 minutes. At approximately 5:24 p.m., cell site

9   location data for TT45 showed that Samuel Duarte Avila was in the vicinity of **Subject

10  Premises 61**. Additionally, prior to this, at approximately 5:15 p.m., Elyas Kerow using

11  phone number (253) 442-3244[43] called Samuel Duarte Avila at TT45. (Session 4649.)

12  Samuel Duarte Avila asked who the caller was and the male identified himself as

13  "Elyas." Samuel Duarte Avila referenced how Elyas Kerow was using a different phone

14  number and then said that he was just getting to the "paint shop" (cocaine supplier's

15  house, **Subject Premises 61**) and explained that a third party (Cresencio Moreno

16  Aguirre) told him the "apartment" (cocaine) is ready and that Samuel Duarte Avila was

17  going to do a check. Elyas Kerow acknowledged this and suggested that the parties meet

18  at a bar in Auburn. Samuel Duarte Avila said that he would talk to his buddy and was

19  about five minutes from his buddy's house, believed to be **Subject Premises 61**. Based

20  on my training and experience, I believe that Cresencio Moreno Aguirre obtained five

21  ounces of cocaine that he had at **Subject Premises 61** and that Samuel Duarte Avila

22  came to **Subject Premises 61** to look at the cocaine product. I also believe that Samuel

23  Duarte Avila told Elyas Kerow that his buddy, Cresencio Moreno Aguirre, had obtained

24  cocaine and that they agreed to meet later that night to conduct a cocaine transaction. I

25  know based on intercepted calls in this investigation that Samuel Duarte Avila, Cresencio

26

27  [43] Prior to this call, Elyas Kerow using TT82 called Samuel Duarte Avila at TT45 and then told Samuel Duarte Avila that he would call Samuel Duarte Avila right back. (Session 4646.)

1  Moreno Aguirre, and Elyas Kerow, among others, often used construction-related terms
2  like "paint" and "carpet" to refer to units of cocaine.

3      182.    As set forth above, on March 1, 2021, Samuel Duarte Avila and Brett
4  Radcliff met and conducted a cocaine transaction with Samuel Duarte Avila as the
5  passenger in **Subject Vehicle 58** and Samuel Duarte Avila's GPS location data for TT45
6  placed him at **Subject Premises 61** just prior to the cocaine transaction. Agents believe
7  that Samuel Duarte Avila met with Cresencio Moreno Aguirre at **Subject Premises 61**
8  prior to the cocaine transaction and that Samuel Duarte Avila was driven by Cresencio
9  Moreno Aguirre from **Subject Premises 61** to the cocaine transaction in **Subject
10  Vehicle 58**.

11      183.    On March 9, 2021, at approximately 12:49 p.m., Samuel Duarte Avila
12  using TT62 called Cresencio Moreno Aguirre at TT80. (Session 737.) During this call,
13  Cresencio Moreno Aguirre asked if "Sergio" Reyes-Pina had said no to a cocaine
14  transaction they had been planning, and Samuel Duarte Avila confirmed. Samuel Duarte
15  Avila said that he found another cocaine supplier for cheap, "35 per kilo here" ($35,000
16  per kilogram of cocaine), compared to $40,000 per kilogram. Samuel Duarte Avila and
17  Cresencio Moreno Aguirre discussed how to save and come up with enough money for
18  the kilogram of cocaine. Cresencio Moreno Aguirre then complained that he was still
19  owed money from a prior cocaine transaction. The parties then agreed to talk later that
20  day. Based on my training and experience, I believe Samuel Duarte Avila told Cresencio
21  Moreno Aguirre about a supplier who was offering to sell a kilogram of cocaine at
22  $35,000, which was a better deal than what he had been previously looking at for $40,000
23  per kilogram of cocaine.

24      184.    Based on the investigation to date, agents believe that Cresencio Moreno
25  Aguirre lives at **Subject Premises 61** and drives **Subject Vehicle 58**. Agents obtained
26  GPS location data on Cresencio Moreno Aguirre's cell phone, TT80, which showed that
27  he remained at **Subject Premises 61** overnights from February 2021 to April 2021, the
period during which investigators were receiving GPS location data for this phone. As set

AFFIDAVIT OF SHAWNA MCCANN - 94
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

forth above, agents conducted physical surveillance at **Subject Premises 61** and observed Crescencio Moreno Aguirre conducting suspected drug transactions at this residence. Moreover, as recently as May 13, 2021, agents have observed **Subject Vehicle 58** parked in the apartment complex parking lot for **Subject Premises 61**.

185.   On June 10, 2021, at approximately 10:27 p.m., agents on physical surveillance observed Crescencio Moreno Aguirre, identified based on a comparison to his driver's license photograph, exit **Subject Premises 61**, briefly smoke with an unknown female who had previously exited **Subject Premises 61**, and then return inside **Subject Premises 61**. At approximately 10:37 p.m., agents observed a cream colored 1986 Toyota Corolla bearing Washington State license plate CV3495A (**Subject Vehicle 69**), known to be driven by Samuel Duarte Avila, pull in the apartment complex parking lot.[44] Agents then observed Crescencio Moreno Aguirre exit **Subject Premises 61**, make contact with **Subject Vehicle 69** for about one minute, and then walk back into **Subject Premises 61** as **Subject Vehicle 69** drove off. Based on my training and experience, I believe that this brief interaction between Crescencio Moreno Aguirre and the driver of **Subject Vehicle 69,** believed to be Samuel Duarte Avila, was indicative of a drug transaction.

186.   I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Crescencio Moreno Aguirre is a multi-ounce

---

[44] It was too dark outside for agents to positively identify the driver of **Subject Vehicle 69** as Samuel Duarte Avila.

AFFIDAVIT OF SHAWNA MCCANN - 95
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  cocaine redistributor working with Samuel Duarte Avila, who likely keeps his narcotics

2  supply and proceeds in **Subject Premises 61** and **Subject Vehicles 58**.

3  **L.**   **Gabriel Timmen's Residence**

4     187.   Gabriel Timmen is a multi-ounce redistributor of cocaine working with

5  several members of the Michael Walker DTO, including Sergio Reyes-Pina. During this

6  investigation, based on physical surveillance and GPS location data for TT18 and TT38

7  used by Sergio Reyes-Pina, agents identified Gabriel Timmen's residence as 9330 SW

8  Gorsuch Road, Vashon, Washington (**Subject Premises 63**).[45]

9     188.   During the period of wire and electronic communications interceptions on

10  Sergio Reyes-Pina using TT18 and TT38, agents observed Sergio Reyes-Pina discussing

11  narcotics transactions with Gabriel Timmen and travelling to **Subject Premises 63** to

12  conduct these narcotics transactions. These drug transactions and agents' observations are

13  noted below for purposes of establishing probable cause to search **Subject Premises 63**.

14     189.   On October 29, 2020, at approximately 3:40 p.m., Gabriel Timmen using

15  phone number (206) 259-0340 (identification discussed below) called Sergio Reyes-Pina

16  at TT18. (Session 395.) During this call Sergio Reyes-Pina told Gabriel Timmen that he

17  is "trying to pick up a little more [cocaine]" and that Sergio Reyes-Pina has "some really

18  good shit [good quality cocaine], same thing I gave you last time [prior cocaine

19  transaction], it's just more solid." Gabriel Timmen and Sergio Reyes-Pina discussed

20  meeting up later that night at Gabriel Timmen's house (**Subject Premises 63**), and Sergio

21  Reyes-Pina talked about taking a boat to get to the meeting at Gabriel Timmen's house.

22  Later that day at approximately 7:08 p.m., Sergio Reyes-Pina using TT38 talked to his

23  girlfriend and told her that he was going to "Vashon with Gabe [Gabriel Timmen]."

24  (Session 1121.) Later that day at approximately 9:18 p.m., Sergio Reyes-Pina using TT18

25  told Gabriel Timmen using phone number (206) 259-0340 that Sergio Reyes-Pina was

26  "on the boat" and will be "there soon." (Session 401.) At around 10:05 p.m., cell site

27

---

[45] **Subject Premises 63** is listed as Gabriel Timmen's residence on his driver's license.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

location data for TT38 showed that Sergio Reyes-Pina was in the vicinity of **Subject Premises 63** on Vashon Island, and GPS location data for TT18 and TT38 showed that Sergio Reyes-Pina was at **Subject Premises 63**. Based on my training and experience, I believe that Sergio Reyes-Pina went to Gabriel Timmen's house, **Subject Premises 63**, taking the ferry to get to Vashon Island, to supply Gabriel Timmen with cocaine.

190.    On November 2, 2020, at approximately 3:28 p.m., Sergio Reyes-Pina using TT18 called Gabriel Timmen at phone number (206) 259-0340. (Session 741.) During this call, Gabriel Timmen said that Sergio Reyes-Pina still owed him "a half ounce back." Sergio Reyes-Pina asked, "a half of what?", and Gabriel Timmen clarified, "a half of blow [half ounce of cocaine]." Sergio Reyes-Pina said that he would give Gabriel Timmen "two and one half [ounces of cocaine]" because Sergio Reyes-Pina got "four [ounces of cocaine] recently… and just add it to [Gabriel Timmen's] tab." Gabriel Timmen asked when Sergio Reyes-Pina was "com[ing] out," and Sergio Reyes-Pina said, "tomorrow or the next day." Based on my training and experience, I believe that Sergio Reyes-Pina agreed to supply Gabriel Timmen with two and a half ounces of cocaine and to meet at **Subject Premises 63** in the following days to conduct the cocaine transaction.

191.    On November 8, 2020, at approximately 7:23 p.m., Samuel Duarte Avila using TT45 called Sergio Reyes-Pina at TT18. (Session 2184.) During this call, Sergio Reyes-Pina said he was on the way to Vashon (**Subject Premises 63**) to talk to "the dude [Gabriel Timmen]" and "see how many [ounces of cocaine] he wants." Samuel Duarte Avila said "they [supplier]" just dropped the price "down to 13 [$1,300 per ounce of cocaine] again" and to let him know how many ounces Sergio Reyes-Pina wanted. Sergio Reyes-Pina asked for three to five ounces, and Samuel Duarte Avila said to let him know in 20 minutes because the "dude [supplier]" did not work at night. Shortly after this conversation, on November 8, 2020, at approximately 7:33 p.m., Gabriel Timmen using phone number (206) 259-0340 called Sergio Reyes-Pina at TT18. (Session 2187.) Sergio Reyes-Pina told Gabriel Timmen that he just pulled up, and Gabriel Timmen told Sergio Reyes-Pina to walk up the driveway, towards the silver Camry to the kitchen door.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Gabriel Timmen told Sergio Reyes-Pina that he had to meet a "client" out on the road but would let Sergio Reyes-Pina in. At the time of this call, cell site location data for TT18 placed Sergio Reyes-Pina at Gabriel Timmen's house, **Subject Premises 63**. Based on my training and experience, I believe that Sergio Reyes-Pina met Gabriel Timmen at **Subject Premises 63** to discuss a future cocaine transaction and to pick up narcotics money from Gabriel Timmen to purchase that cocaine from Samuel Duarte Avila to then bring to Gabriel Timmen.

192.    On March 1, 2021, Samuel Duarte Avila using TT45 and Sergio Reyes-Pina using TT38 spoke on the phone. (Session 8636.) During this call, Sergio Reyes-Pina said he "needed one [ounce of cocaine] for the white guy [Gabriel Timmen]" and asked if Samuel Duarte Avila could meet "the dude" (Gabriel Timmen) half way. Samuel Duarte Avila said that he could not go to "the Island or the ferry [Vashon Island]." Sergio Reyes-Pina said that he would bring the money to Samuel Duarte Avila and asked if Samuel Duarte Avila could drop off the "stuff [cocaine]" so that Samuel Duarte Avila would not have to go to the ferry to meet Gabriel Timmen. On March 2, 2021, Sergio Reyes-Pina using TT38 texted Samuel Duarte Avila at TT45: "[M]y friend in Vashon Island [Gabriel Timmen] is waiting for you." (Session 9163.)

193.    On March 9, 2021, at approximately 6:30 p.m., Samuel Duarte Avila using TT62 and Crescencio Moreno Aguirre using TT80 spoke on the phone. (Session 746.) During this call, Samuel Duarte Avila said that there is a business with "Chaparro[46] [Sergio Reyes-Pina]" and explained that Chaparro (Sergio Reyes-Pina) takes "shit [cocaine] to the island [Vashon Island]" and that Chaparro is working with "Guero[47] [Gabriel Timmen]." Based on my training and experience, I believe that Sergio Reyes-

[46] Chaparro is slang in Spanish for short person. Based on intercepted communications in this investigation, agents know that Chaparro is a nickname used by Samuel Duarte Avila to refer to Sergio Reyes-Pina, who is 5'2" and 115 pounds.

[47] Guero is slang in Spanish for white guy. Based on intercepted communications in this investigation, agents believe that Guero in this call referred to Gabriel Timmen, who is a white male who lives on Vashon Island

AFFIDAVIT OF SHAWNA MCCANN - 98
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pina obtained cocaine from Samuel Duarte Avila to redistribute to Gabriel Timmen on Vashon Island at **Subject Premises 63** and that Samuel Duarte Avila told Cresencio Moreno Aguirre about Sergio Reyes-Pina's dealings with Gabriel Timmen.

194.    On June 17, 2021, agents requested local officers from King County Sheriff's Office to conduct a knock and talk at **Subject Premises 63** in order to confirm the residence of Gabriel Timmen. During this knock and talk at **Subject Premises 63,** local officers reported that an unknown elderly male who resembled Gabriel Timmen, believed to be an older relative of Gabriel Timmen, answered the door. The officers asked for Gabriel Timmen, and the unknown elderly male stated that "Gabriel" lived there but that Gabriel did not drive and was not home at the moment because he was out with a girlfriend

195.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Gabriel Timmen is a multi-ounce cocaine trafficker working with Sergio Reyes-Pina, who keeps his narcotics supply and proceeds in **Subject Premises 63.**

**M.    Viet "Tony" Nguyen's Residence and Vehicle.**

196.    Viet Nguyen aka Tony is a multi-ounce cocaine redistributor for Sergio Reyes-Pina. During this investigation, based on physical surveillance, intercepted communications, and GPS location data for Viet Nguyen's cell phone (TT52), agents identified Viet Nguyen's residence as 10825 11th Avenue SW, Seattle, Washington

AFFIDAVIT OF SHAWNA MCCANN - 99
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(**Subject Premises 64**),[48] and his vehicle as a black 2014 Mercedes coupe bearing Washington license plate BVV7319 registered to Hoang Nguyen at **Subject Premises 64** (**Subject Vehicle 59**). During the period of wire and electronic communications interceptions on Sergio Reyes-Pina using TT18 and TT38, agents observed Sergio Reyes-Pina and Viet Nguyen discussing and conducting narcotics transactions. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 64** and **Subject Vehicle 59**.

197.    Between November 2, 2020 and November 4, 2020, Viet Nguyen (identification discussed below) using phone number (206) 458-1547 (TT52) and Sergio Reyes-Pina using TT18 had the following text message conversation:

TT52: Tone [nickname Tone/Tony] (Session 895)

TT52: Does that ahit [cocaine] come back all the way [good quality to cook into crack cocaine]. (Session 911)

TT18: Yea. (Session 916)

TT18: I make sum [crack cocaine] for some of my friends. (Session 918)

TT52: Nice. (Session 922)

TT52: Yo ima link with you soon got some people [customers] interested. (Session 1075)

TT52: Can you send me a good pic of it [cocaine] real quick (Session 1186)



TT18:                                    (SID 668)

---

[48] **Subject Premises 64** is also listed as Viet Nguyen's residence on his driver's license.

AFFIDAVIT OF SHAWNA MCCANN - 100
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    TT52: Good looks [good quality]. (Session 1193)

2    TT52: I got somebody [customer] wanna check it [cocaine] out tonight you wanna
3              come by later to my house [**Subject Premises 64**] drop some [cocaine] off
              so I can show my boy. (Session 1221)

4    TT52: He will grab at least 4-5 [ounces] if he like it. (Session 1223)

5    TT18: Yea. (Session 1225)

6    TT52: What time you bout to slide over so I can give my guys a time to meet up.
7              (Session 1228)

8    TT18: Ima be home soon to see how many [ounces of cocaine] i got (Session
              1231)

9    TT18: I got 2 o's [two ounces of cocaine] (Session 1255)

10   TT52: WNna bring them over [to **Subject Premises 64**] (Session 1259)

11   TT18: Yea i can be there in 10min (Session 1266)

12   TT18: At door (Session 1301)

13        198.    At the time of the text message where Sergio Reyes-Pina said he was "at

14   door," cell site location data for TT18 showed that Sergio Reyes-Pina was in the vicinity

15   of Viet Nguyen's residence at **Subject Premises 64**. Later on November 4, 2020, after

16   Sergio Reyes-Pina went to **Subject Premises 64** to meet with Viet Nguyen, Viet Nguyen

17   using TT52 texted Sergio Reyes-Pina at TT18: "I moved 1 [sold one ounce of cocaine]

18   bro but I told my homeboy gimme back the duff tomorrow so I got cash for 1 [ounces of

19   cocaine] and I'll get the other egg [ounce of cocaine that did not sell] back tomorrow."

20   (Session 1332.) Based on my training and experience, I believe that Viet Nguyen aka

21   Tony asked Sergio Reyes-Pina for cocaine that was good quality to be used to make

22   crack cocaine. Sergio Reyes-Pina said he had cocaine available to sell and had cooked

23   some of that powder cocaine into crack cocaine already. Viet Nguyen discussed lining up

24   customers to redistribute to cocaine to, and Sergio Reyes-Pina met Viet Nguyen at

25   **Subject Premises 64** to bring two ounces of cocaine to Viet Nguyen, who was able to

26   sell one of those ounces of cocaine that same night.

27        199.    On November 6, 2020, Sergio Reyes-Pina using TT18 and Viet Nguyen

     using TT52 exchanged calls and text messages to arrange a time to meet at Sergio Reyes-

AFFIDAVIT OF SHAWNA MCCANN - 101
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pina's house (**Subject Premises 56**). Sergio Reyes-Pina using TT18 texted his address to Viet Nguyen as: "1106 sw 139th st burien wa [apartment complex of **Subject Premises 56**]." (Session 1700.) Later that day, at approximately 5:21 p.m., Viet Nguyen using TT52 called Sergio Reyes-Pina at TT38. (Session 2405.) During this call, Viet Nguyen said he was at Sergio Reyes-Pina's house, **Subject Premises 56**. Sergio Reyes-Pina said he was coming outside, and Viet Nguyen said he was in the black Mercedes (matching description of **Subject Vehicle 59**).

200.   On November 15, 2020, Viet Nguyen using TT52 asked Sergio Reyes-Pina at TT18 over text message: "Aye you know where I can get like a lil glock 9." (Session 3284.) Sergio Reyes-Pina responded that he would ask. (Session 3286.)  Based on my training and experience, I know that a "lil glock 9" is likely a reference to a compact Glock, 9mm pistol.

201.   On November 17, 2020, between 9:15 a.m. and 11:43 a.m., Viet Nguyen using TT52 and Sergio Reyes-Pina using TT18 had the following text message conversation:

TT52: "Yo g how many [ounces of cocaine] you got left I'm tryna work a play." (Session 3404.)

TT18: "Plug gota fe [few ounces of cocaine left]." (Session 3406)

TT52: "Ok koo just bout to let my guy [customer] know he bout to come back in town tonight." (Session 3408)

TT18: "Yup mb i was busy al morning but i got 1 and can get asmany" (Session 3410)

TT52: "All good g" (Session 3428).

202.   That same day, at approximately 6:55 p.m., Viet Nguyen using TT52 called Sergio Reyes-Pina at TT18. (Session 3446). Viet Nguyen asked Sergio Reyes-Pina for "three more [ounces of cocaine]" because he had "that one [ounce of cocaine left over from prior deal on November 4, 2020]" and could move "four" ounces of cocaine right now. Sergio Reyes-Pina said he did not have "it" on him and would have to call his "plug [supplier]." At approximately 8:12 p.m., agents observed via remote video surveillance,

AFFIDAVIT OF SHAWNA MCCANN - 102
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sergio Reyes-Pina sitting in his Suburban across the street from the stash house (**Subject Premises 62**). At approximately 9:17 p.m., Sergio Reyes-Pina using TT18 called Viet Nguyen at TT52. (Session 3517.) Sergio Reyes-Pina told Viet Nguyen that he only had "two" and described it as "fire," a common term for good quality drugs. Viet Nguyen asked when Sergio Reyes-Pina would arrive at **Subject Premises 64**, and Sergio Reyes-Pina said about three minutes.

203. At approximately 9:55 p.m., Viet Nguyen using TT52 called Sergio Reyes-Pina at TT18. (Session 3541.) Viet Nguyen said that his guy took them all and that he would be at his house (**Subject Premises 64**) in about 45 minutes to meet Sergio Reyes-Pina. At approximately 10:30 p.m., agents on physical surveillance outside of **Subject Premises 64** observed Sergio Reyes-Pina arrive at **Subject Premises 64** in the Suburban. At approximately 10:32 p.m., Sergio Reyes-Pina using TT18 and Viet Nguyen using TT52 spoke over the phone, during which Sergio Reyes-Pina said he was at Viet Nguyen's house (**Subject Premises 64**). Viet Nguyen told Sergio Reyes-Pina that he was not home yet but that Sergio Reyes-Pina could go inside with "Derrick," and Viet Nguyen would be there in ten minutes. (Session 3552). At approximately 10:51 p.m., agents observed a black 2014 Mercedes bearing Washington license plate BVV7319 (**Subject Vehicle 59**) arrive at **Subject Premises 64**. GPS location data for TT52 shortly after **Subject Vehicle 59** arrived indicated that the device and its user, Viet Nguyen, were in the vehicle, as no other vehicles arrived during that time. At approximately 10:54 p.m., agents observed Sergio Reyes-Pina exit **Subject Premises 64** and depart in the Suburban.

204. Based on my training and experience, I believe that Sergio Reyes-Pina met with Viet Nguyen at **Subject Premises 64** to supply Viet Nguyen with two ounces of cocaine to combine with one ounce of cocaine that Viet Nguyen had left over from a prior deal with Sergio Reyes-Pina, and that Viet Nguyen took the three ounces of cocaine to his customer who bought all three ounces and gave the money to Viet Nguyen. Then Viet Nguyen met with Sergio Reyes-Pina again that night at **Subject Premises 64** to give Sergio Reyes-Pina the money from the transaction.

AFFIDAVIT OF SHAWNA MCCANN - 103
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

205.   On November 30, 2020, at approximately 4:00 p.m., agents observed **Subject Vehicle 59** arrive at **Subject Premises 64**. Agents photographed the driver, whose appearance was consistent with Viet Nguyen's driver's license photograph, as he exited **Subject Vehicle 59** and went into **Subject Premises 64** with a pizza box. At approximately 4:11 p.m., GPS location data for TT52 indicated Viet Nguyen was in the vicinity of **Subject Premises 64**. **Subject Vehicle 59** was the only vehicle to arrive during that time, indicating the male who exited with the pizza box was the user of TT52.

206.   On December 3, 2020, at approximately 3:00 p.m., GPS location data for TT52 indicated Viet Nguyen was in the vicinity of **Subject Premises 64**. **Subject Vehicle 59** was parked near the rear of **Subject Premises 64**. At approximately 4:04 p.m., agents observed a male exit **Subject Premises 64** and go to and from **Subject Vehicle 59** twice within a few minutes, accessing **Subject Vehicle 59** with a set of keys. The male then returned to **Subject Premises 64**. Agents recognized the male as the same male previously seen arriving in the black Mercedes on November 30, 2020 and were able to identify him as Viet Nguyen based on a comparison to his driver's license photograph. At approximately 5:03 p.m., agents observed the same male exit **Subject Premises 64** and leave in **Subject Vehicle 59** alone. The next GPS location data for TT52 indicated Viet Nguyen left the area in **Subject Vehicle 59**.

207.   On May 11, 2021, agents observed Viet Nguyen, identified again based on a comparison to his driver's license photograph, exit **Subject Premises 64**, get into **Subject Vehicle 59**, and drive off, indicating that Viet Nguyen still resides at **Subject Premises 64** and uses **Subject Vehicle 59.**

208.   I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists

AFFIDAVIT OF SHAWNA MCCANN - 104
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of drug trafficking associates and pay-owe sheets. Based on the above-referenced

2  intercepted communications, I believe that Viet Nguyen aka Tony is a multi-ounce

3  cocaine trafficker working with Sergio Reyes-Pina, who keeps his narcotics supply,

4  proceeds, and potentially firearms in **Subject Premises 64** and **Subject Vehicle 59.**

5  **N.**     **Raul Barreto Bejines's Residence and Vehicle**

6       209.    Raul Barreto Bejines is a cocaine redistributor working with Jorge Aguilar

7  Duran, Humberto Flores, and Randolph Brown.[49] During this investigation, based on

8  physical surveillance, intercepted communications, and GPS location data for Raul

9  Barreto Bejines's cell phone (TT34, identification discussed below), agents identified

10  Raul Barreto Bejines's residence as 18760 NE 59th Court, #H1059, Redmond,

11  Washington (**Subject Premises 65**),[50] and his vehicle as a black 2005 Volkswagen Jetta

12  bearing Washington license plate BKH4556, registered to Gregory J Kowalsky at 46519

13  SE 150th Street, North Bend, Washington (**Subject Vehicle 60**). During the period of

14  wire and electronic communications interceptions on Raul Barreto Bejines using TT34,

15  agents observed Raul Barreto Bejines discussing and conducting narcotics transactions.

16  These drug transactions and agents' observations are noted below for purposes of

17  establishing probable cause to search **Subject Premises 65** and **Subject Vehicle 60**.

18       210.    During this investigation, agents identified Raul Barreto Bejines as a

19  cocaine trafficker and source of supply of cocaine to Randolph Brown (TT24)[51] and

20  Larry Collins (TT16)[52] based on intercepted communications over TT16 in September

21

22  [49] Randolph Brown is currently charged in *United States v. McGee, et al.*, CR21-058 RSM, with conspiracy to

23  distribute controlled substances, possession of controlled substances with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm.

24  [50] **Subject Premises 65** is also listed as Raul Barreto Bejines's residence on his driver's license.

25  [51] During this investigation, investigators obtained a search warrant for GPS location data for TT24 and identified

26  the user of the cell phone device as Randolph Brown, based on physical surveillance in the vicinity of the GPS location data and observation of Randolph Brown, identified based on comparison to his driver's license

27  photograph, at different times and at multiple different locations in the vicinity of the GPS location data for TT24.

[52] Larry Collins is currently charged in *United States v. McGee, et al.*, CR21-058 RSM, with conspiracy to distribute controlled substances and distribution of cocaine base. Agents obtained a search warrant for GPS location data on

AFFIDAVIT OF SHAWNA MCCANN - 105
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2020. More specifically, investigators repeatedly intercepted calls between Larry Collins using TT16 and Randolph Brown using phone number (206) 259-1461 (TT24) in which Randolph Brown indicated he could obtain drugs for Larry Collins or discussed having recently communicated with his supplier. Toll records show that before and after those communications between Larry Collins and Randolph Brown, Randolph Brown would repeatedly communicate with Raul Barreto Bejines at phone number (425) 321-4206 (TT34), and then communicate again with Larry Collins to report on the availability of certain drugs from his supplier. The pattern of these communications led investigators to believe that Raul Barreto Bejines was a source of supply to Randolph Brown and provided the probable cause to intercept the phone with which Raul Barreto Bejines communicated with Randolph Brown (TT34).

211. For example, on September 7, 2020, at approximately 4:02 p.m., Larry Collins using TT16 called Randolph Brown at TT24. (Session 121.) During this call the following discussion took place:

TT16: Any word yet?

TT24: Nah. My one little partner [supplier]. That [guy] texted me today talking about he's on [has narcotics]. That last shit [narcotics] I got from him [supplier], that shit was garbage [bad quality]. But it was cooked up though [crack cocaine].

TT16: Right, right.

TT24: I can call the boy [supplier] and see what's happening.

TT16: Ok, yep. Yeah, I'm trying to umm grab another little 4 real quick. I need like 4 thousand real quick [$4,000 worth of cocaine]. I'm working on [unintelligible] right now. I got enough for a baby [4.5 ounces of cocaine] but I'm just working on a little more.

TT24: Alright. Let me call [supplier] and see what's up.

TT16: Ok.

TT24: Alright.

---

TT16 and identified the user as Larry Collins based on observing Larry Collins in the area of the GPS pings for TT16 at different locations and times.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

212.    Based on my training and experience, I believe that Larry Collins asked Randolph Brown for 4.5 ounces cocaine and that Randolph Brown said he would contact his supplier, but that the quality of cocaine that Randolph Brown had gotten from his supplier last time was not good. I know that "baby" is a common term used by drug traffickers—and particularly by this DTO/gang set, based on an earlier, related investigation—to refer to 4.5 ounces of narcotics; that bad quality narcotics are commonly referred to as "garbage;" and that "cooked up" commonly refers to the process of cutting and cooking down powder cocaine into crack cocaine.

213.    Because during this call Randolph Brown stated that he was going to call his supplier and discuss a cocaine transaction and pricing, investigators reviewed toll records for Randolph Brown's phone (TT24). These toll records showed that, within seconds after hanging up with Larry Collins (TT16), Randolph Brown made an outgoing phone call to Raul Barreto Bejines at (425) 321-4206 (TT34). Because of the timing of the call and the context that Randolph Brown had just told Larry Collins he was going to call his supplier, I believe that Randolph Brown called Raul Barreto Bejines at TT34 to discuss cocaine transactions and drug trafficking activities, and that Raul Barreto Bejines is a source of supply for Randolph Brown.

214.    On September 11, 2020, at approximately 10:46 a.m., Randolph Brown using TT24 called Larry Collins at TT16. (Session 228.) During this call the following discussion took place:

TT24: Hey man, the Mexican boy [supplier] just called me, right, talking about he got some good news and bad news. I'm like, give me the bad news first. So he said motherfucker got 9 of them [nine ounces of cocaine] for me, but it's better [better quality] but he want 1600 [$1,600 per ounce of cocaine]. I told him absolutely not.

TT16: Right

TT24: Motherfucker, that bullshit. That's your price. You trying to bump that shit up. Motherfucker, hell naw.

TT16: Yeah, you should said, hey what's dude's number [supplier's boss's number]?

TT24: Matter fact, yeah. Matter fact, I'm about to call him [supplier] back and tell him let me get his [boss's] number. 'Cause he said something the last time about either dude [boss] wanting my number or give me his number or some shit. But um, um. What was I fixin' to say, oh yeah, he said the reason why it is so high [price] because he had to pay somebody to bring it [load of cocaine] up from California. Well, motherfucker that ain't my problem.

TT16: Right, sho ain't.

TT24: Shit, what the fuck. I'm about to call him [supplier] back and tell him let me get dude's [boss's] number. That's what I'm gonna do.

TT16: Yeah, just to see what he say.

T24: Bet.

TT16: He probably won't give it to you but you know.

TT24: Right, right. I'm gonna say, didn't dude, want, I already got dude's [boss's] number anyway you feel me. Because I saved it on my phone, the California number.

TT16: Yeah.

TT24: Let me, let me call this motherfucker back.

TT16: Alright.

TT24: Alright.

215.   A few seconds later, Randolph Brown using TT24 called Larry Collins back at TT16. (Session 229.) During this call the following discussion took place:

TT24: Right when I got off the phone with you, I seen a text. He [supplier] talking about I [supplier] called my friend [boss], 1550 [$1,550 per ounce of cocaine]. Motherfucker, I'm finna call you [supplier] right now, and I want to talk to the Mexican [boss].

TT16: Right.

TT24: Motherfucker, you trying to talk about 1550 [$1,550 per ounce of cocaine] but that's what it was the last time.

TT16: Right. Let's get you [supplier] out the way [go direct with the boss].

TT24: Right. Let me…let me…I'm bout to call this motherfucker [supplier] right now.

TT16: Alright.

AFFIDAVIT OF SHAWNA MCCANN - 108
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    TT24: Alright.

2    216.    Based on my training and experience, I believe that Randolph Brown was

3    telling Larry Collins that Randolph Brown's supplier offered nine ounces of cocaine for

4    $1,600 per ounce, and that Randolph Brown was complaining about the high price.

5    Randolph Brown wanted to talk to his supplier's boss about the price, but before

6    Randolph Brown called his supplier back he received a text message from the supplier

7    saying the price per ounce of cocaine was lowered to $1,550 per ounce.

8    217.    Because in the first phone call between Randolph Brown and Larry Collins

9    on September 11, 2020, at approximately 10:46 a.m. (Session 228), Randolph Brown

10   stated that he just received a phone call from his supplier, investigators reviewed toll

11   records for Randolph Brown's phone (TT24). These toll records show that Randolph

12   Brown received an incoming phone call from Raul Barreto Bejines using TT34 at 10:40

13   a.m. that lasted for about two minutes. He had not received any other call for at least the

14   30 minutes before that. After speaking with Raul Barreto Bejines, Randolph Brown's

15   next call, about four minutes later, was the outgoing phone call to Larry Collins at TT16

16   in which he told Larry Collins that he had just spoken with his supplier [Raul Barreto

17   Bejines at TT34]. Accordingly, I believe that Raul Barreto Bejines using TT34 and

18   Randolph Brown had discussed cocaine transactions and drug trafficking activities.

19   218.    Because in the second phone call between Randolph Brown and Larry

20   Collins, set forth above as Session 229, Randolph Brown told Larry Collins that he was

21   going to call his supplier back right now, investigators reviewed toll records for Randolph

22   Brown's phone (TT24). Those toll records show that, after this second phone call

23   between Randolph Brown and Larry Collins ended at 10:49 a.m., within seconds,

24   Randolph Brown made an outgoing phone call to Raul Barreto Bejines at TT34. That call

25   lasted only a few seconds, but Raul Barreto Bejines using TT34 called Randolph Brown

26   back at 10:50 a.m., and they talked until 10:53 a.m. Randolph Brown then had a few

27   incoming and outgoing calls with other numbers. At 10:58 a.m., Raul Barreto Bejines

     using TT34 called Randolph Brown at TT24 and they spoke for 23 seconds. Randolph

AFFIDAVIT OF SHAWNA MCCANN - 109
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Brown then sent a text to another phone number. At 11:01 a.m., Randolph Brown using

2  TT24 called Larry Collins at TT16 and they spoke for about 40 seconds. Randolph

3  Brown told Larry Collins that he just talked to "the dude," and that "the dude" said

4  "1525, no less." (Session 231.) Randolph Brown and Larry Collins discussed when they

5  could meet, and Randolph Brown told Larry Collins that he was going to call his supplier

6  and have him come to his house (Subject Premises 8). At approximately 11:02 a.m.,

7  Randolph Brown using TT24 sent an outgoing text message to Raul Barreto Bejines at

8  TT34, and attempted to make a call to Raul Barreto Bejines at TT34; it may not have

9  connected, but Raul Barreto Bejines using TT34 returned the call to Randolph Brown at

10  TT24 a moment later at 11:04 a.m., and they spoke for 67 seconds. Because Randolph

11  Brown indicated he was going to call his supplier back and continue to discuss the

12  cocaine transaction and negotiate the price of cocaine, and based on the subsequent calls,

13  investigators believe that during the phone calls between Randolph Brown (TT24) and

14  Raul Barreto Bejines (TT34), reflected on toll records, the conversation pertained to drug

15  trafficking and that Raul Barreto Bejines is Randolph Brown's cocaine supplier.

16      219.    On September 11, 2020, at approximately 10:46 a.m., investigators

17  intercepted a phone conversation between Larry Collins (TT16 Session 228) and

18  Randolph Brown at TT24. During the conversation, Larry Collins and Randolph Brown

19  discussed a possible narcotics transaction with his supplier, later determined to be Raul

20  Barreto Bejines. At approximately 10:48 a.m., investigators intercepted a phone

21  conversation between Larry Collins (TT16 Session 229) and Randolph Brown at TT24.

22  During the conversation, Randolph Brown and Larry Collins had further discussion about

23  the prices of narcotics. At approximately 11:01 a.m., investigators intercepted a phone

24  conversation between Larry Collins (TT16 Session 231) and Randolph Brown at TT24.

25  During the conversation, they further discussed the prices of the narcotics. At

26  approximately 2:01 p.m., investigators intercepted a phone conversation between Larry

27  Collins (TT16 Session 235) and Randolph Brown at TT24. During the conversation,

Randolph Brown told Larry Collins that his supplier [Raul Barreto Bejines] would be

AFFIDAVIT OF SHAWNA MCCANN - 110
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    there [believed to be Randolph Brown's location at Subject Premises 8] in five minutes.

2    Larry Collins told Randolph Brown he was on the way. Agents believed Randolph Brown

3    was telling Larry Collins to come to his residence in Federal Way, Washington and

4    because GPS location data for TT24 indicated that Randolph Brown was at his residence

5    at that time. At approximately 1:43 p.m., investigators intercepted a phone conversation

6    between Larry Collins (TT16 Session 236) and Randolph Brown at TT24. During the

7    conversation, Larry Collins and Randolph Brown discussed where Larry Collins could

8    park at [Randolph Brown's residence] and indicated that his supplier [Raul Barreto

9    Bejines] was just leaving [Randolph Brown's residence], indicating that Larry Collins

10   could take the supplier's parking spot when the supplier left. After Randolph Brown's

11   supplier left and Larry Collins had already arrived and parked, at approximately 2:01

12   p.m., agents arrived at Randolph Brown's residence and observed Larry Collins's known

13   2019 Acura MDX parked in front of Randolph Brown's residence. A short time later,

14   agents observed a male exit from Randolph Brown's residence, get into the Acura, and

15   drive away. The male appeared to be Larry Collins based off a comparison to his driver's

16   license photograph. Accordingly, agents believe that Randolph Brown conducted a

17   narcotics transactions, namely meeting his supplier [Raul Barreto Bejines] to get

18   resupplied with cocaine, and then meet with Larry Collins to sell some of the cocaine to

19   Larry Collins.

20        220.   On November 17, 2020 at approximately 3:00 p.m., United States

21   Magistrate Judge Mary Alice Theiler issued a search warrant for Randolph Brown's

22   residence located at 2532 S 286th Place, #A, Federal Way, Washington. On November

23   17, 2020, at approximately 8:03 p.m., agents executed this search warrant and located

24   four firearms, $4,000 in US currency, suspected heroin, a large quantity of cocaine,

25   marijuana, a digital scale, and six cell phone devices. Randolph Brown was present at the

26   time of the search and was interviewed by agents after being read his *Miranda* rights and

27   knowingly and voluntarily agreeing to waive his rights and speak with agents. During the

interview, Randolph Brown admitted that he had narcotics, U.S. currency, and firearms in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his bedroom. Also during the interview, Randolph Brown told agents that his cocaine supplier was named "Raul" and provided a phone number for his supplier, which matched TT34 used by Raul Barreto Bejines. At agents' request, Randolph Brown agreed to make a consensually recorded phone call to Raul Barreto Bejines at TT34; Raul Barreto Bejines answered this call, Randolph Brown ordered nine ounces of cocaine from Raul Barreto Bejines, and Raul Barreto Bejines said he would get back to Randolph Brown. A few minutes after this call, Raul Barreto Bejines, who agents were intercepting wire and electronic communications on over TT34, placed a call to Jorge Aguilar Duran that went unanswered, indicating that Raul Barreto Bejines was a drug trafficker who acted as the middle man between Randolph Brown and Jorge Aguilar Duran.

221.    On October 1, 2020, investigators conducted surveillance at the billing address for TT34, 18760 NE 59th Court, Redmond, Washington. At approximately 4:03 p.m., investigators observed **Subject Vehicle 60**, occupied by three unknown young females, arrive and park near the H building. The females began unloading groceries and carrying them to the stairwell leading to #H1059 (**Subject Premises 65**). An unknown teenage male joined them from an apartment and helped unload the car. At approximately 4:42 p.m., investigators observed a male, who investigators identified as Raul Barreto Bejines based on a comparison to his driver's license photograph, exit the stairwell for #H1059 (**Subject Premises 65**), get into the driver's seat of **Subject Vehicle 60**, and drive away. At approximately 5:19 p.m., investigators observed the unoccupied **Subject Vehicle 60** parked at the Pour House Bar and Grill, 330 W North Bend Way, North Bend, Washington. Shortly thereafter, GPS location data for TT34 showed the phone device was in the vicinity of this restaurant.

222.    On October 1, 2020, investigators obtained a search warrant to use a cell-site simulator to locate TT34, which is subscribed to Raul Barreto Bejines. On October 2, 2020, while conducting physical surveillance, investigators used the cell-site simulator, which successfully identified the location of TT34 in the H building of 18760 NE 59th Court, Redmond, Washington. That same day, shortly after locating TT34 in the H

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  building, investigators observed Raul Barreto Bejines exit the H building of the

2  apartment complex. Later on October 2, 2020, investigators observed a dark colored

3  Chevy SUV park near **Subject Premises 65**. They then observed Raul Barreto Bejines

4  exit the H building (where **Subject Premises 65** is located), run to the parked Chevy

5  SUV, and run back to the apartment building a few seconds later. The Chevy SUV then

6  departed the apartment complex.

7          223.    As set forth above, during this investigation, investigators identified Jorge

8  Aguilar Duran[53] as a source of supply of cocaine to Raul Barreto Bejines based on

9  intercepted communications on Raul Barreto Bejines's phone (TT34). For example, on

10  October 24, 2020, at approximately 5:55 p.m., Raul Barreto Bejines using TT34 called

11  Jorge Aguilar Duran at phone number (747) 276-7419. (Session 64.) During this call, the

12  following discussion took place, translated from Spanish:

13          TT34: Hey dude! I'm heading out there, ya!

14          Duran: Hold on.

15          TT34: Are you working?

16          Duran: Yes, dude.

17          TT34: I'll swing by right now to pick up a Corona [type of cocaine].

18          Duran: What?

19          TT34: I'll swing by for a Corona [cocaine] okay?

20          Duran: What? No, I got here really early dude, I didn't bring it [type of cocaine].

21          TT34: Ah! You don't have it [type of cocaine] there?

22          Duran: Huh?

23          TT34: You don't have anything [any cocaine on you] right now dude? You don't
                have anything there?

24

25  [53] Investigators in this investigation obtained cell phone number (747) 276-7419 from the toll records of TT34 used

26  by Raul Barreto Bejines. Investigators conducted a deconfliction check on phone number (747) 276-7419, which
    showed a connection to an investigation of Jorge Aguilar Duran being conducted by Homeland Security

27  Investigations ("HSI"), discussed below. Agents in this investigation were advised by HSI agents that the user of
    phone number (747) 276-7419 was confirmed as Jorge Aguilar Duran based off of a comparison to his driver's
    license photograph, and phone calls and meetings between Jorge Aguilar Duran and an HSI confidential source.

AFFIDAVIT OF SHAWNA MCCANN - 113
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Duran: I do, but the expensive one [expensive type of cocaine].

2   TT34: How much is the expensive one?

3   Duran: Well, you know dude, at 900 [$900].

4   TT34: Fuck that dude!

5   Duran: What?

6   TT34: 400 [$400], because it's me.

6   Duran: No dude. I can't dude.

7
8   TT34: Okay. I'll swing by in about a half hour. No, like in one hour! Like in one
        hour more or less.

9   Duran: Alright then.

10  TT34: I'll call you.

11      224.    Based on my training and experience, I believe Raul Barreto Bejines and

12  Jorge Aguilar Duran were discussing a cocaine transaction and that Raul Barreto Bejines

13  agreed to meet Jorge Aguilar Duran to buy cocaine from Jorge Aguilar Duran. I know

14  based on other intercepted calls in this investigation that the term "Corona" is used by

15  Raul Barreto Bejines and his associates to refer to a specific amount or type of cocaine.

16      225.    On November 9, 2020, at approximately 8:45 p.m., Raul Barreto Bejines

17  using TT34 called Jorge Aguilar Duran at phone number (747) 276-7419. (Session 1277.)

18  During this seventeen-second call, in Spanish, Raul Barreto Bejines asked for a favor

19  from Jorge Aguilar Duran to "separate two chavitos. I don't have my divider." Jorge

20  Aguilar Duran, said "alright." Based on my training and experience, and the training and

21  experience of other investigators, I know that the term "chavito" is sometimes used by

22  drug traffickers to refer to an eighth of an ounce of cocaine. I believe that Raul Barreto

23  Bejines did not have a scale on him in order to divide up the cocaine he was going to

24  purchase from Jorge Aguilar Duran to resell to his customers, so Raul Barreto Bejines

25  asked Jorge Aguilar Duran to divide the cocaine into two separate packages, each an

26  eighth of an ounce of cocaine, before selling the cocaine to him.

27      226.    On May 11, 2021, agents observed **Subject Vehicle 60** parked near

**Subject Premises 65**. On June 10, 2021, at approximately 8:15 p.m., agents observed

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   **Subject Vehicle 60** parked at the Pour House Bar and Grill in North Bend, Washington.

2   Agents went inside the restaurant and observed Raul Barreto Bejines working in the

3   kitchen area. On June 11, 2021, at approximately 10:00 a.m., agents observed **Subject**

4   **Vehicle 60** parked back at **Subject Premises 65** indicating that Raul Barreto Bejines still

5   resides at **Subject Premises 65**. Additionally, agents obtained utility records for **Subject**

6   **Premises 65**, which showed that the utilities at this residence are under the name Raul

7   Barreto as recently as May 20, 2021, when agents made the request for utility records.

8   227.   I know based on my training and experience, that drug traffickers

9   frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

10   stash locations in order to protect their supply and to have the narcotics on hand for

11   transactions. I also know that drug traffickers maintain records and other trafficking-

12   related materials in their premises, including residences, for a long period of time,

13   including current and prior cell phone devices that contain text messages and contact lists

14   of drug trafficking associates and pay-owe sheets. Based on the above-referenced

15   intercepted communications, I believe that Raul Barreto Bejines is a cocaine trafficker

16   working with Humberto Flores, Jorge Aguilar Duran, and Randolph Brown, who keeps

17   his narcotics supply and proceeds in **Subject Premises 65** and **Subject Vehicle 60**.

18   **O.   Humberto Flores's Residence**

19   228.   Humberto Flores is a multi-ounce cocaine redistributor working with Raul

20   Barreto Bejines. During this investigation, based on physical surveillance, intercepted

21   communications, and GPS location data for Humberto Flores' cell phone (TT48,

22   identification discussed below), agents identified Humberto Flores' residence as 1003 7th

23   Avenue Southeast, #A, Puyallup, Washington (**Subject Premises 66**).[54]

24   229.   During the period of wire and electronic communications interceptions on

25   Raul Barreto Bejines using TT34, agents observed Raul Barreto Bejines discussing and

26

27   [54] Humberto Flores has a different residence in Sumner, Washington listed as the address on his driver's license. Agents have conducted physical surveillance at this Sumner residence in April 2021 but have not observed Humberto Flores there.

AFFIDAVIT OF SHAWNA MCCANN - 115
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conducting narcotics transactions with Humberto Flores. These drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 66**.

230.    On October 23, 2020, agents began intercepting wire and electronic communications on TT34, as authorized in the Western District of Washington. On October 29, 2020, at approximately 7:12 p.m. and 7:43 p.m., Raul Barreto Bejines using TT34 sent the following text messages in Spanish to the user of phone number (303) 523-2152 (TT48) (identified as Humberto Flores below):

TT34: I will see you tomorrow (Session 458)

TT34: 9 pesos [$900 worth of cocaine] (Session 461)

231.    On October 29, 2020, at approximately 9:13 p.m., Humberto Flores using TT48 called Raul Barreto Bejines at TT34. (Session 464.) During this call the following discussion took place, translated from Spanish:

TT34: Go ahead, buddy.

TT48: What's up?

TT34: Am I going to see you tomorrow, buddy, or what?

TT48: Yeah. Are you going to work, or what?

TT34: Tomorrow? Yes.

TT48: Oh, well then I'll see you there where you work.

TT34: At what time?

TT48: In the afternoon. Around 5...6.

TT34: I arrive here around 5:10.

TT48: I will be there around 5:30... 6.

TT34: All right then.

TT48: All right.

TT34: Make it 9 tomorrow [$900 worth of cocaine], buddy.

TT48: Well, it's about time that... Come on, 9 months, dude [since Raul Barreto Bejines has last bought cocaine from Humberto Flores].

AFFIDAVIT OF SHAWNA MCCANN - 116
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT34: No, buddy. I haven't been able to because... my daughter... she's kind of starting to have a set back and... You were calling me yesterday but...

TT48: I don't believe you. Yesterday I kept calling you.

TT34: But I didn't have the other phone, [unintelligible]. But I'm going to bring that right now. I didn't have the other phone. I left it at the house [**Subject Premises 65**]. I was in Seattle. I was at the hospital with my daughter.

TT48: Mm-hmm.

TT34: Uh-huh. But I will have that one [phone] now. I had another phone right now. All right. So we're set then [for the drug transaction tomorrow].

TT48: Uh-huh.

TT34: All right.

TT48: All right.

232.    Based on my training and experience, I believe that Raul Barreto Bejines asked Humberto Flores for $900 worth of cocaine. Humberto Flores gave Raul Barreto Bejines a hard time for not calling him/buying cocaine from him for nine months, indicating that Raul Barreto Bejines and Humberto Flores have conducted narcotics transactions in the past. The parties agreed to conduct the cocaine transaction the following day.  In the above-referenced call, Raul Barreto Bejines also references having at least two cell phone devices and, based on my training and experience, I know that drug traffickers frequently use more than one cell phone device to conduct their drug trafficking operations as well as to evade law enforcement detection.

233.    On October 30, 2020, at approximately 5:01 p.m., Raul Barreto Bejines using TT34 called Humberto Flores at TT48. (Session 525.) During this call the following discussion took place in Spanish:

TT48: What's up, buddy?

TT34: Where are you, buddy?

TT48: Well, I'm on my way over there. I told you it would be at 6 [p.m.].

TT34: No, well, I'm also barely going over there. That's why I was asking.

TT48: Around 6, dude. Around there.

TT34: Okay. Okay, that's fine. I will be there at 5:30.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT48: All right then.

TT34: All right then.

234.    On October 30, 2020, at approximately 6:53 p.m., Raul Barreto Bejines using TT34 called Humberto Flores at TT48. (Session 542.) During this call the following discussion took place in Spanish:

TT48: What's up, buddy?

TT34: What's up, buddy?

TT48: No, dude, it got late because I went back to pick up some papers but I'm already on my way, dude. It's just that I came here to fucking Maple Valley. But I'm already on my way over there.

TT34: All right, then.

TT48: [unintelligible]

TT34: No, that's fine. It was just...

TT48: I will be there in about a fucking twenty... half an hour, dude.

TT34: I thought it was taking a long time. All right then, just let me know.

TT48: All right.

235.    Based on my training and experience, I believe this is a continuation of Raul Barreto Bejines and Humberto Flores arranging to conduct the $900 cocaine transaction.  They had agreed to meet at Raul Barreto Bejines's workplace around 6:00 p.m. for the narcotics transaction, but Humberto Flores was running late.

236.    As set forth above in Part N, agents intercepted several communications between Randolph Brown and Larry Collins discussing cocaine transactions, with Randolph Brown then contacting Raul Barreto Bejines at TT34, in addition to Randolph Brown's interview and order up call of nine ounces of cocaine to Raul Barreto Bejines at TT34, which showed that Raul Barreto Bejines is a multi-ounce drug trafficker and further establishing that these above-referenced intercepted communications between Raul Barreto Bejines and Humberto Flores pertain to drug transactions.

237.    On November 18, 2020, at approximately 7:30 p.m., GPS location data put Humberto Flores using TT48 within range of a Chase Bank in Auburn, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Agents observed a white 2019 Ford van, bearing Washington license plate number
2    C07718P, registered to Varsity Facility Services, parked in front of the Chase Bank. One
3    male, later identified as Humberto Flores, could be seen inside of the Chase Bank,
4    cleaning it. At approximately 8:00 p.m., Humberto Flores came out of the bank and drove
5    away southbound in the van. Surveillance personnel followed and observed the van pull
6    into the Washington Federal Bank located at 206 A Street Southeast, in Auburn. GPS
7    location data for TT48 moved to within range of that location. Humberto Flores got out
8    of the vehicle, went inside the bank, and began to clean. Agents took photographs of
9    Humberto Flores and confirmed his identification based on a comparison to his driver's
10   license photograph. At approximately 8:17 p.m., Humberto Flores came out of the bank
11   and departed in the van. At approximately 8:28 p.m., the van arrived at another Chase
12   Bank located at 6950 Lakeland Hill Way Southeast, in Auburn. Humberto Flores went
13   inside the bank and began to clean. GPS location data for TT48 was within range of that
14   location at the time. At approximately 8:47 p.m., Humberto Flores drove the van out of
15   the lot. Surveillance followed the van as it traveled southbound on Washington State
16   Route 167, and GPS location data for TT48 moved along within range of the van. At
17   approximately 9:04 p.m., agents observed the van parked in front of **Subject**
18   **Premises 66**. At approximately 9:08 p.m., agents observed Humberto Flores exit **Subject**
19   **Premises 66** and retrieve items from the van, and then return to **Subject Premises 66**. At
20   approximately 9:16 p.m., GPS location data for TT48 put Humberto Flores at **Subject**
21   **Premises 66**. At approximately 9:19 p.m., agents verified the address that Humberto
22   Flores exited and went back into as **Subject Premises 66**.

23       238.    On May 17, 2021, at approximately 8:35 p.m., agents observed a 2015 Ford
24   F150 registered to Humberto F Flores Serna and Edgar D. Vazquez Dominguez backed
25   into the driveway of **Subject Premises 66.** On June 7, 2021, agents observed the same
26   Ford F150 and a white 2009 Toyota Tacoma registered to Humberto Flores parked at
27   **Subject Premises 66**, indicating that Humberto Flores still resides at **Subject Premises**
     **66**.

AFFIDAVIT OF SHAWNA MCCANN - 119
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

239.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Humberto Flores is a multi-ounce cocaine trafficker working with Raul Barreto Bejines, who likely keeps his narcotics supply and proceeds in **Subject Premises 66**.

## P.    Cesar Arambula and Britney Ramirez's Residence and Vehicles

240.    Cesar Arambula and Britney Ramirez are kilogram drug traffickers and suppliers working with Samuel Duarte Avila, Jorge Aguilar Duran, and Rafael Ramirez. During this investigation, based on physical surveillance, GPS location data on Cesar Arambula's cell phones (TT58 and TT59, identification discussed below), and intercepted communications, agents identified Cesar Arambula and Britney Ramirez's residence as 1119 W Sam Street, Kent, Washington (**Subject Premises 67**),[55] and his vehicles as (1) a grey 2012 Toyota Tundra bearing Washington license plate LEM204J, registered to Cesar Arambula at **Subject Premises 67** (**Subject Vehicle 61**), and (2) a white 2017 Toyota Corolla bearing Washington license plate BQG3751, registered to Cesar Arambula at **Subject Premises 67** (**Subject Vehicle 62**).

241.    During the period of wire and electronic communications interceptions on Sergio Reyes-Pina using TT18, agents observed Sergio Reyes-Pina and Samuel Duarte Avila discussing and conducting narcotics transactions with Cesar Arambula. Additionally, investigators conducted a traffic stop of **Subject Vehicle 62**, which Britney

---

[55] Cesar Arambula has a different residence in Kent listed on his driver's license. **Subject Premises 67** is listed as Britney Ramirez's residence on her driver's license.

1  Ramirez was driving and in which Cesar Arambula was riding as the only passenger,

2  searched the vehicle based on probable cause, and located six kilograms of cocaine.

3  These drug transactions and agents' observations as well as the probable cause search are

4  noted below for purposes of establishing probable cause to search **Subject Premises 67**

5  and **Subject Vehicles 61** and **62** as well as the person of Britney Ramirez.

6      *1.      Communications with Sergio Reyes-Pina*

7      242.    On October 30, 2020, Sergio Reyes-Pina using TT18 and Samuel Duarte

8  Avila using TT45 communicated several times to coordinate a cocaine transaction. After

9  getting off the phone with Sergio Reyes-Pina at approximately 12:03 p.m. (Session 405),

10 toll records for Samuel Duarte Avila's phone (TT45) showed that the next call Samuel

11 Duarte Avila made was to Cesar Arambula at TT58,[56] at approximately 12:03 p.m.,

12 which lasted 199 seconds. After hanging up with TT58, the next call Samuel Duarte

13 Avila made using TT45 was to Sergio Reyes-Pina at TT18, at approximately 12:07 p.m.

14 (Session 406.) During this call, as set forth above, Samuel Duarte Avila told Sergio

15 Reyes-Pina that there were only three ounces of cocaine available and that "he"—

16 referencing his supplier—did not have anything else.  Based on my training and

17 experience, I believe that after hanging up with Sergio Reyes-Pina, Samuel Duarte Avila

18 called his cocaine source of supply, Cesar Arambula at TT58, and found out that there

19 were only three ounces of cocaine left, and then Samuel Duarte Avila called Sergio

20 Reyes-Pina back to tell him that.

21      243.    On November 2, 2020, at approximately 3:50 p.m., Sergio Reyes-Pina

22 using TT18 called Samuel Duarte Avila at TT45. (Session 745.) During this call, Sergio

23 Reyes-Pina asked if "there were more [cocaine]." Samuel Duarte Avila said "the guy"

24 (cocaine source of supply) told him yesterday that "he" (the runner bringing cocaine) left

25 and probably arrived today. Sergio Reyes-Pina said that there is a guy, believed by

26

27 [56] The user of TT58 was identified as Cesar Arambula based on a comparison to text messages on TT59. Text messages to both numbers referred to the user as the "carpet" guy, Arambula's known alias, and based on the information provided by Jorge Aguilar Duran during a post-arrest interview, as set forth below.

AFFIDAVIT OF SHAWNA MCCANN - 121
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  investigators to be Elyas Kerow, that said "he wants a lot [of cocaine]." Samuel Duarte
2  Avila asked if Sergio Reyes Pina meant "the same," as in the same type of cocaine.
3  Sergio Reyes-Pina said "they [Elyas Kerow] want the same" as the one Samuel Duarte
4  Avila had given Sergio Reyes-Pina on a prior drug transaction, but at "12 [$1,200 per
5  ounce]." Samuel Duarte Avila asked how much cocaine Sergio Reyes-Pina needed, and
6  Sergio Reyes-Pina said "it's going to be a lot [of cocaine that Elyas Kerow wants]."
7  Samuel Duarte Avila said he would call Sergio Reyes-Pina when he got home and that he
8  would call "that guy" (source of supply) in the meantime. Samuel Duarte Avila then
9  asked if Elyas Kerow wanted more from the "brick [kilogram of cocaine]," and Sergio
10 Reyes-Pina replied, "a half [kilogram of cocaine], more or less."

11       244.    Based on my training and experience, I believe that Sergio Reyes-Pina
12 called Samuel Duarte Avila to discuss getting about a half kilogram of cocaine for a
13 customer of Sergio Reyes-Pina's at $1,200 per ounce. Samuel Duarte Avila said he
14 would call his source of supply of cocaine to see if that amount was currently available
15 and would call Sergio Reyes-Pina back when he got home. Samuel Duarte Avila also
16 advised Sergio Reyes Pina that his source of supply had talked to him yesterday and that
17 the source of supply's runner should be arriving with a load of cocaine that day.

18       245.    After getting off the above-referenced phone call with Sergio Reyes-Pina at
19 approximately 3:51 p.m., toll records for Samuel Duarte Avila's phone (TT45) showed
20 that the next communications Samuel Duarte Avila made were three outgoing text
21 messages to Cesar Arambula at TT58, at approximately 3:55 p.m. About 20 minutes after
22 sending the text messages to TT58, Samuel Duarte Avila made an outgoing call to Cesar
23 Arambula at TT58, which lasted 98 seconds. Based on my training and experience, I
24 believe that after hanging up with Sergio Reyes-Pina, Samuel Duarte Avila texted and
25 then called his cocaine source of supply, Cesar Arambula at TT58, to see how much
26 cocaine Cesar Arambula had, based on Sergio Reyes-Pina's conversation with Samuel
27 Duarte Avila in which Sergio Reyes-Pina said he had a customer who wanted to purchase
   a lot of cocaine.

AFFIDAVIT OF SHAWNA MCCANN - 122
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## 2.   *Identification by Jorge Aguilar Duran and Other Methods*

246.   In addition to the investigation of the Michael Walker DTO, Homeland Security Investigations ("HSI") and the Drug Enforcement Administration ("DEA") were conducting a separate investigation into Jorge Aguilar Duran. As part of that investigation, HSI obtained a federal search warrant for Jorge Aguilar Duran's apartment in Issaquah, Washington, two vehicles, and person. These search warrants included the authority to seize and search the contents of any cell phone devices. On November 16, 2020, at approximately 6:00 a.m., HSI executed the search warrant at Jorge Aguilar Duran's apartment in Issaquah, Washington. Agents located and seized approximately $32,558 in U.S. currency, a firearm, several ounces of cocaine (located in the toilet in an apparent attempt to destroy the evidence), an iPhone, and an LG phone in Jorge Aguilar Duran's apartment.

247.   Jorge Aguilar Duran was taken into custody for ICE/ERO violations and was read his *Miranda* rights in Spanish by an HSI agent who was fluent in both Spanish and English. Jorge Aguilar Duran stated in Spanish, translated to English, that he understood his rights and agreed to speak with agents. Jorge Aguilar Duran admitted to flushing cocaine down the toilet in the apartment when agents were knocking and announcing the search warrant at the apartment door. Jorge Aguilar Duran initially claimed to only purchase about a half ounce of cocaine, at most, at one time. Later in the interview, Jorge Aguilar Duran admitted that he was supplied approximately three to five ounces of cocaine, and at the end of the interview Jorge Aguilar Duran admitted that he was supplied up to nine ounces of cocaine on a weekly basis. Jorge Aguilar Duran stated that he was supplied cocaine from one person who he called "Primo" or "Tios" but did not know his real name.

248.   During the interview, Jorge Aguilar Duran provided verbal consent for agents to review the contents of his iPhone. Jorge Aguilar Duran stated that "Primo's" phone number was saved under the contact name Carpetos Cesas at phone number (206) 489-6958 (TT59). Jorge Aguilar Duran used that contact name because he thought

1  "Primo" worked with carpets and that his first name was Cesar. Jorge Aguilar Duran was

2  shown a driver's license photograph of Cesar Arambula and positively identified him as

3  "Primo." Jorge Aguilar Duran stated that Cesar Arambula charged him $1,300 per ounce

4  of cocaine. Jorge Aguilar Duran's iPhone contained several text messages with Cesar

5  Arambula at TT59 that appeared to pertain to drug transactions from March 31, 2020, to

6  August 2, 2020 (some of these text messages are described below at paragraphs 239–

7  248).  Aguilar Duran was asked why the text messages stopped at August 2, 2020, and

8  Jorge Aguilar Duran stated that he began speaking with Cesar Arambula over the phone

9  at TT59 instead of texting him.

10      249.    Jorge Aguilar Duran admitted that the second phone recovered from the

11  apartment, an LG phone, was also his phone and that Cesar Arambula had given him the

12  LG phone and told Jorge Aguilar Duran to use the LG phone to talk to Cesar Arambula

13  about cocaine transactions. Jorge Aguilar Duran provided verbal consent for agents to

14  review the contents of the LG phone, which was assigned phone number (747) 276-7419.

15  Agents reviewed the contact list of Jorge Aguilar Duran's LG phone, in the presence of

16  Jorge Aguilar Duran, and noted "Primo Carpetas" was saved as a contact with phone

17  number (253) 765-3310 (TT58). Jorge Aguilar Duran stated that Cesar Arambula used

18  both phone numbers (253) 765-3310 (TT58) and (206) 489-6958 (TT59) to communicate

19  about drug trafficking activity. Jorge Aguilar Duran also stated that Cesar Arambula's

20  girlfriend, whom he positively identified based on her driver's license photograph as

21  Britney Ramirez, assisted Cesar Arambula with his narcotics trafficking by conducting a

22  cocaine transaction with Jorge Aguilar Duran on behalf of Cesar Arambula.

23      250.    HSI conducted a search of Jorge Aguilar Duran's LG cell phone device

24  pursuant to the federal search warrants noted above and provided the extracted contents

25  of the LG cell phone device to FBI to assist with this investigation. Investigators

26  observed the following text message conversations on Jorge Aguilar Duran's LG cell

27  phone device.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

251.    On September 23, 2020, at approximately 11:14 p.m., Jorge Aguilar Duran texted Cesar Arambula at TT58: "Primo bring at least 3 [ounces of cocaine]." Based on my training and experience, I believe that Jorge Aguilar Duran asked Cesar Arambula to bring at least three ounces of cocaine to him.

252.    On October 6, 2020, between approximately 9:21 p.m. and 10:21 p.m., Jorge Aguilar Duran and Cesar Arambula using TT58 exchanged the following text messages:

> Duran: The same [cocaine order as last time] primo.
>
> TT58: Now?
>
> Duran: Tomorrow.
>
> TT58: However you want. Tomorrow I will be busy.
>
> Duran: Now.
>
> Duran: At home.
>
> TT58: Ok, what time?
>
> Duran: Now.
>
> TT58: Ok.
>
> TT58: I'm outside.
>
> Duran: Ok.

253.    Based on my training and experience, I believe that Jorge Aguilar Duran asked to buy cocaine from Cesar Arambula in the same amount as the last cocaine transaction and that Cesar Arambula went to Jorge Aguilar Duran's residence to conduct the cocaine transaction.

254.    On October 10, 2020, at approximately 12:11 a.m., Jorge Aguilar Duran texted Cesar Arambula at TT58 and asked if Cesar Arambula could come the next day [to bring more cocaine]. On October 11, 2020, at approximately 6:57 p.m., Jorge Aguilar Duran texted Cesar Arambula at TT58 and asked if Cesar Arambula was back. Based on my training and experience, I believe that Jorge Aguilar Duran texted Cesar Arambula so that Jorge Aguilar Duran could be resupplied with cocaine.

AFFIDAVIT OF SHAWNA MCCANN - 125
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

255.    On October 19, 2020, between approximately 9:08 p.m. and 9:59 p.m., Jorge Aguilar Duran and Cesar Arambula using TT58 had the following text message conversation:

Duran: You can come.

TT58: Ok, same?

Duran: Yes

TT58: Ok.

Duran: To the house.

TT58: Ok.

TT58: I'm outside.

256.    Based on my training and experience, I believe that Jorge Aguilar Duran asked to buy cocaine from Cesar Arambula in the same amount as the last cocaine transaction and that Cesar Arambula went to Jorge Aguilar Duran's residence to conduct the cocaine transaction.

257.    On October 26, 2020, between approximately 7:36 p.m. and 9:00 p.m., Jorge Aguilar Duran and Cesar Arambula using TT58 had the following text message conversation:

Duran: Ok 5.

Duran: It's better than past?

Duran: Ok.

Duran: Of the most whole [brick/kilogram] you have.

Duran: Ok to the house.

TT58: I'm outside.

258.    Based on my training and experience, I believe that Jorge Aguilar Duran asked to buy five ounces of cocaine from Cesar Arambula and that Cesar Arambula went to Jorge Aguilar Duran's residence to conduct the cocaine transaction. Jorge Aguilar Duran wanted the cocaine to be good quality, so he asked that Cesar Arambula take the five ounces of cocaine from the most solid or complete brick or kilogram of cocaine.

AFFIDAVIT OF SHAWNA MCCANN - 126
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

259.   On November 5, 2020, at approximately 4:41 p.m., Cesar Arambula using TT58 texted Jorge Aguilar Duran, "I'm ready," meaning that he had more cocaine to sell.

260.   On November 9, 2020, at approximately 4:50 p.m., Jorge Aguilar Duran texted Cesar Arambula at TT58 and asked if Cesar Arambula could come over, and Jorge Aguilar Duran asked for "five and two [five ounces of cocaine and two ounces of cocaine]." Based on my training and experience, I believe that Jorge Aguilar Duran asked to buy a total of seven ounces of cocaine from Cesar Arambula, separated into a five-ounce package and a two-ounce package. I know that it is common for drug re-distributors, like Jorge Aguilar Duran, to buy cocaine in divided or separately packaged quantities in order to meet the needs and orders of their customers, as with the "chavitos" described above in Part N (regarding Raul Barreto Bejines).

261.   Based on the communication patterns described above in paragraphs 242–245, agents believed that the user of TT58 and TT59 was a source of supply to Samuel Duarte Avila, and they were able to identify the user of TT58 and TT59 as Cesar Arambula based on the interview of Jorge Aguilar Duran; a common call analysis between TT58 and TT59 showing multiple common contacts, including a girlfriend, Britney Ramirez, and likely relatives of Cesar Arambula; and GPS location data on TT59 showing that Cesar Arambula was the user of TT59, based on the data placing the device at Cesar Arambula's residence (**Subject Premises 67**) overnight in conjunction with remote video surveillance capturing Cesar Arambula at his residence.  On December 22, 2020, investigators obtained a search warrant for GPS location data for TT58, with an integrated Pen Register and Trap and Trace Order; however, the phone provider notified investigators that TT58 was suspended as of January 1, 2021, for lack of payment. Accordingly, investigators believed that Cesar Arambula had ceased using TT58 and was using other cell phone devices to facilitate his drug trafficking as discussed below, including TT59 and another cell phone device.

AFFIDAVIT OF SHAWNA MCCANN - 127
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 3.   *Surveillance and Interdiction of Cesar Arambula*

262.   On January 3, 2021, at approximately 4:04 p.m., agents observed, via remote video surveillance, two males and one female exit Cesar Arambula's residence, **Subject Premises 67**, get into a grey Toyota Tundra truck (**Subject Vehicle 61**), and depart. In the evening of January 4, 2021, investigators began receiving GPS location data for TT59 pursuant to a federal search warrant. The GPS location data for TT59 indicated that the cell phone device, used by Cesar Arambula, was in southern California traveling north on Interstate 5. Investigators continued to monitor the GPS location data for TT59, which showed Cesar Arambula traveling north on Interstate 5 continuously throughout the night. Investigators attempted to locate and conduct physical surveillance on Cesar Arambula, starting in the Olympia, Washington area, based on the GPS location data for TT59; however, investigators were unable to locate the grey Toyota Tundra truck on Interstate 5, even with the assistance of GPS location data for TT59, because the GPS location data only provides the cell phone device's location every fifteen minutes. On January 5, 2021, at approximately 4:22 a.m., agents observed, via remote video surveillance, **Subject Vehicle 61** arrive back at **Subject Premises 67**; two males and one female exited **Subject Vehicle 61** and went inside **Subject Premises 67**. Around that time, GPS location data for TT59 placed Cesar Arambula at **Subject Premises 67**.

263.   I know based on my training and experience, that drug traffickers frequently move narcotics from one state to another using vehicles and that an indication of narcotics trafficking activity are short trips, usually by car, to another state to pick up narcotics and bring them back to the drug traffickers' home and base of operations. California in particular is a source state for cocaine trafficked into Washington. In order to avoid law enforcement detection and move the narcotics load as quickly as possible, narcotics traffickers often drive straight to their destination, even if the load trip is more than an eight-hour drive, without stopping and resting overnight. I believe Cesar Arambula's quick visit to California and drive from California to Washington overnight

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  without stopping is indicative of drug trafficking activity and bringing a load of narcotics

2  using **Subject Vehicle 61** from California back to his residence, **Subject Premises 67**.

3      264.   On January 5, 2021, at approximately 6:34 p.m., investigators, via remote

4  video surveillance, observed a white Mazda Miata (**Subject Vehicle 56**) park in front of

5  Samuel Duarte Avila's residence (**Subject Premises 57**) and two males, matching the

6  physical descriptions of Elyas Kerow and David Armer, exit the Mazda Miata and walk

7  towards Samuel Duarte Avila's residence. At approximately 9:01 p.m., via remote video

8  surveillance, agents observed **Subject Vehicle 61** departing Cesar Arambula's residence,

9  **Subject Premises 67**, and at approximately 9:03 p.m., **Subject Vehicle 61** pulled into

10  Samuel Duarte Avila's driveway, while the white Mazda Miata was still there. Around

11  this same time, GPS location data for TT59 placed Cesar Arambula in the vicinity of

12  Samuel Duarte Avila's residence. At approximately 9:09 p.m., **Subject Vehicle 61**

13  departed Samuel Duarte Avila's residence but, due to the dark conditions, investigators

14  were unable to observe who was driving the vehicle. At approximately 10:18 p.m., the

15  two males matching the physical description of David Armer and Elyas Kerow exited

16  Samuel Duarte Avila's residence, accessed the truck of the white Mazda Miata, and then

17  departed in the Mazda Miata. At approximately 10:00 p.m., agents located **Subject**

18  **Vehicle 61** parked and unoccupied in the parking garage at the Muckleshoot Casino

19  located at 2402 Auburn Way South, Auburn, Washington. Agents subsequently contacted

20  security at the Muckleshoot Casino, who reviewed surveillance video at the casino and

21  advised that Cesar Arambula was driving **Subject Vehicle 61** and arrived at the casino

22  with another female and male. Based on a review of the surveillance video, agents

23  identified the female with Cesar Arambula as Britney Ramirez. Cesar Arambula, Britney

24  Ramirez, and the unknown male entered the casino, and a short time later Cesar

25  Arambula talked with two other individuals that were already at the casino playing craps.

26  Cesar Arambula then played craps for a short time before leaving the casino with Britney

27  Ramirez and the unknown male with whom they had arrived. At approximately

10:42 p.m., **Subject Vehicle 61** exited the parking garage of the casino, and GPS location

AFFIDAVIT OF SHAWNA MCCANN - 129
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   data for TT59 showed that Cesar Arambula had left the area. Agents conducting physical

2   surveillance followed Cesar Arambula back to his residence, **Subject Premises 67**.

3       265.    Based on my training and experience, I believe that Cesar Arambula

4   travelled to California to pick up cocaine and bring the cocaine back to Washington state.

5   When Cesar Arambula arrived back in Washington with the cocaine, I believe that Cesar

6   Arambula and Britney Ramirez then took the cocaine to their main redistributors,

7   including Samuel Duarte Avila, for Samuel Duarte Avila to sell off to his customers and

8   re-distributors, including David Armer and Elyas Kerow.

9       266.    On January 12, 2021, at approximately 3:30 p.m., agents observed, via

10   remote video surveillance, Cesar Arambula and a female, matching the physical

11   description of Britney Ramirez, exit **Subject Premises 67**, get into **Subject Vehicle 62**,

12   and depart. The GPS location data for TT59 indicated that the device travelled south on

13   Interstate 5 continuously throughout the night. Cesar Arambula arrived in downtown Los

14   Angeles, California on January 13, 2021, stayed the night, and then began travelling

15   north on Interstate 5 at approximately 5:00 a.m. on January 14, 2021. GPS location data

16   for TT59 showed that Cesar Arambula travelled north on Interstate 5 continuously

17   throughout the day.

18       267.    On January 14, 2021, at approximately 7:44 p.m., investigators set up along

19   Interstate 5 at the Oregon and Washington border located **Subject Vehicle 62** and began

20   conducting physical surveillance. At approximately 8:11 p.m., **Subject Vehicle 62** pulled

21   off at a rest stop at Exit 11 in Battleground, Washington. Agents observed a male get out

22   of the driver's seat of **Subject Vehicle 62**, who they were able to identify as Cesar

23   Arambula based on a comparison to his driver's license photograph. Cesar Arambula

24   walked towards the rest stop bathrooms. Agents observed a female get out of the

25   passenger seat of **Subject Vehicle 62**, who was identified as Britney Ramirez based off a

26   comparison to her driver's license photograph and a video surveillance photograph of her

27   at the Muckleshoot Casino. Britney Ramirez also walked towards the rest stop

bathrooms. While Cesar Arambula was observed at the rest stop, GPS location data for

AFFIDAVIT OF SHAWNA MCCANN - 130
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT59 placed the cell phone device at the rest stop. At approximately 8:13 p.m., agents observed Cesar Arambula and Britney Ramirez exit the bathrooms, get back into **Subject Vehicle 62**, with Britney Ramirez in the driver's seat and Cesar Arambula in the passenger seat, and continue driving north on Interstate 5.

268.   At approximately 9:13 p.m., investigators conducted an interdiction stop on **Subject Vehicle 62** in Centralia, Washington on Interstate 5. Britney Ramirez was identified as the driver and Cesar Arambula was identified as the passenger of the vehicle based on the driver's licenses they provided to agents. Britney Ramirez and Cesar Arambula claimed that they were coming back from the Ilani Casino in Washington state where they had been gambling for the last three hours, playing craps and slot machines; this claim was inconsistent with the GPS data for TT59, and Britney Ramirez and Cesar Arambula never mentioned having travelled to California. Agents conducted a sniff outside **Subject Vehicle 62** with a narcotics K9, which gave a positive indication for the presence of narcotics on the passenger side of the vehicle. Britney Ramirez and Cesar Arambula declined to provide consent to search the vehicle and were released at the scene while the vehicle was impounded. Based on the knowledge that Cesar Arambula is a drug trafficker (from the interview of Jorge Aguilar Duran, text messages on Jorge Aguilar Duran's cell phones, and toll records and intercepted communications of Samuel Duarte Avila and Sergio Reyes-Pina), the false information provided to investigators that Britney Ramirez and Cesar Arambula were coming from a casino in Washington, the GPS location data on TT59 showing that Cesar Arambula was coming back from a short trip to California following a prior short trip to California between January 3-5, 2021, and the positive alert by the narcotics K9, agents conducted a search of **Subject Vehicle 62** for narcotics and other evidence of narcotics trafficking. Agents located six bricks of cocaine (field test presumptive positive) concealed in a hidden compartment/trap inside the rear seats of the vehicle and a cell phone under the passenger seat of the vehicle where Cesar Arambula was seated. Agents released **Subject Vehicle 62** to Cesar Arambula and Britney Ramirez a few days after the interdiction stop.

AFFIDAVIT OF SHAWNA MCCANN - 131
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

269.    Agents obtained a search warrant for the contents of the cell phone found in **Subject Vehicle 62** at the traffic stop and extracted numerous text messages from this device indicating that the device was used by Cesar Arambula for drug trafficking. For example, on several outgoing text messages, the user referred to himself as the "carpet guy," which was the nickname that Jorge Aguilar Duran used for Cesar Arambula.  The contents of the phone also evidenced contact with a number of known associates of the Michael Walker DTO, including Samuel Duarte Avila. On December 9, 2020, Samuel Duarte Avila using TT45 sent the following text message to Cesar Arambula on this device: "I really need two and a half [ounces of cocaine] right now." Agents believe that Samuel Duarte Avila asked Cesar Arambula for two ounces of cocaine, indicating that Cesar Arambula was a cocaine supplier to Samuel Duarte Avila. On December 11, 2020, Samuel Duarte Avila using TT45 and Cesar Arambula using the seized device exchanged the following text messages:

TT45: How much would it be for me to buy the whole one [kilogram of cocaine]?

Arambula: Everything?

TT45: Yes.

Arambula: 39600 [$39,600 for the kilogram of cocaine].

Based on my training and experience, I believe that Samuel Duarte Avila asked Cesar Arambula the pricing for one kilogram of cocaine, which Cesar Arambula said was $39,600. On December 16, 2020, Samuel Duarte Avila using TT62 exchanged the following text messages with Cesar Arambula on the seized device:

TT62: I need half the little carpet pad [half an ounce of cocaine].

Arambula: I need the paper [money] for everything.

TT62: I got the tickets [money] of testerday [yesterday].

TT62: And for him [customer]. Half a roll [half an ounce]. For today.

Based on my training and experience, I believe that Samuel Duarte Avila asked for a half ounce of cocaine for himself and a half ounce of cocaine for an unknown third party

customer, and Cesar Arambula said that the money would have to be provided up front for the cocaine transaction.

270.    On February 15, 2021, agents intercepted a call between Cesar Arambula using TT59 and a male at an unidentified number. (Session 597.) During this call, Cesar Arambula said that he got back from Mexico late last night and that he brought something big for the unidentified male. Based on my training and experience and other intercepted calls, I believe that Cesar Arambula went to Juarez, Mexico to visit family and indicated that he brought back something for the unidentified male, which may pertain to narcotics based on Cesar Arambula's prior drug trafficking history and the frequent nature of narcotics coming from Mexico into the United States.

271.    Cesar Arambula has also discussed having firearms on intercepted calls, supporting the need for after-hours service of these search warrants. For example, on March 18, 2021, Cesar Arambula at TT59 received a call from phone number (253) 777-7242 (UM7242). (Session 4783.) Cesar Arambula said he was heading to UM7242's house, and a female can be heard in the background with Cesar Arambula. UM7242 told Cesar Arambula to tell "Britney [Ramirez]" to bring her "strap" and that "they" are all armed. Cesar Arambula could be heard relaying UM7242's message to the female, believed to be Britney Ramirez. UM7242 then mentioned that "Raulito" brough him a "horn." Based on my training and experience, I know that "strap" is a term commonly used by drug traffickers to refer to a pistol, and that "horn" is a common term used to refer to an assault rifle.

272.    As set forth above, agents obtained GPS location data on TT59 used by Cesar Arambula, and the GPS location data for TT59 placed Cesar Arambula at **Subject Premises 67** overnights from around December 22, 2020 to March 2021. On May 12, 2021, agents observed Cesar Arambula in the driveway of **Subject Premises 67** and **Subject Vehicle 61** parked in the driveway. On May 21, 2021, agents observed, via remote video surveillance, **Subject Vehicle 61** parked in the driveway of **Subject Premises 67**. On June 10, 2021, agents observed via remote video surveillance, **Subject**

1  **Vehicle 61** parked in front of **Subject Premises 67** and **Subject Vehicle 62** parked in the

2  driveway, indicating that Cesar Arambula still resides at **Subject Premises 67** and uses

3  **Subject Vehicles 61** and **62**. Additionally, agents obtained utility records for **Subject**

4  **Premises 67**, which showed that as recently as May 26, 2021 (when agents requested the

5  records), the utilities at this residence were under the name Britney Ramirez.

6      273.   I know based on my training and experience, that drug traffickers

7  frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

8  stash locations in order to protect their supply and to have the narcotics on hand for

9  transactions. I also know that drug traffickers maintain records and other trafficking-

10  related materials in their premises, including residences, for a long period of time,

11  including current and prior cell phone devices that contain text messages and contact lists

12  of drug trafficking associates and pay-owe sheets. Based on the above-referenced

13  intercepted communications, I believe that Cesar Arambula and Britney Ramirez are

14  multi-kilogram cocaine traffickers working with Samuel Duarte Avila, Jorge Aguilar

15  Duran, and Rafael Ramirez, who likely keeps his narcotics supply and proceeds in

16  **Subject Premises 67** and **Subject Vehicles 61** and **62**.

17  **Q.**   **Rafael Ramirez's Residence and Vehicles**

18      274.   Rafael Ramirez is a kilogram drug trafficker and supplier working with

19  Samuel Duarte Avila, Cesar Arambula, and Britney Ramirez. During this investigation,

20  based on physical surveillance, GPS location data on Rafael Ramirez's cell phone (TT81,

21  identification discussed below), and intercepted communications, agents identified Rafael

22  Ramirez's residence as 112 1/2 5th Avenue SW, Pacific, Washington (**Subject Premises**

23  **68**),[57] and his vehicles as (1) a black 2003 Ford Excursion bearing Washington license

24  plate AEJ2423, registered to Maria and Mauro Ramirez at **Subject Premises 68** (**Subject**

25  **Vehicle 63**), (2) a silver 2019 Toyota Camry bearing Washington license plate number

26  BPD1725, registered to Rafael Ramirez at **Subject Premises 68** (**Subject Vehicle 64**),

27

[57] **Subject Premises 68** is listed as Rafael Ramirez's residence on his driver's license.

AFFIDAVIT OF SHAWNA MCCANN - 134
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and (3) a gold 1998 Lincoln Town Car bearing Washington license plate AYB0054

2  registered to Rafael Ramirez at **Subject Premises 68** (**Subject Vehicle 65**).

3      275.    During the period of wire and electronic communications interceptions on

4  Samuel Duarte Avila using TT45, agents observed Samuel Duarte Avila and Rafael

5  Ramirez discussing and conducting narcotics transactions, specifically with Rafael

6  Ramirez supplying Samuel Duarte Avila with cocaine. These drug transactions and

7  agents' observations are noted below for purposes of establishing probable cause to

8  search **Subject Premises 68** and **Subject Vehicles 63**, **64**, and **65**.

9      276.    On February 11, 2021, at approximately 12:56 p.m., Samuel Duarte Avila

10  using TT45 sent a text message to Elyas Kerow at TT82: "Ill be out of service ,on my

11  cell, soon call me or text me if need any paint for that room." (Session 1209.) Agents

12  learned through subsequent text messages and phone calls that Samuel Duarte Avila had

13  not paid the bill on his cellular telephone and that it was about to be turned off. Agents

14  believe that "paint" in this text message was a coded reference to cocaine.

15      277.    On February 11, 2021, at approximately 12:59 p.m., Samuel Duarte Avila

16  using TT45 made an outgoing phone call to Cresencio Moreno Aguirre at TT80 (session

17  1217), which was translated from Spanish.  During the call, Cresencio Moreno Aguirre

18  asked what happened with Samuel Duarte Avila's friend, believed to be Elyas Kerow,

19  who wanted some cocaine. Samuel Duarte Avila responded that he sent them a message

20  earlier and told them that his phone is going to be disconnected soon. Samuel Duarte

21  Avila stated that "the painter" is going to pay for his phone today and complains that

22  another male isn't paying him. Samuel Duarte Avila commented that he really "cut" the

23  cocaine that he gave to that male and remarked that he even had some left to give him

24  later. Samuel Duarte Avila then said that he added the magic powder, the stuff that

25  Cresencio Moreno Aguirre once gave him. Samuel Duarte Avila continued that he didn't

26  know what the guys are used to, but he mixed it with something and the guy takes it like

27  nothing. Agents believe that this conversation was about Cresencio Moreno Aguirre

supplying cocaine to Samuel Duarte Avila, who would in turn supply lower-level

AFFIDAVIT OF SHAWNA MCCANN - 135
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

narcotics dealers, including Elyas Kerow. Based on my training and experience, I believe that Samuel Duarte Avila's comments on "cutting the stuff" with magic powder is a reference to him mixing a quantity of cocaine with various fillers in order to increase the amount of sellable cocaine and thereby his profit. I know this to be a common practice in the sale of narcotics.

278.   On February 11, 2021, at approximately 2:14 p.m., Samuel Duarte Avila using TT45 received a phone call from Sergio Reyes-Pina at TT18 (session 1275), which was translated from Spanish.  In the call, Sergio Reyes-Pina asked Samuel Duarte Avila if he had a "350," which agents know to be a reference to the price for eight grams of cocaine ($350). Samuel Duarte Avila told Sergio Reyes-Pina that he did not have a 350, but there was a "14," which agents know to be a reference to the price for one ounce of cocaine ($1,400).  As the conversation continued, Sergio Reyes-Pina and Samuel Duarte Avila discussed a previous narcotics transaction which apparently did not contain the complete quantity that was paid for. Sergio Reyes-Pina then asked Samuel Duarte Avila if the guy they got the "two" from the other day had anything better. Samuel Duarte Avila replied that the stuff his supplier has now is better than before and continued that the supplier, believed to be Rafael Ramirez, has "16," but Samuel Duarte Avila didn't know how he gets it. Agents know "16" to be a reference to the price for one ounce of higher quality cocaine ($1,600). Sergio Reyes-Pina then asked Samuel Duarte Avila to get one for him. Samuel Duarte Avila said that he would need Sergio-Reyes to come to avoid any issues, which Sergio Reyes-Pina acknowledged. Sergio Reyes-Pina then said that he would drop off the money and call later.

279.   On February 11, 2021 at approximately 2:19 p.m., less than five minutes after the call with Sergio Reyes-Pina, Samuel Duarte Avila using TT45 sent the following text message to Rafael Ramirez at TT81 (session 1278), which was translated from Spanish: "I need a little can of paint [one ounce of cocaine]." Samuel Duarte Avila using TT45 then received an automated reply error message stating that his phone (TT45) was unable to send the message. This error appears to be due to Samuel Duarte Avila not

AFFIDAVIT OF SHAWNA MCCANN - 136
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  paying his phone bill, as referenced in a text message earlier in the day (above referenced
2  Session 1209). At approximately 4:10 p.m., Samuel Duarte Avila using TT45 received a
3  text message from his service provider advising that his bill had been paid. I believe that
4  Samuel Duarte Avila attempted to send a text to Rafael Ramirez to request one ounce of
5  cocaine, indicating that Rafael Ramirez was a cocaine supplier to Samuel Duarte Avila.

6       280.    On February 11, 2021, at approximately 4:17 p.m., Samuel Duarte Avila
7  using TT45 received a phone call from Sergio Reyes-Pina at TT18 (session 1327), which
8  was translated from Spanish. During that call, Samuel Duarte Avila thanked Sergio
9  Reyes-Pina for paying his bill and told him he will text "these guys" real quick, likely
10  referencing his supplier, Rafael Ramirez.

11       281.    On February 11, 2021, at approximately 4:18 p.m., Samuel Duarte Avila
12  using TT45 sent the following text message to Rafael Ramirez at TT81 (session 1329),
13  which was translated from Spanish: "I need a bucket of paint [cocaine]." At
14  approximately 4:19 p.m., Samuel Duarte Avila using TT45 received the following text
15  message from Rafael Ramirez at TT81 (session 1335), which was translated from
16  Spanish: "Is your cell good?" At approximately 4:20 p.m., Samuel Duarte Avila using
17  TT45 received the following text message from Rafael Ramirez at TT81 (session 1337),
18  which was translated from Spanish: "go to my ranch." At approximately 4:21 p.m.,
19  Samuel Duarte Avila using TT45 sent the following text message to Rafael Ramirez at
20  using TT81 (session 1349), which was translated from Spanish: "I'll let you know. I
21  might need more paint [cocaine]. I'll wait for the other painter to tell me if he has
22  enough. One or two buckets [one to two ounces of cocaine], for that job on the weekend.
23  I'll let you know." At approximately 4:28 p.m., Rafael Ramirez using TT81 responded
24  via text message to Samuel Duarte Avila at TT45 (session 1352): "ok."

25       282.    As set forth above, on February 12, 2021, Samuel Duarte Avila using TT45
26  and Elyas Kerow using TT82 arranged to conduct a three-ounce cocaine transaction later
27  that day. At approximately 7:59 p.m., agents intercepted a phone conversation between
Samuel Duarte Avila using TT45 and Elyas Kerow using TT82. (Session 1896.) During

AFFIDAVIT OF SHAWNA MCCANN - 137
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the conversation, Samuel Duarte Avila said that he needed to go by Pacific to get the "paint [cocaine]" before he met with Elyas Kerow and Brett Radcliff, but that Samuel Duarte Avila needed to see Elyas Kerow and Brett Radcliff "before getting the paint [cocaine] to get the money [for the cocaine] because those guys don't let anything go [do not provide narcotics without payment]." The parties agreed to meet at the Super Mall in Auburn. Agents believe that Samuel Duarte Avila was going to get supplied cocaine from Rafael Ramirez, who lives in Pacific at **Subject Premises 68**, and then Samuel Duarte Avila was going to sell three ounces of that cocaine to Elyas Kerow and Brett Radcliff. Later that evening, beginning at approximately 8:45 p.m., agents observed the transaction described earlier, in which Samuel Duarte Avila met with Brett Radcliff and Elyas Kerow in **Subject Vehicle 57** at the tire store parking lot. Samuel Duarte Avila then drove his white Toyota Corolla to a nearby Walmart parking lot, where a lifted a black 2003 Ford Excursion bearing Washington license plate AEJ2423 (**Subject Vehicle 63**), registered to Maria and Mauro Ramirez at **Subject Premises 68**, pulled up and parked next to Samuel Duarte Avila. Samuel Duarte Avila got into the front passenger seat of **Subject Vehicle 63** and, after a brief time in the vehicle, got back out and into his Toyota. Both vehicles departed southbound through the mall parking lot, and Samuel Duarte Avila drove back to the tire store, where **Subject Vehicle 57** was still parked. Agents believe that during these meetings, Samuel Duarte Avila met with Elyas Kerow and Brett Radcliff to pick up money from them, and then drove to a neighboring parking lot to meet with his cocaine supplier, Rafael Ramirez, to get the cocaine and provide the money for the cocaine that he had obtained from Elyas Kerow and Brett Radcliff. Samuel Duarte Avila then drove back to Elyas Kerow and Brett Radcliff and gave them the cocaine that he had just obtained from Rafael Ramirez. On February 16, 2021, agents observed **Subject Vehicle 63** parked unoccupied at **Subject Premises 68**.

283.    On February 19, 2021, at approximately 11:44 a.m., Samuel Duarte Avila using TT45 called Elyas Kerow at TT82.  (Session 3903.) Samuel Duarte Avila began the conversation by greeting the other person with: "What's up Elyas?" During the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  conversation, Samuel Duarte Avila asked "Elyas" if he still had "paint [cocaine]." Elyas
2  Kerow responded that he was almost out and was waiting on Samuel Duarte Avila. The
3  two men discussed who Samuel Duarte Avila would get the "paint" from, and Samuel
4  Duarte Avila asked how many gallons of paint Elyas Kerow needed. Elyas Kerow told
5  Samuel Duarte Avila that he would need "about the same," which Samuel Duarte Avila
6  clarified: "About the same, three gallons [three ounces of cocaine]?" Elyas Kerow
7  responded in the affirmative, and Samuel Duarte Avila stated that he would send a text to
8  the guy with the number of gallons needed for the job, and that they would have to wait
9  for the response.

10      284.   On February 19, 2021, at approximately 11:50 a.m., less than a minute after
11  the preceding call ended, Samuel Duarte Avila using TT45 sent the following text
12  message to Rafael Ramirez at TT81 (Session 3909), which was translated from Spanish:
13  "There will be 3 and a half yards of carpet today [three and a half ounces of cocaine]."
14  At approximately 11:13 p.m., Samuel Duarte Avila using TT45 received the following
15  text message from Rafael Ramirez at TT81 (session 3997), which was translated from
16  Spanish: "There is nothing, man [no cocaine available]."

17      285.   On February 21, 2021, at approximately 8:51 p.m., Samuel Duarte Avila
18  using TT45 received a phone call from an unknown male using phone number 253-442-
19  3244, self-identified on the call as "Bryan." (Session 5212.)  During the call, Bryan said
20  he had "Brett" sitting next to him and asked if Samuel Duarte Avila would be ready
21  tomorrow and stated that "he [referring to Brett]" was not as happy with the cocaine as he
22  had been in the past. Bryan asked Samuel Duarte Avila if they would be getting "the
23  original, the 14 [one ounce of cocaine for $1,400]." As discussed above, agents know that
24  "14" is a reference to the price of one ounce of cocaine ($1,400). Samuel Avila Duarte
25  answered yes, but told Bryan that, if they could wait a few days, he would have another
26  "contractor" (supplier/cocaine load) coming in "this week." Bryan then gave the phone to
27  "Brett" who spoke with Samuel Duarte Avila. Agents believe "Brett" was Brett Radcliff
based on a comparison to the voice on the phone to other intercepted calls between

1  Samuel Duarte Avila and Brett Radcliff using TT84. The call concluded with Bryan
2  saying that they (Bryan and Brett) would call Samuel Duarte Avila back tomorrow to
3  confirm whether they were willing to wait. At approximately 8:57 p.m. (shortly after the
4  above referenced call, session 5212, concluded), Samuel Duarte Avila sent a text
5  message to Rafael Ramirez at TT81 (session 5229), which was translated from Spanish:
6  "I need the paint [cocaine] for that house urgently, four more gallons [four more ounces].
7  When is the roof going to be ready?" Based on my training and experience, I believe that
8  Samuel Duarte Avila was attempting to order four ounces of cocaine to fulfill the order
9  from Elyas Kerow that he had received just before calling Rafael Ramirez.  Agents
10  believe that the question concerning when the roof would be ready is code for when
11  Rafael Ramirez would be able to supply Samuel Duarte Avila with cocaine.

12      286.    On February 22, 2021, at approximately 11:21 a.m., Samuel Duarte Avila
13  using TT45 received the following text message from Rafael Ramirez at TT81 (session
14  5463), which was translated from Spanish: "I'll let you know when it's ready."

15      287.    On March 2, 2021, at approximately 12:18 p.m., agents intercepted an
16  incoming text message to Samuel Duarte Avila at TT45 from Rafael Ramirez at TT81:
17  "It's ready." (Session 9077.) Agents believe this meant that Rafael Ramirez had cocaine
18  to supply to Samuel Duarte Avila. At approximately 12:24 p.m., agents intercepted an
19  outgoing text message from Samuel Duarte Avila using TT45 to Brett Radcliff at TT84:
20  "What cracking, the old man [supplier, Rafael Ramirez] just comunucate with me, on my
21  way to get that paint [cocaine] ok". (Session 9094.)  Agents believe that Samuel Duarte
22  Avila was going to be getting cocaine from Rafael Ramirez and then planned to supply
23  that cocaine to Brett Radcliff. Later that day, Samuel Duarte Avila communicated with
24  Rafael Ramirez at TT81, but there was no audio content with the calls, indicating that the
25  parties were using some form of encrypted communication. At approximately 2:00 p.m.,
26  remote video surveillance showed Samuel Duarte Avila exit his residence (**Subject
27  Premises 57**), get into the Toyota Corolla (**Subject Vehicle 69**), and depart.  At
approximately 2:15 p.m., agents intercepted a phone conversation between Samuel

AFFIDAVIT OF SHAWNA MCCANN - 140
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Duarte Avila using TT45 and Brett Radcliff using TT84. (Session 9129.) During the

2    conversation, Samuel Duarte Avila told Brett Radcliff that he just got the call[58] and was

3    on his way to get the "stuff [cocaine]" and is meeting "the guy [supplier Rafael

4    Ramirez]" in fifteen minutes near Taco Maestro in Auburn. Samuel Duarte Avila and

5    Brett Radcliff agreed to meet somewhere in Auburn after Samuel Duarte Avila met with

6    "the guy."

7         288.    At approximately 2:35 p.m., agents observed Samuel Duarte Avila pull into

8    a strip mall parking lot and park in front of Taqueria El Taco Maestro 2 located at 2824

9    Auburn Way North in Auburn. At approximately 2:36 p.m., agents observed a male, later

10   identified as Rafael Ramirez, get into the front passenger seat of **Subject Vehicle 69** and

11   meet with Samuel Duarte Avila. At approximately 2:56 p.m., agents observed Rafael

12   Ramirez get out of **Subject Vehicle 69** and get into the driver's seat of a silver 2019

13   Toyota Camry bearing Washington license plate number BPD1725 (**Subject Vehicle 64**),

14   registered to Rafael Ramirez at **Subject Premises 68**. Rafael Ramirez was the only

15   occupant in **Subject Vehicle 64**. Rafael Ramirez then drove out of the lot and

16   surveillance personnel followed Rafael Ramirez driving **Subject Vehicle 64**. At

17   approximately 3:01 p.m., agents pulled up alongside **Subject Vehicle 64** and were able to

18   verify the driver was Rafael Ramirez based on a comparison to his driver's license

19   photograph. At approximately 3:01 p.m., agents intercepted a phone conversation

20   between Samuel Duarte Avila using TT45 and Brett Radcliff using TT84. (Session 9170.)

21   During the conversation, they discussed where they were going to meet in Auburn.

22   Surveillance personnel continued to follow **Subject Vehicle 64** as it headed towards

23   Pacific, Washington. At approximately 3:14 p.m., agents observed **Subject Vehicle 64**

24   turn down the driveway of **Subject Premises 68**. Agents believe that Samuel Duarte

25   Avila met with Rafael Ramirez to get supplied with cocaine and then Samuel Duarte

26

27   _____

[58] Agents believe this call is referencing the preceding communication between Samuel Duarte Avila and Rafael
Ramirez that was encrypted and therefore no audio was intercepted.

AFFIDAVIT OF SHAWNA MCCANN - 141
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Avila met with Brett Radcliff to sell some of that cocaine to Brett Radcliff, and that
2  Rafael Ramirez drove directly to his residence, **Subject Premises 68**, after supplying
3  Samuel Duarte Avila with cocaine.

4       289.    As set forth above, in the evening on January 14, 2021, agents conducted a
5  traffic stop on **Subject Vehicle 62** driven by Britney Ramirez with Cesar Arambula in the
6  passenger seat, and after a search of the vehicle, agents located six kilogram bricks of
7  cocaine hidden in the rear seats of the vehicle. After this stop, GPS location data for
8  TT59 showed that Cesar Arambula went to **Subject Premises 68** on January 15, 2021,
9  from approximately 12:14 p.m. to 12:50 p.m. Based on Rafael Ramirez's connection to
10 Samuel Duarte Avila as a cocaine supplier, as set forth herein, and Cesar Arambula's
11 connection to Samuel Duarte Avila as a cocaine supplier, as set forth herein, agents
12 believe that Cesar Arambula and Britney Ramirez were bringing the load of cocaine from
13 California to Washington state for Rafael Ramirez to then supply to other Michael
14 Walker DTO associates, including Samuel Duarte Avila, and that Cesar Arambula visited
15 Rafael Ramirez at **Subject Premises 68** to discuss the traffic stop and seizure of the
16 vehicle with the hidden cocaine. Moreover, based on law enforcement database checks,
17 agents believe Britney Ramirez and Rafael Ramirez are related because they have prior
18 residential addresses in common.

19      290.    On March 5, 2021, at approximately 3:18 p.m., agents intercepted a phone
20 conversation between Samuel Duarte Avila using TT62 and Cresencio Moreno Aguirre
21 using TT80. (Session 647.) During the conversation, Cresencio Moreno Aguirre told
22 Samuel Duarte Avila that he would arrive in ten minutes and advised Samuel Duarte
23 Avila to be ready. At approximately 3:33 p.m., agents intercepted an outgoing text
24 message from Samuel Duarte Avila using TT45 to Rafael Ramirez at TT81: "At what
25 time do I see you for the half [kilogram of cocaine]?" Agents believed that Samuel
26 Duarte Avila was inquiring about when to meet with Rafael Ramirez to get a half
27 kilogram of cocaine from him. At approximately 3:52 p.m., agents intercepted an
   incoming text message from Rafael Ramirez using TT81 to Samuel Duarte Avila at

AFFIDAVIT OF SHAWNA MCCANN - 142
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   TT45: "By the mall." Agents believed that Samuel Duarte Avila and Rafael Ramirez

2   planned to meet at the Southcenter Mall in Tukwila to conduct the cocaine transaction. At

3   approximately 3:52 p.m., agents intercepted an incoming text message from Rafael

4   Ramirez using TT81 to Samuel Duarte Avila at TT45: "And I'll have it [half kilogram of

5   cocaine]." At approximately 3:53 p.m., agents intercepted an outgoing text message from

6   Samuel Duarte Avila using TT45 to Rafael Ramirez at TT81: "Ok, I'll look for you

7   there." At approximately 5:32 p.m., agents intercepted an outgoing text message from

8   Rafael Ramirez using TT81 to Samuel Duarte Avila at TT45: "By the buffalo." Agents

9   believed that Samuel Duarte Avila and Rafael Ramirez planned to meet at the Buffalo

10  Wild Wings restaurant at the Southcenter Mall in Tukwila to conduct the cocaine

11  transaction. GPS location data around that same time placed TT45 and TT62 used by

12  Samuel Duarte Avila, TT80 used by Cresencio Moreno Aguirre, and TT81 used by

13  Rafael Ramirez all within range of that location and within range of each other. Agents

14  believe Samuel Duarte Avila, Cresencio Moreno Aguirre, and Rafael Ramirez all met

15  with each other to conduct the half kilogram cocaine transaction.

16      291.    On April 10, 2021, at approximately 11:00 a.m., GPS location data for

17  TT81 indicated the device was in the location of a restaurant called Huckleberry Square

18  in Burien, Washington. Agents arrived at that location and observed a gold Lincoln Town

19  Car bearing Washington license plate AYB0054 (**Subject Vehicle 65**), registered to

20  Rafael Ramirez at **Subject Premises 68**. At approximately 11:47 a.m., agents observed a

21  male wearing a yellow construction safety vest, identified as Rafael Ramirez based on a

22  comparison to his driver's license photograph, walk toward **Subject Vehicle 65** and get

23  into the driver's seat. Agents observed an adult female and a teenaged female get into the

24  front and rear passenger seats, respectively. At approximately 11:48 a.m., **Subject

25  Vehicle 65** departed the restaurant parking lot. The next GPS location data for TT81 at

26  around 12:00 p.m. showed that the device had moved, consistent with when agents

27  observed Rafael Ramirez leave in **Subject Vehicle 65**. The GPS location data for TT81

    around 12:00 p.m. showed that the device was in the parking lot of the Walgreens located

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  at 14656 Ambaum Blvd SW, Burien, Washington. At approximately 12:06 p.m., agents

2  arrived in the Walgreens parking lot and observed **Subject Vehicle 65** backed into a

3  parking space with a male wearing a yellow construction safety vest sitting in the driver's

4  seat. At approximately 12:17 p.m., agents observed **Subject Vehicle 65** depart the

5  parking lot of the Walgreens. The next GPS location data for TT81 around 12:30 p.m.

6  showed that the device moved, consistent with when agents observed Rafael Ramirez

7  leave in **Subject Vehicle 65**. At approximately 12:46 p.m., GPS location data for TT81

8  showed the device was at Cesar Arambula's residence (**Subject Premises 67**). Around

9  this time, via remote video surveillance, agents observed **Subject Vehicle 65** parked in

10 front of **Subject Premises 67** and Rafael Ramirez, wearing a yellow construction safety

11 vest, exit the driver's seat, go to the passenger seat and retrieve a medium sized brown

12 paper bag and walk into **Subject Premises 67**. Prior to that, the adult female in the front

13 passenger seat and the older female child in the rear passenger seat had exited the vehicle

14 and went inside **Subject Premises 67**. At approximately 1:10 p.m., the adult female

15 exited **Subject Premises 67** and threw a trash bag in the trash can outside the residence.

16 Around that same time, Rafael Ramirez, wearing the yellow construction safety vest,

17 exited **Subject Premises 67**, got into **Subject Vehicle 65**, and departed the residence as

18 the only occupant of the vehicle. The next GPS location data for TT81 showed the device

19 moved, consistent with when agents observed Rafael Ramirez leave in **Subject Vehicle**

20 **65**, indicating that Rafael Ramirez is the user of TT81.

21    292.    On May 12, 2021, agents observed **Subject Vehicle 64** and **Subject**

22 **Vehicle 63** parked at **Subject Premises 68**, indicating that Rafael Ramirez still resides

23 there. Additionally, agents obtained utility information for **Subject Premises 68**, which

24 showed that the utilities for this residence are under Rafael Ramirez's name and have

25 been paid for via credit card in the name Rafael Ramirez.

26    293.    I know based on my training and experience, that drug traffickers

27 frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

stash locations in order to protect their supply and to have the narcotics on hand for

AFFIDAVIT OF SHAWNA MCCANN - 144
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  transactions. I also know that drug traffickers maintain records and other trafficking-

2  related materials in their premises, including residences, for a long period of time,

3  including current and prior cell phone devices that contain text messages and contact lists

4  of drug trafficking associates and pay-owe sheets. Based on the above-referenced

5  intercepted communications, I believe that Rafael Ramirez is a multi-kilogram cocaine

6  trafficker working with Samuel Duarte Avila, Cesar Arambula, and Britney Ramirez who

7  likely keeps his narcotics supply and proceeds in **Subject Premises 68** and **Subject**

8  **Vehicles 63**, **64**, and **65**.

9  **R.**   **Alvaro Valencia's Business and Residence**

10  294.   Agents believe that Alvaro Valencia is a drug trafficking associate of Cesar

11  Arambula. During this investigation, based on physical surveillance, GPS location data

12  on Cesar Arambula's cell phone (TT59), and intercepted communications, agents

13  identified Alvaro Valencia's business as the Mustang Shop d/b/a TMS Performance at

14  8504 S 228th Street, Kent, Washington (**Subject Premises 69**), and his residence as

15  2918 Brookdale Road East, Tacoma, Washington (**Subject Premises 70**).

16  295.   During the period of wire communications interception on Cesar Arambula

17  using TT59, agents intercepted Cesar Arambula and UM0323, believed to be Alvaro

18  Valencia for the reasons outlined below, discussing suspected narcotics trafficking.

19  Agents know Alvaro Valencia to have been involved in drug trafficking in early 2020,

20  when his communications were intercepted during a DEA investigation run out of the

21  District of Arizona.  Moreover, toll analysis for two numbers believed to be used by

22  Alvaro Valencia, (253) 218-0323 (TT88) and (520) 979-4192 (TT89), show that both

23  numbers have recently been in common contact with numbers contacted by Cesar

24  Arambula, believed to be drug trafficking associates of Cesar Arambula. These

25  intercepted communications and agents' observations are noted below for purposes of

26  establishing probable cause to search **Subject Premises 69** and **70**.

27

AFFIDAVIT OF SHAWNA MCCANN - 145
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 1.     *Basis for Belief that Alvaro Valencia is User of Two Phone Numbers*

296.     On February 17, 2021, agents intercepted a communication between Cesar Arambula using TT59 and a then-unidentified male using TT88, believed to be Alvaro Valencia. (Session 891.) During this call, Alvaro Valencia said he was "here at the shop [The Mustang Shop, **Subject Premises 69**]." Cesar Arambula asked what happened to the favor that Alvaro Valencia had asked of Cesar Arambula. Alvaro Valencia said that "they [drug trafficking bosses]" have not said anything to him and that Alvaro Valencia is waiting on "those guys [drug trafficking bosses]." Cesar Arambula said "Fuck man" and that he really needed "that now [money and/or cocaine]." Alvaro Valencia acknowledged and said that he would see what he can do. Alvaro Valencia asked if Cesar Arambula was "down there [Mexico]," and Cesar Arambula said he went to visit the family. Alvaro Valencia said that "they [drug trafficking bosses]" said for this week and told Cesar Arambula that he will call Cesar Arambula. Cesar Arambula said that he usually does not bother "you [Alvaro Valencia] for anything" but this time he needs it and that he should be "back" (to Washington state from his roadtrip to Mexico) by Monday.[59] Based on my training and experience, I believe that Cesar Arambula was discussing, in code, drug trafficking business with Alvaro Valencia. The date of this call was after the traffic stop on Cesar Arambula, and therefore, Cesar Arambula had heightened awareness of law enforcement scrutiny and would have been very cautious about discussing drug trafficking operations openly over the phone. Agents believe that he was also in need of both money and cocaine after agents seized six kilograms of cocaine from the car Cesar Arambula drove back from California.

297.     Agents obtained subscriber information for phone number TT88, which was subscribed to "The Mustang Shop" with a billing address of **Subject Premises 69**, and service provided by Comcast Digital Voice. The voicemail of phone number TT88

---

[59] Based on intercepted communications and GPS location data, Cesar Arambula drove from Washington state to the Texas/Mexico border. He stayed in Texas for a few days, then went to Mexico for a few days, and then returned to Texas for a few days, before driving back to Washington state.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   stated that the phone number was associated with TMS Performance. Accordingly, agents

2   believe TT88 is a landline for The Mustang Shop dba TMS Performance; however, the

3   law enforcement database CLEAR showed that TT88 also is associated with Alvaro

4   Valencia at **Subject Premises 70** based on a source of information listed as "bank

5   account header records." Agents conducted open source research and identified a website

6   for The Mustang Shop dba TMS Performance, which listed the owners of the business as

7   "Al & Chuck" with a photo of both individuals; agents identified "Al" in this photograph

8   as Alvaro Valencia based on a comparison to his driver's license photograph. Agents

9   conducted open source research on businesses associated with Alvaro Valencia and

10  located a business called SPS Cylinder Heads with Chuck Greene and Alvaro Valencia as

11  the governing people and with **Subject Premises 69** as the business address.

12      298.    Agents then identified a second number for Alvaro Valencia in a Kent

13  Police Department incident report, dated September 6, 2018, in which Alvaro Valencia

14  reported a theft at the Mustang Shop, **Subject Premises 69**. The incident report stated

15  that Alvaro Valencia identified himself as the owner of the Mustang Shop and provided

16  his phone number as (520) 979-4192 (TT89), which is not TT88. In another Kent Police

17  Department incident report, however, dated December 11, 2016, Alvaro Valencia

18  reported malicious mischief at TMS Performance and provided his cell phone number as

19  (520) 979-4192 (TT89), the same number provided in the later report, and his work

20  number at TMS Performance as TT88.

21      299.    Agents also identified a Facebook account under the username "Alvaro

22  Valencia" that was open to the public and contained numerous photographs, including

23  selfie-style photographs of Alvaro Valencia, identified based on a comparison to his

24  driver's license photograph, and various Ford and Ford Mustang vehicles. On the Wall

25  Posts of this Facebook page, agents located the following photograph:

26

27

AFFIDAVIT OF SHAWNA MCCANN - 147
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12



Agents believe that this photograph depicts a firearm with gold-plated/designed hand grips posted by Alvaro Valencia. Based on my training and experience, I know that drug traffickers connected to Mexican cartel traffickers frequently carry firearms with gold-plated/designed hand grips as a means of showing their status in the drug trafficking organization.

### 2.   *Alvaro Valencia's Prior Drug Trafficking Communications on TT88 and TT89*

300.   In 2019, DEA Tucson was investigating Alejandro Beltran for narcotics trafficking. Specifically, DEA Tucson believed that Alejandro Beltran was trafficking narcotics, primarily methamphetamine and cocaine, from the Tucson area to the east coast of the United States via large trucks or tractor-trailers. During this DEA investigation, DEA Tucson obtained several wiretap orders, issued by the District of Arizona, to intercept communications of Alejandro Beltran's cell phone. During these wiretaps, DEA Tucson collected numerous intercepted communications between Alejandro Beltran and other members of his drug trafficking organization discussing narcotics trafficking activities. DEA Tucson's investigation culminated in the arrest and

AFFIDAVIT OF SHAWNA MCCANN - 148
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   indictment of Alejandro Beltran and five other individuals for controlled substances,

2   firearms, smuggling, and kidnapping offenses.

3       301.    In late 2019 and early 2020, the DEA Tucson investigation intercepted

4   communications between Alejandro Beltran and Alvaro Valencia using TT88 and TT89.

5   Agents believe that the user of TT88 and TT89 at the time was Alvaro Valencia because

6   (1) the communications were intercepted after the police reports described above were

7   filed, in which Alvaro Valencia provided TT88 and TT89 as his contact numbers;

8   (2) during an intercepted call between Alvaro Valencia using TT88 and Alejandro

9   Beltran, Alvaro Valencia told Beltran to call him on his cell phone (TT89) because the

10  number Alvaro Valencia was using at that time, TT88, "is the shop number" (Session

11  4219); and (3) the subscriber information from the phone provider for TT89 showed that

12  TT89 was activated on March 7, 2016 and the subscriber information had not changed

13  since activation, indicating the user, Alvaro Valencia, has used TT89 since March 7,

14  2016.[60]

15      302.    On January 13, 2020, at approximately 2:52 p.m., Alvaro Valencia using

16  TT88 called Alejandro Beltran at (520) 664-8300. (Session 5510.) During this call the

17  following discussion took place:

18      TT88: Where, where are you at?  El Charco [reference to a location known by
19              both parties]?

20      Beltran: Yes, here in town sir.

21      TT88: Alone?

        Beltran: Yes, go ahead.
22
        TT88: No, no, no well I wanted to talk to you about what we had talked about the
23              other day dude.  These guys [narcotics customers/re-distributors] they want,
24              they need . . . they need things well.

25      Beltran: Let's see, tell me.

26      TT88: And they are, they are asking me for a price [for narcotics] well.

27  ――――――――――――――
    [60] DEA Tucson agents provided linesheets of these intercepted communications, which contained typed
    transcriptions of the content of the communications, between Alvaro Valencia and Alejandro Beltran to FBI Seattle.

1   Beltran: What – [narcotics] do they need – do they want to buy it [narcotics] at . . .
2           there, there where . . . we leave, there where your nephew is at or where do
        they want it to buy?

3   TT88: Yeah.

4   Beltran: There?

5   TT88: Yeah, right there.

6   Beltran: The, the . . . the white one [likely reference to cocaine], right?

7   TT88:  Yeah.

8   Beltran: Uh . . . honestly, honestly the one we have is ninety-eight, ninety-six of
9           purity [good quality narcotics].  They can test it [narcotics purity] out.

10  TT88: Mhm.

    Beltran: Guaranteed.  [Voices overlap]
11
    TT88: Mhm.
12
    Beltran: Hand to hand.  Without being worked [cutting agents have not been added
13          to the narcotics]. . . without being worked.  Pure.

14  TT88: Okay.

15  Beltran: It's from hand to hand and . . . I can give it to you at twenty-four and a
16          half [$24,500 per kilogram].  Twenty-four and a half.

17  TT88: There in Tucson?

18  Beltran: Uh-huh.  But the quality is guaranteed!  It's . . . none of it is worked [not
            cut].  Not worked at all.  I mean, not – [Voices overlap]

19  TT88: And is, and that price, that price . . . what if we buy wholesale [buy
20          narcotics in bulk/large quantities]?

21  Beltran: Uh . . . wholesale, once we look at it as wholesale then we can at least
22          lower it five-hundred [discount of $500 off the price per kilogram for
            buying in bulk]. A five hundred and, and we can talk it over.  We can lower
23          it.

24  TT88: Okay.

    Beltran: Yes.
25
    TT88: What was I going to tell you?  And how much [narcotics] do you guys have
26          right now?

27

AFFIDAVIT OF SHAWNA MCCANN - 150
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Beltran: Well you say the word and I'll get them for you there with . . . there with the nephew, I'll get them there, what–, whatever you ask for.  [Sniffs] Whatever you guys ask for.

TT88: What was I going to tell you?  And, and um . . . and if we get it [narcotics] directly from over there from Mexico would it be cheaper?

Beltran: Um . . . no, the risk [of trafficking the narcotics across the Mexico-United States border] is a lot higher sir and, and for, for one . . . and for such a small . . . for such a small change [the lower prices from buying from Mexico is not worth the risk involved].  It's at the most a difference of . . . two, thousand, three thousand dollars [buying from Mexico would lower the prices for narcotics by $2,000-$3,000].  And, and honestly it's really hot [a lot of law enforcement scrutiny at the border] right now.  It's not worth it.

[Discussion of the increased cost and risk of crossing the U.S.-Mexico border with narcotics.]

Beltran: Well you can risk it but it is real hot.  Real hot – [Voices overlap]

TT88: [Inhales] But that shit is guaran–, it's guaranteed, right?

Beltran: Guaranteed!  Guaranteed!  If you do not like it [the narcotics/quality] then the kilo [kilogram of cocaine] that you don't want can be returned.  It can be tested out at the li–, at the town.  I guarantee you that it's a ninety-eight [98% in purity].  Ninety-eight . . . of quality.

TT88: [Exhales]

Beltran: There are no let downs there.  There are no let downs there.  [Voices overlap]

TT88: And everything is the same, right [same type of narcotics/quality]?

Beltran:  Everything is the same, all the – everything is the same.

TT88: Uh.  Okay.  Let me talk with these guys [Alvaro Valencia's drug trafficking associates] and I'll, I'll give you a call when I can.

Beltran: Mhm that is guaranteed.  Whichever you don't like it, it can be returned, but from there all of them will be the same.  All of them.

TT88: And, and, and how . . . and how . . . how do these guys want to work?  What . . . that we get the product [narcotics] and pay them [suppliers] later or do they want, do they want the exchange [narcotics in exchange for money to purchase narcotics] right then and there?

Beltran: Um . . . well to start uh, well . . . pay in cash, you know, give and take.  Um . . . once there is trust well then, then, once the ice is broken then we

AFFIDAVIT OF SHAWNA MCCANN - 151
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

can start looking into it, you now?  One can, can talk with the man [supplier] and . . . and for there to be way for them to come through, that they won't run and none of that and well . . . it's guaranteed and a few [kilograms of cocaine] can be lent out [given to Alvaro Valencia without payment up front], you know? A few.

TT88: Okay.

Beltran: But to start – [voices overlap]

TT88: All right well – let me talk with this fool and I'll call you right now to see what is up.

Beltran: You got it.

TT88: All right, then.

Beltran: All right.

303.    Based on my training and experience, I believe that Alvaro Valencia using TT88 was talking to Alejandro Beltran about Alvaro Valencia getting several kilograms of cocaine from Alejandro Beltran in Tucson to be brought to the Seattle area, and that Alvaro Valencia and Alejandro Beltran discussed pricing for the kilograms of cocaine at $24,500 each, with a possible discount of $500 off per kilogram of cocaine if Alvaro Valencia bought a large amount of cocaine kilograms, *i.e.* "wholesale.  Alvaro Valencia asked whether it would be cheaper to get kilograms of cocaine from Mexico instead of Tuscon, but Alejandro Beltran stated that the risk of getting caught crossing the border into the United States with the narcotics was too great and that law enforcement scrutiny at the U.S.-Mexico border was high at that time. Alvaro Valencia ended the call by stating that he would talk to his drug trafficking associates, presumably in the Seattle area where Alvaro Valencia is located, and then contact Alejandro Beltran again.

304.    Alvaro Valencia also used TT89 to communicate with Alejandro Beltran regarding narcotics trafficking.  For example, on January 23, 2020, at approximately 2:01 p.m., Alejandro Beltran using (520) 664-8300 called Alvaro Valencia using TT89. (Session 6308.)  After greeting each other, the following discussion took place:

Beltran: Nothing, regarding, regarding, [Stammers] regarding the work, did they get back to you?

AFFIDAVIT OF SHAWNA MCCANN - 152
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   TT89: Uh . . . ye– [Voices overlap]

2   Beltran: Regarding what we had talked about– [Voices overlap]

3   TT89: Ye–ye–yeah, yeah, well yeah, but, but [Stammers] uh. . . right now – well
4   it's because the price, the price that they are getting it [cocaine] in Tijuana
    [Mexico] for it's a lot cheaper well.

5   Beltran: Oh, they are getting it – how much are they getting it [cocaine] for over
6   there?

7   TT89: In the – over there, over there – well they are giving it [cocaine] to them,
    there on the other side [in Mexico], not on this side. Uh . . . they are giving
8   it for, they are getting it [a kilogram of cocaine] for twenty-two, five
9   hundred [$22,500].

10  Beltran: Twenty-two, five hundred? Oh, yeah!  Yeah because we can–[Voices
    overlap]

11  TT89: So–[Voices overlap]

12  Beltran: We could get in on the American side; however the problem would be
13  getting through the checkpoint well.

14  TT89: Mhm! Mhm! [Voices overlap]

15  Beltran: That's the risk.

16  TT89: Yeah, because over there it's– [Voices overlap]

17  Beltran: And over there there's no checkpoint. Right?  There's no check point over
    there? – [Voices overlap]

18  TT89: No– [Voices overlap]

19  Beltran: Or there is one?

20  TT89: No, yes there is one– [Voices overlap]

21  Beltran: Yeah, there is one! [Voices overlap]

22  TT89: There's one as you leave San Diego.

23  Beltran: Yeah, there is one!  Because over here through our town there's that one,
    and then over here–[Voices overlap]
24
25  TT89: [Grunts] [Voices overlap]

    Beltran: Through Nogales there's the other one, big one.  You see–[Voices
26  overlap]

27  TT89: Yeah! Yeah! Yeah!

    Beltran: And also [audio glitch] we would need to–[Voices overlap]

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT89: Watch hold on–[Voices overlap]

Beltran: Pay for the [narcotics trafficking] trip–[Voices overlap]

TT89: Hold on! Hold on! Hold on, I'm going to, I'm going to call you from a
different phone–[Voices overlap]

Beltran: All right–[Voices overlap]

TT89: I'll call you right back–[Voices overlap]

Beltran.  All right!  Sounds good!

305.    Two minutes after this call began, at approximately 2:03 p.m., Alvaro
Valencia using his other phone, TT88, called Alejandro Beltran at (520) 664-8300.
(Session 6310.)  During this call, Alvaro Valencia and Alejandro Beltran continued to
discuss a deal for cocaine, including its quality and the opportunity for the buyer to test
the cocaine before purchasing it.  During the call, Alejandro Beltran asked "if they
happened to buy a few of them [kilograms of cocaine], how many would they purchase,"
to which Alvaro Valencia replied "[a]t least, at least five, between five and ten
[kilograms]."  Alvaro Valencia then stated that, "what they are going to want is going to
ask for, is just one [kilogram] to start," so that the buyers would be able to "test it [for
quality]." Based on my training and experience, I believe that Alvaro Valencia and
Alejandro Beltran continued to discuss the purchase of and pricing for multiple kilograms
of cocaine, that Alvaro Valencia found that he could purchase kilograms of cocaine in
Tijuana, Mexico for $22,500, and that Alvaro Valencia ultimately told Alejandro Beltran
that he was interested in purchasing between 5 and 10 kilograms of cocaine, but initially
wanted to buy only one kilogram of cocaine to test the quality.

### 3.   *Alvaro Valencia's Common Contacts with Cesar Arambula Relating to Drug Trafficking*

306.    Based on toll record analysis on Cesar Arambula's cell phones, including
TT58 and TT59, agents identified Alvaro Valencia as a high-frequency contact using
both phone numbers TT88 and TT89.  A comparison of toll record analyses for Cesar
Arambula's phones (TT58 and TT59), and Alvaro Valencia's phones (TT88 and TT89),
revealed a number of recent common contacts, including contacts believed to be drug

1  trafficking associates of Cesar Arambula.  For this reason, agents believe that Alvaro
2  Valencia continues to be involved in drug trafficking.

3      307.    Additionally, as set forth above, Cesar Arambula also made a trip to
4  California from January 3 to 5, 2021, which agents believe was for the purpose of drug
5  trafficking, specifically to bring money to California and/or bring cocaine back to
6  Washington state. Later on the same day that Cesar Arambula returned, on January 5,
7  2021, from approximately 4:19 p.m. to 4:36 p.m. and again on January 6, 2021, from
8  approximately 4:32 p.m. to 5:25 p.m., GPS location data for TT59 showed that Cesar
9  Arambula went to **Subject Premises 69**. Cesar Arambula also visited other drug
10 trafficking associates on January 5, 2021, including Samuel Duarte Avila. GPS location
11 data for TT59 also showed that Cesar Arambula went to **Subject Premises 69** on January
12 28, 2021, from approximately 12:48 p.m. to 1:22 p.m. and again on February 4, 2021,
13 from approximately 2:22 p.m. to 2:58 p.m. Agents conducted a search for all registered
14 vehicles to Cesar Arambula and conducted physical surveillance on Cesar Arambula,
15 including at his residence, and have not observed him owning or driving a Ford vehicle,
16 let alone a Ford Mustang. Accordingly, agents believe that Cesar Arambula's frequent
17 trips to **Subject Premises 69** are for drug trafficking purposes, and not for legitimate
18 business purposes. On May 28, 2021, at approximately 9:07 a.m., agents observed Alvaro
19 Valencia, identified based on a comparison to his driver's license photograph, exit
20 **Subject Premises 70**, get into a gray 2013 BMW 528 bearing Washington license
21 BOL1484 registered to Mathew Valencia at **Subject Premises 70**, and depart. On June 2,
22 2021, at approximately 11:13 a.m., agents observed the same gray BMW bearing
23 Washington license BOL1484 parked at **Subject Premises 69**. Additionally, **Subject
24 Premises 70** is listed as Alvaro Valencia's residence on his driver's license.

25          *a.  UM0084*

26     308.    As set forth above, agents seized a cell phone from Cesar Arambula during
27 the interdiction stop on January 14, 2021. A search and review of the text messages on
   this cell phone showed drug trafficking text messages between Cesar Arambula and an

AFFIDAVIT OF SHAWNA MCCANN - 155
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

unknown individual at phone number (213) 432-0084 (TT65 and referred to as "UM0084"). These text messages indicated that UM0084 was Cesar Arambula's cocaine source of supply. For example, on December 14, 2020, UM0084 using TT65 and Cesar Arambula exchanged the following text messages:

TT65: It was short last time 600 [$600]

TT65: How many [kilograms of cocaine] u want?

TT65: There 35 [$35,000 per kilogram of cocaine].

TT65: Tell him 35 [$35,000 per kilogram of cocaine].

Arambula: 2 [kilograms of cocaine] did they [price] go up

309.    Based on my training and experience, I believe that UM0084 told Cesar Arambula that he was short $600 from a prior narcotics transaction and asked how many kilograms of cocaine Cesar Arambula wanted to buy this time at $35,000 per kilogram; Cesar Arambula said he wanted two kilograms of cocaine and asked if the price per kilogram had increased. I know that $35,000 is within the range of the price for a kilogram of cocaine, at the time of this discussion.

310.    On January 1, 2021, UM0084 using TT65 sent Cesar Arambula the following text messages:

TT65: Hey put all your money in the backpack we taking our money with us something's telling met o take all the money.

TT65: Or hide it really good.

311.    Based on my training and experience, I believe that UM0084 was suspicious of law enforcement or rival traffickers and told Cesar Arambula to relocate or hide his narcotics proceeds.

312.    On January 8, 2021, UM0084 using TT65 and Cesar Arambula exchanged the following text messages:

Arambula: Has he [supplier] said anything about the price [for cocaine]. Dulces.
TT65: No.

AFFIDAVIT OF SHAWNA MCCANN - 156
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT65: Why?

Arambula: Phil [an associate of Cesar Arambula] was asking.

TT65: Still 34500 [$34,500 for a kilogram of cocaine].

TT65: They went down to 32500 [$32,500 for a kilogram of cocaine].

TT65: But tell him [Phil] 34 [$34,000].

Arambula: Ok.

Arambula: That's what i was going to say.

TT65: Okay.

313.    Based on my training and experience, I believe that Cesar Arambula asked UM0084 for the current pricing for a kilogram of cocaine and that UM0084 told Cesar Arambula that the price was $32,500, but that Cesar Arambula should tell his associate that the price was $34,000, thereby increasing Cesar Arambula's and UM0084's profits.

314.    Agents obtained toll records for UM0084, which showed that UM0084 has been in contact with numerous drug traffickers working with, or believed to be working with, Cesar Arambula, including Samuel Duarte Avila, Rafael Ramirez, an unidentified male using phone number (425) 902-3847, an unidentified male using phone number (206) 407-8572, an unidentified male using phone number (253) 561-6728, and an unidentified male using phone number (206) 261-5267. Toll records also showed that Alvaro Valencia using TT89 was in contact with UM0084 on January 15, 2021. As set forth above, on the evening of January 14, 2021, Cesar Arambula and Britney Ramirez were traffic stopped coming back from California with six kilograms of cocaine hidden in their vehicle. Based on the text messages between Cesar Arambula and UM0084, set forth above, and UM0084's contacts with multiple drug traffickers associated with Cesar Arambula, I believe that UM0084 was Cesar Arambula's source of supply of cocaine in California and that Alvaro Valencia's call with UM0084 the day after the traffic stop on Cesar Arambula and Britney Ramirez was related to Cesar Arambula's and UM0084's drug trafficking.

AFFIDAVIT OF SHAWNA MCCANN - 157
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### b. Philip Mendoza-Mercado, Jr.

315.     Agents obtained toll records for Alvaro Valencia using TT89(believed to be his personal number), which showed that Alvaro Valencia was in contact with the phone number (206) 673-6465, believed to be used by Philip Mendoza-Mercado, Jr.,[61] approximately 78 times between November 1, 2020 and January 10, 2021. Agents obtained toll records for Alvaro Valencia using TT88 (believed to be his business number), which showed that Alvaro Valencia was in contact with Philip Mendoza-Mercado, Jr. at phone number (206) 673-6465 two times on November 4, 2020 and once on February 4, 2021. Agents believe Philip Mendoza-Mercado Jr. is a drug trafficking associate of Cesar Arambula and that Alvaro Valencia's frequent contacts with Phillip Mendoza-Mercado Jr. further evidence Alvaro Valencia's common contacts with drug traffickers, including Cesar Arambula, UM0084, and Philip Mendoza-Mercado Jr., showing that Alvaro Valencia is also likely a drug trafficking associate of Cesar Arambula.

316.     Specifically, Philip Mendoza-Mercado Jr. and Cesar Arambula have met in person and communicated shortly before or after both of Cesar Arambula's short trips to southern California, which agents believe were short trips to southern California to pick up a load of narcotics for transportation back to Washington state, including the January 12, 2021 to January 14, 2021 trip to California, in which investigators seized six kilogram bricks of cocaine from Cesar Arambula's vehicle as he was returning from southern California. After Cesar Arambula's prior trip to California between January 3, 2021 and January 5, 2021 in which investigators believe Cesar Arambula picked up a load of narcotics and drove it back to Washington state, Cesar Arambula communicated with and

---

[61] This is an AT&T cellular telephone subscribed to Guillermina Mercado De M and believed to be one of multiple cell phones used by Philip Mendoza-Mercado Jr.  Agents know Guillermina Mercado and believe her to be connected to Philip Mendoza-Mercado Jr., such that he could use phones subscribed in her name.  Moreover, via remote video surveillance, investigators observed Philip Mendoza-Mercado Jr. meeting with Cesar Arambula shortly after pen register data for TT59 indicated that Cesar Arambula had spoken with this phone number. Additionally, investigators conducted social media checks on this phone number, and located a Telegram account with the user "Big Phil" associated with this number.

AFFIDAVIT OF SHAWNA MCCANN - 158
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   met with Philip Mendoza-Mercado Jr. on January 8, 2021. Specifically, on January 8,

2   2021, at approximately 12:38 p.m., investigators, via remote video surveillance, observed

3   a black Dodge Ram truck bearing Washington license plate C60481S pull up in front of

4   Cesar Arambula's residence (**Subject Premises 67**). The black Dodge Ram was

5   registered to Guillermina De M Mercado at 408 W Pine Street, Unit 108, Union Gap,

6   Washington. A female, identified as Guillermina Mercado based on a comparison to her

7   driver's license photograph, exited the driver's seat and an unidentified male exited the

8   passenger seat of the black Dodge Ram truck and met with a heavy-set male in Cesar

9   Arambula's driveway. Agents identified this heavy-set male as Philip Mendoza-Mercado

10  Jr. based on a comparison to his driver's license photograph. GPS location data for TT59

11  indicated that Cesar Arambula was at his residence during this time period. At

12  approximately 12:38 p.m., Philip Mendoza-Mercado Jr. got into the driver's seat of the

13  black Dodge Ram but got back out about one minute later and was observed holding a

14  cell phone in his hand, appearing to talk on speakerphone. Philip Mendoza-Mercado Jr.

15  followed Guillermina Mercado and the unidentified male into Cesar Arambula's

16  residence. At approximately 12:45 p.m., the unidentified male retrieved an unknown item

17  from the black Dodge Ram and went back inside Cesar Arambula's residence. At

18  approximately 12:47 p.m., Guillermina Mercado retrieved a black jacket out of the black

19  Dodge Ram and went back inside Cesar Arambula's residence. At approximately 1:18

20  p.m., Guillermina Mercado exited Cesar Arambula's residence carrying a black backpack

21  followed by Philip Mendoza-Mercado Jr. and an unidentified child. Guillermina Mercado

22  got into the driver's seat, Philip Mendoza-Mercado Jr. got into the passenger seat, and the

23  child got into the rear driver's seat of the black Dodge Ram, which then departed Cesar

24  Arambula's residence.

25      317.    Philip Mendoza-Mercado was convicted of felony drug possession with

26  intent to manufacture/deliver in September 2019 and served a prison sentence from

27  approximately October 2019 to mid-2020; he is currently on supervision for this drug

conviction. Guillermina Mercado was also arrested with Philip Mendoza-Mercado Jr.

AFFIDAVIT OF SHAWNA MCCANN - 159
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

pertaining to his most recent felony conviction; however, Guillermina Mercado was not charged as part of this case, despite evidence indicating Guillermina Mercado participated in Philip Mendoza-Mercado Jr.'s drug trafficking, including a search of Guillermina Mercado's cell phone, which showed that she sent money to Mexico and referred to "aguas" (both "aguas" and "water" are commonly used by some drug traffickers to refer to methamphetamine) on a few occasions, and a drug ledger, which contained the email address of guillerminamercado12@gmail.com. The ledger also contained lines of numbers including, "2 @ 2,600"; a total of 179,800 circled at the bottom with "SENT" written below it; many pages of names next to numbers, with some crossed out indicating a pay/owe sheet; and one page with "3 x 25.2" totaling "75,600," followed later by "4 @ 25.2," totaling "100,800." These amounts coincided with the wholesale cost of a kilogram of cocaine. In the same ledger was a reference to "19 bottles" totaling "53,200." Also, the term "agua/aguas" was again mentioned as a code word for methamphetamine; one in particular said "Se compraron 6 aguas a 2,600 entotal for 18,200 se les saco a 76,000," which translated to "they bought 6 waters at 2,600 totaling 18,200." These prices are consistent with the wholesale price of methamphetamine.

318.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that UM0323, believed to be Alvaro Valencia, is a cocaine trafficker working with Cesar Arambula who likely keeps his narcotics supply and proceeds in **Subject Premises 69** and **70**.

AFFIDAVIT OF SHAWNA MCCANN - 160
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

319.   Based upon my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

a.   Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed (pay-owe sheets), telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, vehicles, storage lockers, and businesses.

b.   Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization. Traffickers commonly maintain this information in books or papers as well as in their cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

c.   Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences, vehicles, and storage lockers. This evidence often includes not only contraband and paraphernalia, but also financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes. Drug traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product. These individuals often maintain these photographs and recordings in their possession or at their premises.

AFFIDAVIT OF SHAWNA MCCANN - 161
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.     During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings which show ownership, dominion, and control of vehicles, residences, and/or storage units.

e.     Persons trafficking and using controlled substances commonly sell or use more than one type of controlled substance at any one time.

f.     Traffickers frequently maintain items necessary for weighing, packaging, and cutting drugs for distribution. This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

g.     It is common for drug dealers to also be users of their product, and that it is common for the drug user to maintain paraphernalia associated with the use of controlled substances.

h.     Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of controlled substances, including travel records, in locations convenient to them, such as their residences and vehicles.

i.     Traffickers frequently keep on hand amounts of United States currency in order to maintain and finance their ongoing narcotics business. They commonly deal in currency because of its untraceable nature. They sometimes convert their illicit currency into currency equivalents such as cashier's checks and money orders. Traffickers often conceal in secure locations such as their residences and vehicles currency, financial instruments, precious metals, jewelry, and other items of value which are the proceeds of drug transactions, and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities, and financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, and

other records showing the management of such assets. Traffickers often have money counters.

j. Traffickers often maintain weapons, including guns, ammunition, and body armor, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k. Traffickers often have false identification documents and identification documents in the names of others in order to conceal their identities.

l. Traffickers very often place assets in names other than their own, or use fictitious names and identification, to avoid detection of these assets by government agencies. Even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

m. Illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale and, similarly, such drug traffickers will have an "inventory" which will fluctuate in size depending upon various factors to include the demand and supply for the product. I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

320.    As noted above, drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines

AFFIDAVIT OF SHAWNA MCCANN - 163
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

a. The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source or was intercepted on a wiretap here or in another district.

b. The stored list of recent received calls and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors, and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user

AFFIDAVIT OF SHAWNA MCCANN - 164
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    not part of the conspiracy, the information is helpful (and thus is evidence)

2    because it leads to friends and associates of the user who can identify the user,

3    help locate the user, and provide information about the user. Identifying a

4    defendant's law-abiding friends is often just as useful as identifying his drug-

5    trafficking associates.

6         c.    Stored text messages, emails, and any social media content/messages

7    (like Facebook messenger) are important evidence, similar to stored numbers.

8    Agents can identify both drug associates, and friends of the user who likely have

9    helpful information about the user, his location, and his activities.

10        d.    Photographs and video recordings on a cellular telephone, including

11   metadata, are evidence because they help identify the user, either through his or

12   her own picture/video, or through pictures/videos of friends, family, and associates

13   that can identify the user and the locations the user has been. Pictures/videos also

14   identify associates likely to be members of the drug trafficking organization. Some

15   drug dealers photograph/video groups of associates, sometimes posing with

16   weapons and showing identifiable gang signs. Also, digital photos often have

17   embedded "geocode" or GPS information embedded in them. Geocode

18   information is typically the longitude and latitude where the photo was taken.

19   Showing where the photo was taken can have evidentiary value. This location

20   information is helpful because, for example, it can show where coconspirators

21   meet, where they travel, and where assets might be located.

22        e.    Stored web browsing history is important evidence because it shows

23   the user's activities and places of interest, including if the user looked up

24   addresses, restaurants, and other businesses on a web browser on the cell phone,

25   which can show where coconspirators meet, where they travel, and where assets

26   might be located. Moreover, through web browsing history, a user can also access

27   or look up associates or coconspirators on social media, which is valuable

     information in a drug investigation because it will identify members of the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   organization, such as suppliers, distributors and customers.f.   Stored address

2   records are important evidence because they show the user's close associates and

3   family members, and they contain names and nicknames connected to phone

4   numbers that can be used to identify suspects.

5      g. Stored data in money transfer applications, such as Venmo and

6   CashApp, are important evidence because they show from whom and to whom the

7   user is sending money. In the era of digital currency and online money transfers, I

8   know based on my training and experience, and intercepted communications

9   during this investigation that drug traffickers, and specifically drug traffickers

10   within the Michael Walker DTO, use Cash App and other money transfer

11   applications to pay for drug products in lieu of physical cash. Accordingly, any

12   stored data on money transfer applications on cell phones can show the user's drug

13   trafficking associates, customers, and other connections.

14      h. Stored location data, including from any map applications on the cell

15   phone, are important evidence because the data can show where the user has been,

16   including addresses of residences and business parking lots, which can show stash

17   house locations, drug transaction meeting locations, or the addresses of a drug

18   trafficker's associates, customers, or suppliers.

19   ## JUSTIFICATION FOR NIGHTTIME SERVICE

20      321. During the course of this investigation, investigators have seized numerous

21   firearms. Additionally, during the course of this investigation, subjects of this

22   investigation or those associated with them have or are suspected to be involved in

23   incidents of shootings, robbery/burglary with the use of firearms, felon in possession of

24   firearms, and other crimes of violence. Additionally, physical surveillance and GPS

25   location data for several subjects' cell phones show that several subjects leave their

26   residence between 6:00 a.m. and 7:00 a.m. for work, Jason Hester and Elyas Kerow.

27   Currently, daybreak is occurring around 5:00 a.m. Investigators intend to serve these

warrants at 4:00 a.m., increasing the likelihood subjects are asleep as those serving the

AFFIDAVIT OF SHAWNA MCCANN - 166
USAO #2019R01083

1  search warrants approach the residences, decreasing the likelihood of subjects arming

2  themselves or destroying evidence prior to investigators knocking and announcing.

3  **CONCLUSION**

4      322.    Based on the above-described information, there is probable cause to

5  believe that contained within the locations and vehicles, described in Attachments A and

6  A1 through A48, there exists evidence, fruits, and instrumentalities, as described in

7  Attachment B, of violations of 21 U.S.C. §§ 841 and 846 (distribution of, and possession

8  with intent to distribute, controlled substances, and conspiracy to do the same), 21 U.S.C.

9  § 843(b) (use of communication facilities to commit, facilitate, or further an act or acts

10  which constitute a felony), 18 U.S.C. §§ 1956 and 1957 (money laundering and

11  conspiracy to do the same), 18 U.S.C. § 1952 (interstate and foreign travel to promote,

12  manage, establish, carry on, or facilitate unlawful activity), 18 U.S.C. § 924(c)

13  (possession of a firearm in furtherance of a drug trafficking crime), and 18 U.S.C.

14  § 922(g) (prohibited person in possession of a firearm), committed by Herbert Scott,

15  Edward Abercrombie, Sedric McNeair, Jason Hester, Sergio Reyes-Pina aka Gio, Samuel

16  Duarte Avila, Elyas Kerow aka E and Elias, David Armer, Brett Radcliff, Cresencio

17  Moreno Aguirre, Craig Fellers, James Fellers, Gabriel Timmen aka Gabe, Viet Nguyen

18  //

19  //

20  //

21

22

23

24

25

26

27

AFFIDAVIT OF SHAWNA MCCANN - 167
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  aka Tony, Raul Barreto Bejines, Humberto Flores, Cesar Arambula, Britney Ramirez aka

2  Brit, Rafael Ramirez, and UM0323 believed to be Alvaro Valencia.

3

4

5

6  _____
   Shawna McCann, Affiant
7  Special Agent, FBI

8      The above-named agent provided a sworn statement to the truth of the foregoing

9  affidavit by telephone on the 28th day of June, 2021.

10

11

12

13  _____
14  The Honorable Paula L. McCandlis
   United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

AFFIDAVIT OF SHAWNA MCCANN - 168
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Items to Be Seized**

From the locations and vehicles listed in Attachment A, and A1 through A53 of
this warrant, the government is authorized to search for and seize the following items,
which are evidence, instrumentalities, and/or fruits of the commission of the following
crimes: distribution and possession with intent to distribute controlled substances, in
violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit
these offenses in violation of Title 21, United States Code, Section 846; laundering of
monetary instruments in violation of Title 18, United States Code, Sections 1956 and
1957, and conspiracy to commit the same; use of a communications facility to commit,
facilitate, or further acts which constitute a felony drug offense in violation of Title 21,
United States Code, Section 843(b); interstate and foreign travel to promote, manage,
establish, carry on, or facilitate unlawful activity, in violation of Title 18, United States
Code, Section 1952, in violation of Title 21, United States Code, Section 952; possession
of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United
States Code, Section 924(c); and prohibited person in possession of a firearm, in violation
of Title 18, United States Code, Section 922(g), including the following:

1. Any controlled substances and suspected controlled substances, including but
not limited to cocaine, crack cocaine, and marijuana.

2. Drug paraphernalia, meaning items used or intended to be used to store,
process, package, use, and/or distribute controlled substances, such as plastic bags,
cutting agents, scales, measuring equipment, chemicals or similar items used to test the
purity and/or quality of controlled substances, and similar items.

3. Drug transaction records, meaning documents such as ledgers, receipts, notes,
and similar items relating to the acquisition, transportation, and distribution of controlled
substances.

4. Customer and supplier information, including items identifying drug customers
and drug suppliers, such as telephone records, personal address books, correspondence,

diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

     5. Financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents/titles, financial instruments, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, business records, documents related to the purchase, sale, and improvement of real estate, and any other records that show income and expenditures, net worth, or relate to obtaining, transferring, secreting, laundering, or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances.

     6. Cash, precious metals, jewelry, and other similar items of value, and/or proceeds of drug transactions, as well as money counters.

     7. Documents and other property, such as photographs, mail, or other items, tending to show who resides in and has dominion and control over the location.

     8. Firearms or parts thereof, ammunition, firearms magazines, firearms accessories, body armor, firearms boxes, firearms manuals, records of the purchase of firearms, or other items related to the ownership or use of firearms.

     9. Cell phones and other communications devices. If such cell phones or other communications devices are seized, the government may search them without further authorization for the following items:

     a. Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

     b. Stored list of recent received, sent, and missed calls;

     c. Stored contact information;

     d. Stored photographs, videos, addresses, calendar notes, notes, map history, or documents/files of or related to narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data or other metadata associated with those photographs, videos, and other items;

e. Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services where the data is stored on the telephone;

f. Stored emails related to the aforementioned crimes of investigation;

g. Stored voicemails related to the aforementioned crimes of investigation;

h. Stored web browsing history related to the aforementioned crimes of investigation;

i. Stored social media content/history related to the aforementioned crimes of investigation;

j. Stored banking or money transfer history, including application based money transfer data/history (i.e. Venmo or CashApp account data/history); and

k. Stored location data, including from any map applications on the cell phone.

The applied-for warrant authorizes the forensic examination of any seized cell phone or other communication device for the purpose of identifying electronically stored data described herein. This review may be conducted by any federal or local government personnel, sworn or non-sworn, assisting in the investigation, who may include, in addition to law enforcement officers and agents, federal and local contractors and support staff, attorneys for the government, attorney support staff, and technical experts. Pursuant to the requested warrant, the FBI may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# ATTACHMENT C

| Code | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), 841(b)(1), and 846 | Distribution of, and possession with intent to distribute, controlled substances, and conspiracy to commit these offenses |
| Title 18, United States Code, Sections 1956 and 1957 | Money laundering and conspiracy to launder money |
| Title 21, United States Code, Section 843(b) | Use of communication facilities to commit, facilitate, or further an act or acts which constitute a felony |
| Title 18, United States Code, Section 1952 | Interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity |
| Title 18, United States Code, Section 924(c) | Possession of a firearm in furtherance of a drug trafficking crime |
| Title 18, United States Code, Section 922(g) | Prohibited person in possession of a firearm |